hold that in a case such as this one, where: (1) the claim before the bankruptcy court is wholly

derived from another legal claim already pending in a parallel, out-of-state, non-bankruptcy

proceeding; and (2) the pending original, or "source," claim was filed in a court prior to the

commencement of the bankruptcy case, bankruptcy courts should apply the choice of law rules

of the state where the underlying prepetition claim was filed.

We therefore VACATE the district court's order and REMAND the case to the district

court with instructions to remand the case to the bankruptcy court and, in so doing, instructing

the bankruptcy court to apply the choice of law rules of Connecticut to decide Statek's motion

for reconsideration.

## I.    Background

Coudert, the debtor in this case, was for over a century one of the world's leading

international law firms.  The claimant is one of Coudert's former clients, Statek Corporation.[1]

Statek's claim is based on an asserted tort, legal malpractice, committed by Coudert against

Statek during the course of their attorney-client relationship.  Statek's allegations are roughly as

follows.

From 1984 until 1996, Statek was controlled by Hans Frederick Johnston.  Johnston, who

had obtained control of the company by fraud, devoted most of his tenure with Statek to looting

the corporate treasury and traveling lavishly at the company's expense.  In furtherance of his

schemes, Johnston caused Statek to retain Coudert in 1990.  Although Coudert's fees were paid

---

[1] Statek originally filed the proof of claim on behalf of itself and its parent corporation, Technicorp International II, Inc. ("TCI-II").  TCI-II was subsequently dropped from the complaint underlying the proof of claim, however, and Statek proceeded through the claim objection proceeding as the only claimant.

3

by Statek, the firm counseled Johnston personally, helping him to hide and launder various assets

stolen from Statek.  Among other things, lawyers in Coudert's London office created secret shell

corporations, established offshore asset protection trusts, procured safe deposit boxes in the

name of those trusts, assisted with West Indian real estate purchases, and coordinated the

removal from the United States of a multi-million dollar art and stamp collection.

Eventually, Johnston's crimes were discovered.  He was removed from power and was

sued by Statek for fraud and waste.  While the fraud and waste lawsuit was ongoing, Statek

strove to locate company funds that Johnston and his associate Sandra Spillane misappropriated.

The search only intensified after Statek obtained a judgment against Johnston and Spillane for

over $30 million.  Progress was slow because Johnston had spread his ill-gotten gains widely,

moving money into and out of shell corporations, offshore trusts, art and collectibles, and a

variety of other laundering devices.  Many of the assets were believed to be in the hands of third

parties.

For assistance, Statek turned to its old law firm, Coudert.  As the fraud and waste lawsuit

got underway in 1996, Statek sent a request to Coudert for any information and all files relating

to its representation of Statek during the Johnston years.  Coudert responded with six files

pertaining mostly to the creation of a Statek subsidiary.  After Statek secured a large money

judgment against Johnston, it and two other judgment creditors forced Johnston into involuntary

bankruptcy in the United Kingdom.  At that point, a trustee was appointed for Johnston's estate

and charged with collecting its assets.  In 2002, the trustee approached Coudert for information

about its representation of Statek and learned about Courdert's work for Johnston moving art to

Europe.  More inquires led to more revelations.  By 2004, the trustee had learned of Coudert's

4

role in setting up Johnston's offshore asset protection trusts, obtaining secret safe deposit boxes, and facilitating the West Indian property deal.

Statek believes that Coudert's delay turning over files and information, to which as a former client it was entitled, allowed Johnston to irretrievably dispose of millions of dollars. Statek also asserts that if Coudert had been forthcoming about its representation during Johnston's reign, Statek would have saved the time and money it was forced to expend recovering assets hidden around the world. All told, Statek claims that Coudert's inaction has cost it in the neighborhood of $85 million.

In October 2005, Statek filed a malpractice lawsuit against Coudert in state court in Connecticut where Johnston had allegedly lived, run Statek, and received many of Coudert's services.[2] Several months later, Coudert—which was already in dissolution—filed a motion to dismiss Statek's action on the basis of lack of personal jurisdiction and *forum non conveniens*. On September 22, 2006, while that motion was pending, Coudert filed a petition for Chapter 11 bankruptcy in the Southern District of New York. This filing triggered an automatic stay of Statek's Connecticut action pursuant to 11 U.S.C. § 362. In the bankruptcy court, Statek thereafter filed a proof a claim based on its pending malpractice action, and it attached to its claim as an exhibit the complaint it had filed in state court almost a year earlier. In March 2007, Coudert removed the Connecticut action to the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1452, which allows for removal of any state court action

---

[2] The state action also named several individual partners at Coudert, but none of those parties are involved with the bankruptcy claim at issue here.

5

over which there is bankruptcy jurisdiction.[3]  Once the Connecticut action was removed, Statek

moved the bankruptcy court in New York for relief from the automatic stay so that it could

proceed with the malpractice action in federal district court in the District of Connecticut.

Coudert objected, and the two sides ultimately compromised:  the stay was lifted only as to

conducting discovery on and resolving Coudert's motion to dismiss in the Connecticut action.  In

February 2008, the district court in Connecticut (Underhill, *J.*) conditionally dismissed Statek's

complaint on *forum non conveniens* grounds, but Coudert would not consent to the conditions.[4]

The case thus remained pending in Connecticut and the stay was automatically reimposed.  In

June 2008, Statek again moved the bankruptcy court for relief from the stay, and the parties

again settled on less than a full relief from the stay.  In August 2008, the stay was partially lifted

so that Statek could file an amended complaint in the District of Connecticut, which was also

incorporated into its proof of claim pending in the bankruptcy court.  Additionally, the

bankruptcy court granted relief from the stay to allow for mediation between the parties and

Coudert's malpractice insurer with the hopes of liquidating the claim.  As might be inferred, the

mediation failed and, in March 2009, the Plan Administrator (Coudert's Chapter 11 Plan for

Liquidation having been confirmed) filed a motion in bankruptcy court to disallow the claim.

Although motions to disallow claims are "core proceedings" for the purposes of 28 U.S.C. § 157,

the validity of Statek's claim turned on a finding of tort liability against Coudert.  Under these

---

[3] Because Statek sought damages from Coudert, the Connecticut action was certainly
"related to" Coudert's bankruptcy case, and the bankruptcy court thus had original, though not
exclusive, jurisdiction over it pursuant to 28 U.S.C. § 1334(b).

[4] The district court made dismissal contingent on Coudert (1) agreeing to lift the
automatic stay, which would permit Statek to file in another forum, and (2) waiving any statute
of limitations defense in the new forum.

6

circumstances, the bankruptcy court—with the consent of the parties—applied the procedural

rules of an "adversary proceeding" to the dispute, treating the Plan Administrator's motion to

disallow as a Fed. R. Civ. P. 12(b)(6) motion to dismiss.

In July 2009, the bankruptcy court, relying on our decision in *Bianco v. Erkins (In re*

*Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001), applied New York choice of law rules to

Statek's claim.  Under New York's anti-forum shopping "borrowing statute," N.Y. C.P.L.R. §

202, the bankruptcy court determined that because Statek was a non-resident, its claim must be

judged by the shorter of either New York's statute of limitations or the statute of limitations of

the jurisdiction where the claim accrued (presumably Connecticut or the United Kingdom).  As

Statek had already conceded that its claim was untimely under the New York statute of

limitations, the bankruptcy court determined that provision to be as short as or shorter than any

other possibilities, applied it, and disallowed the claim.

Statek filed an unsuccessful motion for reconsideration and then sought to have its claim

reinstated on appeal to the United States District Court for the Southern District of New York

(Hellerstein, *J.*).  That district court affirmed the bankruptcy court's two orders.  Statek now

appeals that decision.

**II.**     **Discussion**

      A.     <u>The District Court's Appellate Jurisdiction</u>

At the time Statek appealed to the district court, a party seeking review of a bankruptcy

judge's decision had ten days from "the date of the entry of the judgment, order, or decree" to

file a notice of appeal to a district court or bankruptcy appellate panel.  Fed. R. Bankr. P. 8002(a)

7

(2009).[5] The ten-day deadline is tolled if one of a specified list of motions is filed in the

bankruptcy court.  *See* Fed. R. Bankr. P. 8002(b) (2009).  But once the time to appeal runs, a

district court or bankruptcy appellate panel has no jurisdiction to consider an untimely appeal.

"[T]he time limit contained in Rule 8002(a) is jurisdictional, and . . . in the absence of a timely

notice of appeal in the district court, the district court is without jurisdiction to consider the

appeal, regardless of whether the appellant can demonstrate 'excusable neglect.'"  *Siemon v.*

*Emigrant Sav. Bank (In re Siemon)*, 421 F.3d 167, 169 (2d Cir. 2005).

 Appellee Plan Administrator challenges the timeliness of Statek's appeal to the district

court from the bankruptcy court's initial order disallowing the claim.[6]  (Appellee's Br. 2 n.2.).

Its argument is based on the following timeline:

| | |
|---|---|
| 7/21/2009 | Bankruptcy court order disallowing Statek's claim. |
| 7/31/2009 | Statek's motion for reconsideration filed. |
| 9/8/2009 | Bankruptcy court denies motion for reconsideration. |
| 9/16/2009 | Statek appeals both orders to the district court. |

---

 [5] Effective December 1, 2009, Rule 8002 now provides a fourteen-day window to file a
notice of appeal.

 [6] We may (and indeed must) consider the timeliness of the notice of appeal, even though
the Plan Administrator apparently failed to present the issue to the district court.  Rule 8002 is
jurisdictional.  *See In re Siemon*, 421 F.3d at 169.  A circuit court has an "independent obligation
to consider the presence or absence of subject matter jurisdiction *sua sponte*."  *Walters v. Indus.*
*& Commercial Bank of China, Ltd.*, 651 F.3d 280, 287 (2d Cir. 2011) (quotation marks omitted).
"For that reason, every federal appellate court has a special obligation to satisfy itself not only of
its own jurisdiction, but also that of the lower courts in a cause under review . . . ."  *Bender v.*
*Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quotation marks omitted).  "And if the
record discloses that the lower court was without jurisdiction this court will notice the defect,
although the parties make no contention concerning it."  *Id.*  "When the lower federal court lacks
jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of
correcting the error of the lower court in entertaining the suit."  *Id.* (alterations omitted).

Accordingly, regardless of whether the motion for reconsideration tolled the time to appeal the

bankruptcy court's initial order, Statek's appeal of that order disallowing its claim was untimely.

Its appeal of the denial of the motion for reconsideration, however, was timely.  The district

court's review—and, by extension, our review as well—is thus limited to the bankruptcy court's

denial of Statek's motion to reconsider.

      B.     Standard of Review

      When reviewing a bankruptcy court decision that was subsequently appealed to a district

court, we review the bankruptcy court's decision independent of the district court's review.  *U.S.*

*Lines v. United States (In re McLean Indus., Inc.)*, 30 F.3d 385, 387 (2d Cir. 1994); *see also*

*DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 94 (2d Cir.

2011) ("We look through the district court to the bankruptcy court's decision . . . .").  A

bankruptcy court's denial of a motion to reconsider a disallowed claim is a discretionary

decision, reviewed under the familiar and deferential abuse-of-discretion standard.  *See Univ.*

*Church v. Geltzer*, 463 F.3d 218, 228 (2d Cir. 2006); *see also Solow v. PPI Enters. (U.S.), Inc.*

*(In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 202 (3d Cir. 2003) (appeals court "review[s] the

Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its

exercises of discretion for abuse thereof" (quotation marks omitted)).  Although this standard

affords a bankruptcy judge substantial latitude, "we nonetheless remain mindful that a

bankruptcy court would *necessarily* abuse its discretion if it based its ruling on an erroneous

view of the law or on a clearly erroneous assessment of the evidence."  *Klein v. Wilson, Elser,*

*Moskowitz, Edelman & Dicker (In re Highgate Equities, Ltd.)*, 279 F.3d 148, 152 (2d Cir. 2002)

(alteration and quotation marks omitted, emphasis added).

9

C.    Choice of Law

We are faced in this case with apparently conflicting rules on choice of law in federal

cases.  It is well established that a federal court sitting in diversity must generally apply the

choice of law rules of the state in which it sits.  And it is now well established that a bankruptcy

court must also apply state choice of law rules.  But it is also clear that when a case is

transferred, the choice of law rules of the state in which the case was initially filed transfer with

it.  This case presents a hybrid situation, and requires us to decide which state's choice of law

rules should apply when a bankruptcy court sitting in one state is resolving a bankruptcy claim

arising from a state-law action previously filed in another state.

1.    *Choice of Law Rules in Diversity Cases*

When a federal district court sits in diversity, it generally applies the law of the state in

which its sits, including that state's choice of law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*,

313 U.S. 487, 496 (1941).[7]  "There is no federal general common law."  *Erie R.R. Co. v.*

*Tompkins*, 304 U.S. 64, 78 (1938).  Applying *Erie*, *Klaxon* held that state choice of law rules are

substantive state law.  313 U.S. at 496.  *Klaxon*'s logic provides important foundational

principles for our analysis in this case.  "Once it is recognized that federal choice of law rules are

a species of federal common law, the . . . ability of the federal courts to create federal common

law and displace state created rules is severely limited."  *In re Gaston*, 243 F.3d at 606.  The

federal courts are not powerless to displace state choice of law rules,[8] but, without express

---

[7] When a district court exercises federal question jurisdiction, federal law provides the
substantive rules of decision and there is generally no need to consider choice of law.

[8] This would be in contrast to any substantive state laws that relate exclusively to matters
outside the purview of the federal courts—perhaps, for example, certain elements of state family

10

authorization from Congress, we can do so only by making federal common law. Given the

separation of powers as between Congress and the judiciary, this is not the preferred method of

displacing state substantive law. Indeed, as the Supreme Court recently stated:

> Recognition that a subject is meet for federal law governance, however, does not
> necessarily mean that federal *courts* should create the controlling law. Absent a
> demonstrated need for a federal rule of decision, the Court has taken the prudent
> course of adopting the readymade body of state law as the federal rule of decision
> until Congress strikes a different accommodation.

*Am. Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2536 (2011) (emphasis added)

(citations and citation marks omitted); *see also Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63,

68 (1966) ("Whether latent federal power should be exercised to displace state law is primarily a

decision for Congress."). In most situations this "demonstrated need for a federal rule of

decision," *see American Electric Power*, 131 S. Ct. at 2536, arises because application of state

law would conflict with a federal policy or interest, *see Atherton v. FDIC*, 519 U.S. 213, 219

(1997).

## 2.    *Choice of Law Rules in Bankruptcy Cases*

*Klaxon* and its progeny set forth clear rules for federal courts sitting in diversity. But the

rules for bankruptcy courts are more difficult to discern. 28 U.S.C. § 1334(b) vests the district

courts with original jurisdiction over civil proceedings "arising under," "arising in," or "related

---

law. From a federalism perspective, the limits on the federal courts' power to create common
law track those of Congress's legislative power. *See Erie*, 304 U.S. at 78-79; *cf.* Paul M. Bator
et al., *Hart & Wechsler's The Federal Courts and the Federal System* 713-14 (2d ed. 1973)
(federally-created choice of law rules applicable in the federal courts do not create federalism
problems because Congress has the power to create, or delegate authority to create, rules for the
courts that are "necessary and proper" to the exercise of federal court jurisdiction).

11

to" cases under the Bankruptcy Code. Such jurisdiction extends not only to questions of federal law, but also to many state law disputes. *Erie* made clear that state law provides the rules of decision for the *merits* of state law claims in bankruptcy court. 304 U.S. at 77. Until recently, however, there was controversy about whether state or federal law should provide the means for choosing the state law that is ultimately applied to decide a state law claim in bankruptcy court—the choice of law. We partially resolved this issue in *In re Gaston*, 243 F.3d 601, where we held that state, not federal, choice of law rules must control.

*In re Gaston* concerned an adversary proceeding filed by the trustee of a bankrupt law firm's estate to collect unpaid legal fees from a former client. The bankruptcy proceedings were held in the Southern District of New York, and it was there that the trustee initiated the adversary proceeding. The client who owed the fees, however, lived in Idaho, and it was in Idaho where the law firm's services had been rendered. The district court[9]—without discussion—followed *Klaxon*, applied New York choice of law rules, and determined that New York's borrowing statute required application of the New York statute of limitations. 243 F.3d at 604, 609.

On appeal we held that, although the source of the district court's jurisdiction was bankruptcy, not diversity, *Klaxon* nevertheless provided guidance. *Id.* at 601-02. We recognized that because bankruptcy is a form of federal question jurisdiction, bankruptcy courts in some of our sister circuits apply federal choice of law principles rather than state choice of law rules, *see id.* at 605 & n.6 (citing cases), but we rejected this approach. We noted that after *Klaxon* federal

---

[9] At some point, pursuant to 28 U.S.C. § 157, the district court withdrew its referral of this proceeding and conducted a jury trial itself. *See In re Gaston*, 243 F.3d at 605 n.5.

12

choice of law rules must be regarded as "a species of federal common law." *Id.* at 606. And

because federal common law should be applied only where there is "a significant conflict

between some federal policy or interest and the use of state law," *id.* at 606 (quoting *Atherton*,

519 U.S. at 218), we were loath to use it. We concluded, therefore, that unless there was an

important federal interest or policy concern that would justify application of federal choice of

law rules in place of state choice of law, the district court's decision should stand. Finding no

such interest or concern, we affirmed the district court's decision to use state rather than federal

choice of law rules. *Id.* at 607.

>    3.    *Choice of Law Rules when Bankruptcy Claim Consists of a Previously-*
>          *Filed State-Law Action*

The bankruptcy court read *In re Gaston* as requiring it to apply the choice of law rules of

its forum state, New York, which thereby caused it to disallow Statek's claim. On appeal Statek

disagrees that New York's choice of law rules control. It argues that the applicable choice of

law rules are those of Connecticut, where Statek filed its original malpractice action. *In re*

*Gaston*, although adopting the general rule that bankruptcy courts must apply state choice of law

rules, provides no guidance as to *which* state's choice of law rules apply. That is a question of

first impression, to which *Klaxon* provides the answer.

As noted above, *Klaxon* partly concerned whether state or federal choice of law should

apply in diversity cases. But *Klaxon* also addressed *which* state's choice of law controls,

requiring district courts to apply the state choice of law rules of the state in which they sit. 313

U.S. at 496. Practically, this rule prevents forum shopping between the state and federal court

systems ("intra-state forum shopping"), which was apparently a serious problem in the pre-*Erie*

days of general federal common law. Back then, if the law applied by the federal district court

of a state was more favorable to plaintiffs than the law of that state's own courts, prospective

plaintiffs had an incentive to create diversity jurisdiction (often by reincorporating out of state)

and file in federal court. Indeed, the *Erie* Court's decision to eliminate general federal common

law was in part justified by intra-state forum shopping concerns. *See Erie*, 304 U.S. at 74.

*Klaxon* echoes *Erie*'s hostility toward intra-state forum shopping. By requiring federal

courts to treat a claim exactly the same as would the courts of the state in which they sit, *Klaxon*

ensures that a plaintiff's choice of forum within a given state will not be influenced by choice of

law considerations. According to the Court in *Klaxon*, any other result would allow "the

accident of diversity of citizenship [to] constantly disturb equal administration of justice in

coordinate state and federal courts sitting side by side." 313 U.S. at 496.

This effective bar on intra-state forum shopping comes, of course, at the expense of

permitting forum shopping between states ("inter-state forum shopping"), which *Klaxon* regards

as an unavoidable consequence of the federal system. *See* 313 U.S. at 496. Over time, however,

inter-state forum shopping has come to be perceived less as a necessary evil of federalism and

more as a right to be enjoyed by plaintiffs and protected for their benefit. Thus, in *Van Dusen*,

376 U.S. 612, the Supreme Court held that when a defendant obtains a change of venue under 28

U.S.C. § 1404(a), the choice of law rules of the state where the plaintiff originally filed the claim

"follow" the action to the new forum. In deciding the issue, the Court described the prerogative

federal law affords plaintiffs to choose among federal forums as a "venue privilege," and the

Court cautioned against construing § 1404(a) in a way that would "defeat the state-law

advantages that might accrue from the exercise of this venue privilege." *Van Dusen*, 376 U.S. at

635. When applying *Klaxon*, "the critical identity to be maintained is between the federal

14

district court which decides the case and the courts of the State in which the action was filed."

*Id.* at 639.

*Van Dusen*, in other words, is far less concerned about the fact that plaintiffs may engage

in inter-state forum shopping on the basis of competing choice of law doctrines than it is with

making sure that *only* plaintiffs engage in forum shopping. In deciding where to file a claim,

plaintiffs are permitted to forum-shop among state courts. But once that claim is filed,

defendants in state courts are generally locked into the forum unless removal is possible. If a

*defendant* could forum-shop using § 1404(a) to transfer venue and obtain different choice of law

rules, the defendant would "achieve a result in federal court which could not have been achieved

in the courts of the State where the action was filed," the main evil *Klaxon* sought to avoid. *See*

*Van Dusen*, 376 U.S. at at 638.

Any remaining doubt about the Supreme Court's tolerance for inter-state forum shopping

by plaintiffs was put to rest in *Ferens*, 494 U.S. 516. There, the Court extended *Van Dusen*'s

rule to cover *plaintiff-initiated* transfers under § 1404(a). *Ferens*, 494 U.S. at 519. While

recognizing its rule would allow plaintiffs to separate their shopping for favorable choice of law

rules from their ultimate choice of forum, *id.* at 531, the Court believed a plaintiff's right to shop

for favorable choice of law rules is so important that it should not be compromised "by being put

to a choice between a choice of law versus forum," *id.* at 529. Under *Ferens*, a plaintiff may

"have his cake and eat it too." *Id.* at 537 (Scalia, *J.*, dissenting).

Shopping for favorable choice of law rules very often comes down to shopping for

favorable statutes of limitations. *See, e.g.*, *Ferens*, 494 U.S. at 519-20; *Van Dusen*, 376 U.S. at

630-32 & n.26. To mitigate against abusive statute-of-limitations shopping, some states have

created mechanisms—binding on the local federal courts via *Klaxon*—that discriminate against claims accruing out of state.  New York's borrowing statute, N.Y. C.P.L.R. § 202, guards against forum shopping by out-of-state plaintiffs by mandating use of the *shortest* statute of limitations available.  If New York's statute of limitations is shorter than the statute of limitations of the place where the cause of action accrued, New York courts should apply the local rule; if the foreign statue of limitations is shorter, then that is what controls.

Given all this, it is perhaps not surprising that the issue at the heart of this case is—as it was in *In re Gaston*—whether New York's borrowing statute should apply in federal bankruptcy proceedings held in the Southern District of New York.  In *In re Gaston*, both principles underlying *Klaxon* were served by applying New York law (the forum state of the bankruptcy court in that action) to the trustee's collection action.  *In re Gaston*'s holding avoided relying on federal common law and also ensured that the trustee's claim would be treated the same in federal court as it would have been in state court.  We recognized that the facts of *In re Gaston* were largely analogous to a *non-transfer* diversity case.  The trustee for the law firm's estate brought, for the first time, a claim in bankruptcy court in New York that, but for the bankruptcy, could have been brought by the law firm in New York state court.  If the law firm in *In re Gaston* had attempted to collect on its unpaid fees in a New York court before bankruptcy was filed, New York's borrowing statute would have applied.  *Klaxon*'s goal of establishing equal treatment of claims by the state and federal courts would clearly have been violated by a rule applying a different state's law to the claim simply because the law firm filed for bankruptcy and its interest in the fees was assigned to the trustee of its estate.  In *In re Gaston*, the trustee—the

16

party bringing the claim—chose the forum, and principles of state/federal uniformity compelled us to apply the law of the state of that forum.

The same cannot be said in this case. Except by the most formalistic of interpretations, Statek—the claimant here—did not choose to litigate in New York. Instead, it affirmatively chose to file its complaint against Coudert somewhere else. The record is clear that Statek exercised its venue privilege in favor of Connecticut. Only in the midst of the Connecticut proceedings—well after they were initiated, when Coudert had filed for bankruptcy—did Statek come to New York. Realistically, Statek had no other option. *Cf. Stern v. Marshall*, 131 S. Ct. 2594, 2614 (2011) (creditor-plaintiff "did not truly consent to resolution of [state-law claims] in the bankruptcy court proceedings," because by operation of the Bankruptcy Code, "[h]e had nowhere else to go if he wished to recover from [the] estate."). That Statek's participation in the bankruptcy is an extension of the Connecticut action is beyond doubt. Statek could only hold itself out as a potential creditor in the bankruptcy by virtue of the pending Connecticut action, and, accordingly, its proof of claim was nothing more than a copy of the Connecticut complaint. The two proceedings are functionally one and the same.

Under these circumstances, it would be fundamentally unfair to allow Coudert's bankruptcy, coming as it did in the midst of the Connecticut action, to deprive Statek of the state-law advantages adhering to the exercise of its venue privilege. To hold otherwise would be to allow the defendant Coudert to use a device of federal law (the bankruptcy code) to choose the forum and accompanying choice of law—a practice forbidden by *Klaxon*. *See Van Dusen*, 376 U.S. at 638; *see also Ferens*, 494 U.S. at 524. It would also lead to the ironic result that New

17

York's anti-forum shopping borrowing statute would be applied to defeat the claim of a party that did not shop for New York as a forum.

We recognize that our opinion in *In re Gaston* employs some broad language, in dicta, that could be read as reaching every state law claim in every bankruptcy case without exception.[10] But *In re Gaston* did not address a claim like Statek's, which is identical to and inseparable from others pending between the parties in foreign jurisdictions. If *In re Gaston* were extended to reach such cases, we believe some of the very principles that case seeks to advance—namely harmony between state and federal courts—would be undermined.

For cases such as this one, we hold that bankruptcy courts should follow *Van Dusen* and look to the choice of law rules of the state where the underlying prepetition complaint was filed. This is the appropriate course of action where, as here:  (1) the claim before the bankruptcy court is wholly derived from another claim already pending in a parallel, out-of-state, non-bankruptcy proceeding; and (2) the pending original, or "source," claim was filed in a court prior to the commencement of the bankruptcy case.

### III.    Conclusion

In denying Statek's motion to reconsider, the bankruptcy court stated it was "bound by the Second Circuit's determination in *In re Gaston*" to apply New York choice of law rules. That reading of *In re Gaston* constituted a legal error, and thus *ipso facto* was an abuse of discretion. *See In re Highgate Equities, Ltd.*, 279 F.3d at 152. Statek's proof of claim was functionally an extension of its prepetition claim pending in a lawsuit against Coudert. By filing

---

[10] For example, our opinion in *In re Gaston* includes the statement:  "[W]e decide that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."  243 F.3d at 601-02.

the underlying action in Connecticut, Statek exercised its right as plaintiff to choose the venue in

which it wanted to litigate the claim, and it was entitled to take advantage of whatever choice-of-

law rules that selection entailed.  Coudert's subsequent filing for bankruptcy in New York,

which in essence approximated a defendant-initiated venue transfer, did not deprive Statek of the

state-law advantages attending its original choice of forum.

The portion of the district court's order affirming the bankruptcy court's July 21, 2009,

order disallowing claim number 239 is VACATED, and the case is REMANDED with

instructions to DISMISS IN PART for lack of subject-matter jurisdiction.  The portion of the

district court's order affirming the bankruptcy court's denial of Statek's motion for

reconsideration is REVERSED, and the case is REMANDED to the district court with

instructions to REMAND IN PART to the bankruptcy court with instructions to apply

Connecticut's choice of law rules in deciding Statek's motion to reconsider.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DENNIS JACOBS**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: February 28, 2012
Docket #: 10-2723bk
Short Title: In Re: Coudert Brothers LLP

DC Docket #: 09-cv-9561
DC Court: SDNY (NEW YORK CITY)
DC Judge: Hellerstein

## NOTICE OF DECISION

The court has issued a decision in the above-entitled case. It is available on the Court's website
http://www.ca2.uscourts.gov.

Judgment was entered on February 28, 2012; and a mandate will later issue in accordance with
FRAP 41.

If pursuant to FRAP Rule 39 (c) you are required to file an itemized and verified bill of costs you
must do so, with proof of service, within 14 days after entry of judgment. The form, with
instructions, is also available on Court's website.

Inquiries regarding this case may be directed to 212-857-8560.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DENNIS JACOBS**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: February 28, 2012
Docket #: 10-2723bk
Short Title: In Re: Coudert Brothers LLP

DC Docket #: 09-cv-9561
DC Court: SDNY (NEW YORK CITY)
DC Judge: Hellerstein

## BILL OF COSTS INSTRUCTIONS

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
*   be filed within 14 days after the entry of judgment;
*   be verified;
*   be served on all adversaries;
*   not include charges for postage, delivery, service, overtime and the filers edits;
*   identify the number of copies which comprise the printer's unit;
*   include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
*   state only the number of necessary copies inserted in enclosed form;
*   state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
*   be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DENNIS JACOBS**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: February 28, 2012
Docket #: 10-2723bk
Short Title: In Re: Coudert Brothers LLP

DC Docket #: 09-cv-9561
DC Court: SDNY (NEW YORK CITY)
DC Judge: Hellerstein

## VERIFIED ITEMIZED BILL OF COSTS

Counsel for

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to
prepare an itemized statement of costs taxed against the

and in favor of

for insertion in the mandate.

Docketing Fee

Costs of printing appendix (necessary copies _____ ) _____

Costs of printing brief (necessary copies _____ _____ ) _____

Costs of printing reply brief (necessary copies _____ ) _____

**(VERIFICATION HERE)**

_____
Signature

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                                               :
IN RE COUDERT BROTHERS LLP                                     :    **ORDER VACATING AND**
                                                               :    **REMANDING THE**
                                                               :    **DECISION OF THE**
                                                               :    **BANKRUPTCY COURT**
                                                               :
                                                               :    09 Civ. 9561 (AKH)
                                                               :
-------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

       Statek Corporation had a pending lawsuit against Coudert Brothers LLP, its former

attorneys, and filed a claim against Coudert in Coudert's bankruptcy, in the amount of approximately

$87 million. The Bankruptcy Court for the Southern District of New York (Drain, J.), dismissed

Statek's claim, holding in an order of July 22, 2009 that New York's choice of law rules (as well as New

York's borrowing statute, CPLR § 202) applied, and that the claim was barred by the running of

limitations. Statek appealed from that decision, and from the denial of its motion for reconsideration.

On June 14, 2010, I affirmed the ruling of the bankruptcy court. In re Coudert Bros. LLP, 09 Civ.

9561 (AKH), 2010 U.S. Dist. LEXIS 58467 (S.D.N.Y. June 11, 2010).

       Statek appealed my ruling, and on February 28, 2012 the Second Circuit vacated and

remanded. Following the Second Circuit's instructions, I rule that the portion of my order affirming the

bankruptcy court's July 21, 2009 order disallowing claim number 239 is dismissed for lack of subject

matter jurisdiction. The portion of my order affirming the bankruptcy court's denial of Statek's motion

for reconsideration is remanded to the bankruptcy court with instructions to apply Connecticut's choice

of law rules in deciding Statek's motion to reconsider.

       SO ORDERED.

Dated:     August ___, 2012
          New York, New York
                                 ALVIN K. HELLERSTEIN
                                 United States District Judge

HUGHES HUBBARD & REED LLP
Edward J.M. Little
Lisa A. Cahill
David B. Shanies
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Statek Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| Coudert Brothers LLP, | |
| Debtor. | Case No. 06-12226 (RDD) |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
## STATEK CORPORATION'S MOTION FOR RECONSIDERATION

In light of the Second Circuit's February 28, 2012 decision in this case, *In re Coudert Bros. LLP*, 673 F.3d 180 (2d Cir. 2012), and the District Court's August 21, 2012 remand order, Statek Corporation ("Statek") respectfully submits this memorandum of law in further support of its motion for reconsideration (Doc. No. 1210) ("Reconsideration Motion") of the Order dated July 21, 2009 (Doc. No. 1208) ("Order") granting the motion of Development Specialists, Inc. ("Plan Administrator"), in its capacity as Plan Administrator for Coudert Brothers LLP ("Coudert"), to disallow Claim No. 239 and/or Dismiss Statek's Amended Complaint (Doc. No. 1153) ("Motion to Dismiss").

As discussed more fully below, Connecticut's choice of law rules dictate that Connecticut law govern the timeliness of Statek's claims. Under Connecticut law, Statek's claims cannot be dismissed as untimely and the Plan Administrator's motion should be denied.

62052636_1

**S-110**

2

## BACKGROUND

As the Court is aware from Statek's prior submissions, *e.g.*, Doc. Nos. 1165 ("Motion to Dismiss Opp."), 1210 (Reconsideration Motion), and 1222 ("Reconsideration Motion Reply"),[1] Statek's claims against Coudert relate to a lawsuit Statek originally filed in 2005 in Connecticut Superior Court, alleging legal malpractice and other wrongs by Coudert that resulted in massive losses to Statek. The facts underlying Statek's claims are set forth in the Amended Complaint (Doc. No. 1153-8).[2]

1.      **The Plan Administrator's Motion to Dismiss**

The Plan Administrator filed its Motion to Dismiss on March 13, 2009; Statek filed its opposition to that motion on April 13, 2009; and the Plan Administrator filed a reply (Doc. No 1172) ("Motion to Dismiss Reply") on April 24, 2009. The parties' briefing focused on the Plan Administrator's primary argument that the Court should use New York choice of law rules to identify the statute of limitations applicable to Statek's claims. *See, e.g.*, Motion to Dismiss at 8-12. Nevertheless, both parties briefly addressed the application of Connecticut's limitations law, with the Plan Administrator relying on the three-year limitations period for tort actions set forth in Connecticut General Statutes § 52-577, *id.* at 14, and Statek arguing that its claims were timely filed under Connecticut law because the statute was tolled by Coudert's "continuing course of conduct," Motion to Dismiss Opp. at 46.

---

1. In light of the voluminous prior briefing, Statek refers to and incorporates by reference its earlier submissions detailing the factual background and procedural history of its claims. This memorandum will focus on more recent developments, particularly the Second Circuit's decision.

2. For purposes of this Motion and the Plan Administrator's underlying Motion to Dismiss, the facts as pled in the Amended Complaint must be accepted as true, and all inferences from the pleaded facts drawn in Statek's favor. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Securities LLC*, 568 F.3d 374, 377 (2d Cir. 2009) (citing *Wojchowski v. Daines*, 498 F.3d 99, 104 (2d Cir. 2007)).

The Court heard oral argument on May 18, 2009, and, applying New York's borrowing statute, ruled that Statek's claims were time-barred under New York's statute of limitations. *See* Ex. A (May 18, 2009 Transcript) at 94-95; *see also* Order at 1-2.

### 2. Statek's Motion for Reconsideration

Statek filed the Motion on July 31, 2009, seeking reconsideration of the Order and asking the Court to apply Connecticut choice of law rules to determine the applicable statute of limitations. Reconsideration Motion at 2-3. The Plan Administrator filed its opposition to the Motion on August 14, 2009 (Doc. No. 1212) ("Reconsideration Motion Opp."); and Statek filed a reply on August 20 (Doc. No. 1214) ("Reconsideration Motion Reply"). The Court denied the Motion on September 8, 2009 (Doc. No. 1225) and Statek filed a Notice of Appeal (Doc. No 1227).

### 3. Statek's District Court and Second Circuit Appeals

The case proceeded through the appellate process in both the District Court and the Second Circuit. Throughout that process, both parties focused on the sharply contested question of what state's choice of law rules should supply the applicable statute of limitations. The Second Circuit ultimately ruled "with instructions to apply Connecticut's choice of law rules in deciding Statek's motion to reconsider." *In re Coudert*, 673 F.3d at 191.

## ARGUMENT

### 1. Connecticut's Choice of Law Rules Dictate that Connecticut Law Governs the Timeliness of Statek's Claims

Connecticut's choice of law rules provide that identifying the statute of limitations applicable to a given claim requires a court to determine whether a statute of limitations is "procedural" or "substantive" with respect to that claim. *Baxter v. Sturm, Ruger & Co., Inc.*, 644 A.2d 1297, 1299 (Conn. 1994). If the statute of limitations is deemed procedural,

Connecticut law (the *lex fori*) will govern. *Id.* (citing *Thomas Iron Co. v. Ensign-Bickford Co.*,

42 A.2d 145 (Conn. 1945); *Morris Plan Ind. Bank v. Richards*, 42 A.2d 147 (Conn. 1945)). If,

on the other hand, the limitation is deemed substantive, the foreign statute of limitations (the *lex*

*loci delicti*) will govern. *Id.* (citing *Thomas*, 42 A.2d 145).

> The general rule in Connecticut is that statutes of limitations are procedural rather

than substantive. *Baxter*, 644 A.2d at 1299 (citing *Morris*, 42 A.2d 147). A limitation period is

considered substantive "*only* when it applies to a new right created by statute" as opposed to a

right that existed at common law. *Id.* (citing *Thomas*, 42 A.2d 145; *Morris*, 42 A.2d 147)

(emphasis added). Tort claims such as legal malpractice and breach of fiduciary duty existed at

common law. *See, e.g., Conn. v. Marsh & McLennan Cos., Inc.*, 944 A.2d 315, 321 n.10 (Conn.

2008); *Sanborn v. Greenwald*, 664 A.2d 803, 809-10 (Conn. App. Ct. 1995); *see also*

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 587 (1990).

> Because Statek has asserted common law claims, Connecticut's choice of law

rules dictate that the statute of limitations applicable to those claims is procedural. Accordingly,

Connecticut law governs the timeliness of Statek's claims. *See Baxter*, 644 A.2d at 1299.

> **2.    Statek's Claims Should Not Be Dismissed As Untimely**

> Connecticut's general tort statute of limitations provides that "[n]o action founded

upon a tort shall be brought but within three years from the date of the act or omission

complained of." Conn. Gen. Stat. § 52-577 (2010). The Plan Administrator's Motion to Dismiss

took note of Connecticut's statute of limitations, Motion to Dismiss at 14, and likewise noted

that the statute of limitations may be tolled by a defendant's fraudulent concealment, *id.* at 14

n.8, but neglected to address another, highly significant tolling rule. Under Connecticut law, the

statute of limitations may be tolled by a defendant's "continuing course of conduct." *See Vanliner Ins. Co. v. Fay*, 907 A.2d 1220, 1230-31 (Conn. App. Ct. 2006).

The continuing course of conduct doctrine applies where a defendant committed an initial wrong upon the plaintiff and the defendant's breach of duty "remained in existence after commission of the original wrong related thereto." *Vanliner*, 907 A.2d at 1230 (citation omitted). The doctrine will toll the statute of limitations in cases where the defendant's wrong is ongoing and "the situation keeps evolving after the act complained of is complete." *Sanborn*, 664 A.2d at 808. A defendant's breach of a continuing duty can be demonstrated with proof of "later wrongful conduct . . . related to the prior act," or where a "special relationship between the parties" gives rise to a continuing duty. *Vanliner*, 907 A.2d at 1231.

Coudert's breaches of its professional and fiduciary duties arise from a "special relationship" between the parties: the attorney-client relationship. *See Blinkoff v. O & G Indus., Inc.*, 965 A.2d 556, 564 (Conn. App. Ct. 2009); *Dixon v. Evans*, No. LLICV0750016575S, 2008 Conn. Super. LEXIS 933, at *2 (Conn. Super. Ct. Apr. 22, 2008). As set forth in the Amended Complaint, Coudert's continuing breach of its duties to Statek persisted through at least 2004 (*see* Amended Complaint ¶¶ 26-55) and, indeed, continue to this day.[3]

Moreover, the Connecticut Rules of Professional Conduct make clear, in multiple sections, that an attorney has fiduciary duties with respect to a client's property, and that those

---

3. As recently as 2009, Coudert produced documents to Statek that it had failed to produce when Statek made its original request in 1996 for *all* documents and information regarding Coudert's legal services. *See* Exs. B (e-mail from the Plan Administrator's counsel, dated Dec. 8, 2008), C (letter from the Plan Administrator's counsel, dated Feb. 19, 2009) (both forwarding additional material to Statek). One of the e-mails produced in December 2008 mentions a "deed packet," but Coudert has yet to produce that document to Statek or disclose what property it relates to. *See* Ex. D (e-mail discussing "deed packet," dated October 29, 2002). Although the inquiry under Federal Civil Rule 12(b)(6) and Bankruptcy Rule 7012(b) is limited to the face of the complaint, when the parties ultimately present their evidence on this issue, Statek will demonstrate the ongoing nature of Coudert's breaches.

duties survive the termination of the relationship. *See, e.g.*, Conn. Super. Ct. Civ. Rule 1.15(b)

(2010) ("[c]omplete records of such account funds and other property shall be kept by the lawyer

and shall be preserved for a period of seven years after termination of the representation."); Rule

1.15(e) ("Except as stated in this Rule or otherwise permitted by law or by agreement with the

client or third person, a lawyer shall promptly deliver to the client or third person any funds or

other property that the client or third person is entitled to receive"); Official Commentary to Rule

1.15 ("A lawyer should hold property of others with the care required of a professional

fiduciary."); Rule 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the

extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and

property to which the client is entitled").

      As the Connecticut Appellate Court stated in *Sanborn*, the determination as to

whether the continuing course of conduct doctrine applies to toll the statute of limitations is

"conspicuously fact-bound." 664 A.2d at 807 (citation omitted). The Plan Administrator has

nevertheless argued that the attorney-client relationship between Coudert and Statek (and, by

extension, Coudert's duties to Statek) terminated at some point prior to November 5, 2002,

making Statek's claims untimely. *See, e.g.*, Motion to Dismiss Reply at 16-19. Not only is that

argument wrong as a factual and legal matter, it is patently invalid on a motion to dismiss

because a court deciding a Rule 12(b)(6) motion looks "only to the allegations on the face of the

complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). As such, the Plan

Administrator's invitation for the Court to "rely" on deposition testimony to resolve this issue is

wholly inappropriate. *See* Motion to Dismiss Reply at 16 n.16. During oral argument on the

Motion to Dismiss, the Plan Administrator's counsel ultimately conceded that its arguments on

this issue "wouldn't be a 12(b)(6) type of … matter" and were "moving more to the factual

determination [than] might be appropriate" at the motion to dismiss stage. Ex. A at 9-11.

A defendant's motion to dismiss must be denied unless "it appears beyond doubt

that the non-moving party could prove no set of facts that would entitle it to relief." *Calcutti v.*

*SBU, Inc.*, 224 F. Supp. 2d 691, 696 (S.D.N.Y. 2002) (citations omitted). Time and again, courts

have denied motions to dismiss based on statute of limitations arguments that implicate disputed

factual issues. *See, e.g., id.* at 700 (denying motion to dismiss legal malpractice claim on statute

of limitations grounds where the parties disagreed over when their attorney-client relationship

ended); *see also In re Adelphia Comms. Corp.*, 365 B.R. 24, 59 (Bankr. S.D.N.Y. 2007) (denying

motion to dismiss on statute of limitations grounds where the application of the statute of

limitations and tolling doctrines presented questions of fact). The Court should reach the same

result here, as Statek's claims are timely under Connecticut's statute of limitations in light of the

continuing course of conduct doctrine. Statek's claims cannot be time-barred "on the face of the

complaint." *Cf. Roth*, 489 F.3d at 509.

### CONCLUSION

The application of Connecticut's choice of law rules is straightforward in this

case. Because Statek has asserted common law claims based on Coudert's breaches of its

professional and fiduciary duties, the statute of limitations is deemed "procedural" under

controlling Connecticut law. Accordingly, Connecticut's statute of limitations governs Statek's

claims. Those claims are timely under Connecticut law because they arise from a continuing

course of conduct through which Coudert breached its duties to Statek. Coudert's wrongful

conduct extended well into the three-year period preceding commencement of the Connecticut

lawsuit underlying Statek's claim, and it continues to this day. The Plan Administrator cannot

8

demonstrate, based on the face of the complaint, that Statek can prove no set of facts that would

entitle it to relief, and therefore the Motion to Dismiss does not meet the applicable legal

standard and must be denied.

Based on the foregoing and as required by the Second Circuit's ruling, Statek

respectfully submits that the Court should grant reconsideration of the Order disallowing Claim

No. 239 and, upon reconsideration, deny Coudert's motion to dismiss because it fails to meet the

applicable standards under Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of

Bankruptcy Procedure 7012(b).

Dated:  August 24, 2012

HUGHES HUBBARD & REED LLP

By: _____
     Edward J.M. Little
     Lisa A. Cahill
     David B. Shanies
     One Battery Park Plaza
     New York, New York 10004
     (212) 837-6000 (telephone)
     (212) 422-4726 (fax)

*Attorneys for Statek Corporation*

06-12226-rdd    Doc 1485-1    Filed 08/24/12    Entered 08/24/12 15:11:49    Exhibit A
Part 1    Pg 1 of 53

# EXHIBIT A

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2
 3     ------------------------------------X
       In Re:                             :   06-12226
 4                                        :
            COUDERT BROTHERS LLP,         :   One Bowling Green
 5                                        :   New York, New York
                 Debtor.                  :
 6                                        :   May 18, 2009
       ------------------------------------X
 7
                 TRANSCRIPT OF MOTION TO DISALLOW CLAIMS
 8                BEFORE THE HONORABLE ROBERT D. DRAIN
                      UNITED STATES BANKRUPTCY JUDGE
 9
10     APPEARANCES:
11
12     For the Plaintiff:      KAREN S. FRIEMAN, ESQ.
                               DAVID S. TANNENBAUM, ESQ.
13                             Stern Tannenbaum & Bell LLP
                               380 Lexington Avenue
14                             New York, New York 10168
15
16     For Statek Corporation: KENNETH RITT, ESQ.
                               JOSHUA W. COHEN, ESQ.
17                             Day Pitney LLP
                               7 Times Square
18                             New York, NY 10036
19
20     Court Transcriber:      SALLY REIDY
21                             TypeWrite Word Processing Service
                               211 N. Milton Road
22                             Saratoga Springs, NY 12866
23
24                                            .
25
       Proceedings recorded by electronic sound recording,
       transcript produced by transcription service
```

2

1  (Proceedings began at 10:13 a.m.)

2           COURT OFFICER:  Be seated.

3           THE COURT:  Okay, good morning.

4           MS. FRIEMAN:  Good morning.

5           MR. RITT:  Good morning, Your Honor.

6           THE COURT:  <u>Coudert Bothers</u>, and <u>Plan Administrator</u>

7  <u>v. Statek</u> claim objection.

8           MS. FRIEMAN:  Good morning, Your Honor.  I'm Karen

9  Frieman from Stern Tannenbaum & Bell.  We represent the plan

10  administrator Coudert Development Specialists, Inc., and we're

11  here today on DSI's application to disallow Claim No. 239 of

12  the Statek Corporation.

13           THE COURT:  Right.  And as I told you all in our

14  telephonic prehearing conference, I'm treating this hearing as

15  covered under the adversary proceeding rules and one in the

16  context of the parties' briefing under Rule 12(b)(6).

17           MS. FRIEMAN:  Yes, Your Honor.  Thank you.

18           THE COURT:  Okay.

19           MS. FRIEMAN:  There are two grounds for DSI's

20  application to disallow the claim of 239.  The first is that

21  the claim is time barred.  The Second Circuit's decision in

22  <u>Bianco</u> in the <u>Gaston & Snow</u> bankruptcy case, requires the

23  application of New York's choice of law to the determination of

24  the appropriate statute of limitations in this case, and that

25  requires the application of New York's borrowing statute, which

3

 1   is Section 202 of the Civil Practice Law and Rules.  The
 2   borrowing statute provides that the shorter of New York's
 3   statute of limitations or the statute of limitations of the
 4   state where the cause of action accrued should be applied.  New
 5   York's three year statute of limitations would apply to the
 6   claims alleged, underlying claim 239, and the three year
 7   statute of limitation would bar the claims here.  The complaint
 8   was served in this action on November 5th, 2005, and it's based
 9   on actions that were allegedly taken by Coudert in September of
10   1996.  So the claims would clearly be barred under New York
11   statute of limitations, and I think that really the inquiry can
12   end there.
13          But, in any event, we also believe that the claim
14   would be barred under any other possible statute of
15   limitations.  Statek itself concedes that the claim would be
16   barred under the statute of limitations of either New York or
17   California, and it seems that if New York statute doesn't
18   apply, then it should be the statute of California that does
19   apply.  California has a one year/four year statute, meaning
20   that the -- under Section 340.6 of the California Code of Civil
21   Procedure the statute of limitations is the shorter of one year
22   after the discovery of the wrong or four years from the
23   commission of the wrong.  Under the four year statute the claim
24   would have tolled in 2000, and under the one year, since the
25   alleged wrong was discovered no later than 2002, the claim

4

1   would have been barred in 2003.  And, as I said, Statek

2   concedes that California statute of limitations would bar the

3   claim as well.

4        Statek tries to avoid the application of the Bianco

5   case on several grounds, none of which, respectfully, Your

6   Honor, we believe would stand scrutiny.  First they claim that

7   under the Supreme Court's ruling in Katz, Bianco should not be

8   followed because there is a predominant federal interest in

9   applying an independent federal analysis of the appropriate

10  choice of law.  We do not think that Katz stands for that

11  proposition.  Katz was a narrow holding relating to the

12  proprietary of a state asserting the defense of sovereign

13  immunity in a bankruptcy claim, in a bankruptcy case, and the

14  Supreme Court there held that the federal interest in treating

15  state and private creditors uniformly required that the state

16  would not be allowed to assert its sovereign immunity claim.

17  Moreover, we think that Bianco actually forecloses the argument

18  that there's a federal interest in -- that there is a federal

19  interest which trumps the general rule that New York's choice

20  of law in the statute of limitations issue should be followed.

21  And indeed we cite cases in our brief where Bianco was cited

22  with approval in this district following the Supreme Court's

23  decision in the Katz case.

24       Statek argues that the paramount federal interest,

25  which they allege is present, is, one, in preventing the debtor

5

1   from improving its position by filing a bankruptcy.  In other

2   words, I think Statek's argument is that it would be unfair for

3   Coudert to be able to improve its position vis-a-vis Statek by

4   getting the benefit of the New York borrowing statute by its

5   filing in -- its filing its bankruptcy in New York.  And really

6   what that is is an argument that debtors should be discouraged

7   from forum shopping.  And Coudert Brothers LLP, which is the

8   debtor, is a New York limited partnership that has been

9   headquartered in New York for 150 years prior to the filing of

10  its bankruptcy, and we don't think that there's any basis

11  whatsoever for any kind of implication that there was any forum

12  shopping involved by Coudert filing its bankruptcy in New York

13  in connection with one claim raised by Statek.  In fact, New

14  York was the only place that made sense for Coudert to file its

15  bankruptcy, and certainly the filing was appropriate under

16  Section 1408 of Title 28 of the United States Code.

17        But if, even if the borrowing statute doesn't apply,

18  as I've already noted, the California statute would bar the

19  claim.  Statek concedes -- alleges that it is a corporation

20  organized in the state of California with its principal place

21  in California, and that is where it should be deemed to have

22  suffered any alleged injury from the results here so it -- from

23  the alleged acts by Coudert here.  So that statute -- that

24  state statute of limitations should apply.  Statek points out

25  that perhaps the Court should look to Section 142 of the

6

1   Restatement Second of Conflict of Laws, but that provision also

2   states that the forum statute of limitations should apply to

3   this case, and that brings us right back to New York statute

4   and New York's borrowing statute.  Section 142 of the

5   Restatement does note that there can be an exception from this

6   rule in the -- if there are extraordinary circumstances making

7   the result unreasonable, and Statek alleges that there are in

8   fact such circumstances making the application of New York

9   statute unreasonable.

10          Statek, for example, claims that the public policy of

11   New York and California in the creation of their statute of

12   limitations was to limit the liability of attorneys in their

13   jurisdiction and of malpractice insurers in their jurisdiction.

14   This, respectfully, we don't believe is a basis for the refusal

15   to apply New York statute of limitations here.  Coudert, after

16   all, is a New York partnership, and it certainly would be

17   completely within the public policy of the state to apply the

18   statute of limitations to it.  Statek also claims that it would

19   be unreasonable because the statute of limitations could have

20   run before a plaintiff would be aware of the existence of its

21   claim.  But that is not a situation that is unusual.  It's --

22   we cite cases in our brief that show that it's not -- it's the

23   situation not only in New York and California but Connecticut

24   as well recognizes the possibility that the application of its

25   statute of limitations could result in a claim being barred

7

1  before the plaintiff was aware of it.  We also would submit

2  that we don't know how it could be unfair to apply California's

3  statute of limitations against Statek, which, as I noted, is a

4  California corporation and has its principal place of business,

5  Statek claims, there as well.  Statek next argues that --

6             THE COURT:  Before you get on --

7             MS. FRIEMAN:  Yes.

8             THE COURT:  -- to the next argument, it's a little

9  murky in the papers before me, but the claim was also asserted

10  on behalf of TCI, which is a Delaware corporation?

11             MS. FRIEMAN:  TCI-II.  Yes, Your Honor, but what

12  happened, just to take a step back and do some history, the

13  original claim filed by Statek in this action was based on the

14  complaint that it had filed, which was filed both by it and by

15  TCI-II in Connecticut.  Coudert subsequently filed for

16  bankruptcy.  The automatic stay went into place.  The parties

17  entered into a stipulation, which was so ordered by Your Honor,

18  which provided for the lifting of the stay for two limited

19  purposes.  One, as you know, was to allow the parties to go to

20  mediation before Judge Morris, and the second purpose was to

21  allow Statek to amend its complaint.  Statek did amend its

22  complaint significantly, and one of the significant things that

23  it did in its amendment was drop TCI-II as a plaintiff in the

24  case.  So Statek is the only plaintiff, and I believe it should

25  be viewed as the only claimant.

8

1          THE COURT:  Okay.

2          MS. FRIEMAN:  So Statek, on the statute of limitation

3   argument, next argues that the Court should look to the state

4   with the most significant relationship in determining which

5   state statute of limitations should apply, and it offers

6   Connecticut as the jurisdiction where it commenced the suit

7   where the statute of limitations should be examined.  But

8   elsewhere in its papers, particularly, for example, at pages 36

9   and 38 of its memorandum of law, it states that it has not

10  transacted business and does not transact business in

11  Connecticut.  But, in any event, we submit that the claim would

12  be barred by the three year Connecticut statute of limitations

13  which is set forth in Connecticut General Statutes Section 52-

14  577.  That statute provides for a three-year statute of

15  limitations commencing upon the wrongful action, which in this

16  case would have barred the statute -- excuse me, would have

17  barred the claim in September of 1999, three years after the

18  alleged wrong in September of 1996.  To avoid the application

19  of that statute Statek alleges that the doctrine of continuing

20  course of conduct tolls the statute of limitations.  But we

21  submit that Statek's interpretation of that -- that that

22  doctrine doesn't apply, and that Statek's interpretation of

23  that doctrine is overbroad and unreasonable.

24          To begin with, in order to come under the protection

25  of that doctrine, Statek would need to demonstrate a continuing

9

1   duty.  And Statek essentially in its papers posits a duty that

2   goes on forever until the duty it alleges is satisfied.  So

3   basically they're claiming there could never be an end, there

4   would never be repose, that the statute would go on forever.

5   Moreover, the basis for the duty would have to be the attorney-

6   client relationship between Statek and Coudert, and Statek

7   itself states that the evidence of when that relationship

8   terminated was, quote unquote, equivocal.  To come within the

9   continuous course of duty -- excuse me, continuous course of

10  conduct exception Statek would have to show that the attorney-

11  client relationship existed until at least November 5th, 2002,

12  and that's because it would have to be within three years from

13  when it served its complaint on November 5th, 2005.  So the

14  relationship had to exist after November 5th, 2002, but it's

15  conceded in this action that Coudert rendered no legal advice

16  to Statek after the summer of 1996.  Statek also tries --

17           THE COURT:  Where is that conceded?

18           MS. FRIEMAN:  That is in the deposition of Ms. Verrin

19  [Ph.] in this case.  It's Exhibit H to my moving affidavit at

20  pages 245 and 246.

21           THE COURT:  All right.  But that wouldn't be a

22  12(b)(6) type of --

23           MS. FRIEMAN:  That's true, Your Honor.

24           THE COURT:  -- matter, right?

25           MS. FRIEMAN:  And there are other grounds that -- you

10

1   can avoid that issue all together and still rule in our favor

2   on this for the reasons that I'm going to get to.

3          THE COURT:  Okay.

4          MS. FRIEMAN:  So Statek tries to rely on three other

5   indicia of a continuing duty between -- owed by Coudert.

6   First, it claims that Coudert held some money in its accounts

7   belonging to Statek until 1998.  And even if that were so -- so

8   this -- we're completely avoiding this fact issue -- even that

9   were true, the statute would run three years after that in 2001

10  and doesn't do anything to save Statek's claim.  Secondly,

11  Statek argues that a different entity called Dean's Court acted

12  as a secretary for a separate corporate entity from Statek

13  called Statek Europe Limited.  Any relationship, we submit,

14  between these two entirely separate entities would not serve to

15  demonstrate a continuing relationship between Coudert Brothers

16  LLP and Statek Corporation, and it's interesting, Your Honor,

17  that Statek doesn't state in their papers when that believe

18  that relationship ended in any event.  And finally Statek

19  claims that Coudert never gave notice of termination -- never

20  gave notice that it was terminating the attorney-client

21  relationship with Statek.  And there's no, absolutely no

22  requirement in the law that Coudert have done any such thing.

23  The law is clear that there could be a de facto termination of

24  an attorney-client relationship.  But again that, you know, may

25  be moving more to the factual determination that might be

11

1    appropriate at this time.

2            But, in any event, aside from the fact that we submit

3    there's no continuing duty, there's really no continuing course

4    of conduct, which would be necessary to support this exception

5    to Connecticut's three-year statute of limitations.   Statek

6    relies in demonstrating continuing course of conduct subsequent

7    productions of documents to it by Coudert.   So, in other words,

8    it's Statek's position that if Coudert had provided the

9    documents that it provided in 1996 and never provided another

10   piece of paper to Statek, even though, you know, it was asked

11   to look for them and it found them and it turned them over, if

12   Coudert had said we have nothing, we have nothing else, we wipe

13   our hands, we move away, if they never produced a single other

14   piece of paper, then the statute of limitations had run.   But

15   because Coudert attempted to continue to search its records at

16   various times and continued to provide documents to Statek,

17   that somehow those actions are evidence of a continuing wrong

18   sufficient to toll the statute of limitations.   And we cite two

19   cases in our brief, Bellemare and Sanborn, Your Honor, for the

20   proposition that the wrong is the single act when it occurs and

21   is not a continuing one.   So, in short, we think that the claim

22   is clearly barred by the statute of limitations of Connecticut

23   and that the continuing course of conduct doctrine does not act

24   in this situation to extend the statutory period.

25            Finally, Statek claims that English law should apply

12

1  because England has a significant interest in regulating the

2  conduct of attorneys in its jurisdiction.  And we submit that

3  that interest in fact is not implicated in this case.  The

4  defendant Coudert Brothers LLP is a New York limited liability

5  partnership.  Its English office, which Statek had dealings

6  with, Statek concedes in its papers was closed before the

7  action commenced, and the attorney-client relationship was

8  centered in the United States during the relevant period of

9  time.

10         THE COURT:  But why is that?  I mean wasn't there the

11  request made of the English solicitors that did the work?

12         MS. FRIEMAN:  The request was made --

13         THE COURT:  In '96?

14         MS. FRIEMAN:  Yes, it was made to them in England.

15  But the relationship itself, the attorney-client relationship

16  itself between Statek and Coudert was really centered in

17  Connecticut.  And this really -- in the United --

18         THE COURT:  Why is that?

19         MS. FRIEMAN:  Because all -- Statek during the time

20  that it was represented by Coudert maintained a place of

21  business in Connecticut.  All communications were between

22  Connecticut and London, bills were sent to Connecticut.  As I

23  said, communications were made -- and paid from Connecticut,

24  and communications were between England and Connecticut.

25         THE COURT:  But the exception in the case law where

13

1   you're dealing with malpractice cases and professional

2   negligence cases where they look to the interest of the state

3   in regulating attorneys doesn't focus on where the injury

4   occurred, it focuses on where the particular attorneys who were

5   committing malpractice were, you know, members of the bar.

6           MS. FRIEMAN:  Right.

7           THE COURT:  So why wouldn't it -- I mean if

8   ultimately this is an issue of English malpractice law, I'm

9   still having a hard time seeing why English law -- I'm not

10  talking about borrowing statutes, I'm talking about the

11  underlying --

12          MS. FRIEMAN:  Right.

13          THE COURT:  -- law at this point, why English law

14  wouldn't apply.

15          MS. FRIEMAN:  Well, let me try to answer that

16  question in two different ways, if I could, Your Honor.  First,

17  in 1996 clearly the people from Coudert who were involved were

18  in England.  That's clear.  At some point the partner in charge

19  moved to the New York office, and there were communications

20  back and forth between Statek and the New York office relating

21  to the continuing production of files.

22          THE COURT:  But that -- but to me that would only

23  apply if there's some sort of continuing wrong argument as

24  opposed to looking back to '96

25          MS. FRIEMAN:  Uh-huh.  And the second --

14

1          THE COURT:  I'm not ruling that out.

2          MS. FRIEMAN:  Right.

3          THE COURT:  I'm just saying that it seems to me the

4    first wrong, the primary wrong was in '96 --

5          MS. FRIEMAN:  Right.

6          THE COURT:  -- if there was one.

7          MS. FRIEMAN:  I think that that's right, Your Honor.

8    The second thing -- the second way I would try to answer Your

9    Honor's question is that the New York's choice of law rules on

10   the substantive issue as opposed to the statute of limitations

11   issue, looking at which jurisdiction's law should apply on the

12   -- to the underlying tort --

13         THE COURT:  Right.

14         MS. FRIEMAN:  -- looks to where the last act that

15   made the tort actionable occurred.

16         THE COURT:  Right.

17         MS. FRIEMAN:  And there's a 2009 case, Associated

18   Press v. All Headline News Corp., it's a 2009 Westlaw 382690,

19   and, as I said, it's Southern District of New York, February

20   17, 2009.  And that case states that in making that

21   determination the last event that made the tort actionable is

22   the place of injury.

23         THE COURT:  Right.

24         MS. FRIEMAN:  And that in this case would be

25   California where Statek is --

S-132

15

1          THE COURT:  But isn't there an exception to that

2     again when -- one that you're dealing with attorney malpractice

3     claims?

4          MS. FRIEMAN:  Well --

5          THE COURT:  I mean Statek cites a number of cases

6     that look to an overriding interest in the state that regulates

7     the attorneys that would override the general place of wrong

8     determination.

9          MS. FRIEMAN:  I'm not sure that they override.  I

10    would say that I -- my reading of those cases is that it's a

11    factor that the courts look to in determining which forum's

12    jurisdiction should apply.

13         THE COURT:  Okay.  All right.

14         MS. FRIEMAN:  But, in any event --

15         THE COURT:  And I guess you're saying that since it

16    was a New York LLP anyway that --

17         MS. FRIEMAN:  Right.

18         THE COURT:  -- maybe New York law has an interest in

19    dealing with New York LLPs.

20         MS. FRIEMAN: Right.  And also, Your Honor, there's

21    really a malpra -- there hasn't been a claim for malpractice

22    stated in the complaint.

23         THE COURT:  Okay.

24         MS. FRIEMAN:  So, anyway, even if English would

25    apply, we believe that it would be barred under English law

16

1   first, as Your Honor alluded to earlier, the application of the

2   borrowing statute would make English law irrelevant in any

3   event.  But beyond that English law provides for a six-year

4   statute of limitations from the wrong, which again would have

5   tolled -- would have -- the statute would have run in September

6   of 2002, or it has an exception for -- which extends the

7   statute of limitations to three years from what is called the

8   starting date in the English statute.  And we submit that

9   Statek's starting date analysis should not be adopted in this

10  case.  As explained by Statek, as argued by Statek, the

11  starting date depends entirely on the fortuity of its own

12  actions of when it asked for more documents which resulted in

13  the production of documents in 2002.  They also -- there's no

14  indication in its papers that the statute of limitations under

15  English law and its interpretation would ever end, that the

16  claim would ever be barred.  Because not only do they claim

17  that the statute doesn't run until additional documents were

18  asked for by them and then produced, but that then they had

19  some kind of amorphous open-ended time to have analyzed those

20  papers before the starting date would even have run.  So

21  basically they're arguing for a situation where there would be

22  no applicable statute of limitations, where it would be almost

23  impossible for this claim to ever be time barred, and we don't

24  think that that should be adopted.  And again this may be

25  inching a little too close to the summary judgment side of

17

1   things, and I'll just, you know, offer it as an aside and move

2   on.  But clearly by -- in even asking for the documents in

3   2002, which occurred before November of 2002, Statek

4   demonstrated that it had at least an issue as to whether all

5   documents had been produced and some kind of concern that they

6   had not been.  So it could very well be that the starting date

7   should have started well before and would have been -- would

8   have expired by then.

9           So for all of those reasons, we believe that Statek's

10  claims are time barred.  We also think that the claim 239

11  should be disallowed because we don't think that Statek has

12  stated a claim upon which relief can be granted.  If you look

13  at the claim in the amended complaint, it's in one paragraph

14  and it says on its face that it is a claim for something called

15  breach of fiduciary duty and something called breach of

16  professional duty, and Statek has now claimed in its papers

17  that it is not asserting a claim for fiduciary duty.  And I

18  think that it had to make that admission because the law in

19  Connecticut and in fact in England as well is clear that you

20  can state a -- claim fiduc -- the absence of an allegation of

21  dishonesty, disloyalty, self-dealing.  There's no allegation

22  whatsoever in the amended complaint of any such thing.  And any

23  claim for a breach of fiduciary duty would have to be

24  dismissed.  And I believe for that reason Statek has stated in

25  its papers that it is not, contrary to the language of the

18

1  amended complaint, asserting a claim for breach of fiduciary

2  duty.   There is a small exception to that, and I'm going to

3  jump over just for a second to take care of that.

4         THE COURT:   That's on the money?

5         MS. FRIEMAN:   That's on the 43 odd thousand dollars

6  that Statek -- excuse me, Coudert Brothers had and disbursed

7  and has been unable -- disbursed according to the instructions

8  of Statek, but has been unable to provide a cancelled check

9  showing to whom the money was disbursed.   The disbursement was

10 in 1996, and there's no allegation that the disbursement of

11 that money was motivated in any way by any disloyalty or

12 dishonesty or self-dealing or anything like that by Coudert.

13 So even that small breach of fiduciary duty claim would have to

14 be dismissed based on the law of Connecticut or the law of

15 England.   In addition, because that occurred in 1996 and Statek

16 was aware of that in 1996, under any potentially applicable

17 statute of limitations that claim for the $43,000, odd thousand

18 dollars should be barred.   So it seems to us clear that any

19 claim for breach of fiduciary duty at all has -- should be

20 disallowed either because as a matter of law or because it's

21 been abandoned by Statek itself.

22         So then we're left with trying to figure out what's

23 left of Statek's claim as asserted in its amended complaint.

24 And Statek seems to be claiming that there is some kind of what

25 I read to be a negligent breach of fiduciary duty claim based

19

1  on the <u>Bristol</u> case that it cites from England.  Because it's

2  not -- nowhere in the amended complaint is there an allegation

3  of negligence, nowhere in the amended complaint is there an

4  allegation of legal malpractice, although such claims, based on

5  different facts, I concede, but both claims were asserted in

6  the original complaint.  So we're trying to figure out what it

7  is that Statek is claiming, and as I said, as we understand it,

8  Statek is essentially claiming some kind of negligent breach of

9  fiduciary duty claim under English law.

10         Now, assuming for the sake of argument -- we talked a

11  little bit about this before in answer to one of Your Honor's

12  questions about English -- whether or not English law should

13  apply and we don't think it should for the reasons we stated to

14  Your Honor and set forth in the brief, and just briefly we want

15  to talk about some other arguments that Statek offers for the

16  application of English law.  For example, Statek argues that

17  Section 145(2), the restatement section of conflict of laws,

18  requires the application of English law.  But we submit that

19  the factors set forth in that section of the restatement in

20  fact do not point to English law.  The first factor is the

21  place of injury, and the place of injury here is either in

22  California or Connecticut.  The law is clear that a corporation

23  is injured either where it is incorporated or in its principal

24  place of business.  There's no dispute that Statek is a

25  California corporation.  Statek alleges that its principal

20

 1   place of business is in California, and at some point it
 2   alleged that at least in 1996 and before its principal place of
 3   business was in Connecticut.  In any event, it doesn't allege
 4   that it was either incorporated or had a principal place of
 5   business in England.  Faced with that, those facts, Statek
 6   argues for the application of the extremely unusual separate
 7   financial base doctrine.  It claims that it had a separate
 8   financial base in England, and the basis for that claim
 9   essentially is its allegation that that's where the wrong
10   occurred.  But the Baena case is very much on point, cited in
11   our brief, and rejects the concept that a corporation suffers
12   its financial loss where the wrong occurs as opposed to where
13   its principal place of business is or where it is incorporated.
14   Statek essentially had no separate financial existence in
15   England.  Everything it did was over here.  The only factors it
16   points to, as I said, in England are the wrong, and that's not
17   what to look to in determining where the injury is suffered.
18   The second factor is where the wrong occurred, and if you look
19   only to 1996, then we would concede that that was in England.
20   If it was more of a continuing problem, which we don't believe
21   is the case, then it was in England or -- and/or in New York.
22   The third factor is where the parties are incorporated or have
23   their principal place of business, and again that's
24   Connecticut, California or New York.  And as I mentioned
25   before, there's a question of where the relationship was