21

1  centered, and we believe that that was in Connecticut.  So
2  there's only one of the factors set forth in the Restatement
3  that points even in part to England, so we don't believe --
4           THE COURT:  But this is assuming that federal choice
5  of law principles apply as opposed to New York --
6           MS. FRIEMAN:  That'd right.
7           THE COURT:  -- choice of law principles.
8           MS. FRIEMAN:  That's right.
9           THE COURT:  And you're arguing that that's -- it
10 should be New York choice of law --
11          MS. FRIEMAN:  Yes.
12          THE COURT:  -- principles.
13          MS. FRIEMAN:  That's correct.
14          THE COURT:  Right.  Okay.
15          MS. FRIEMAN:  And I'm just trying to address the
16 arguments made by Statek.
17          THE COURT:  In the alternative.
18          MS. FRIEMAN:  Correct.  I'm just --
19          THE COURT:  Okay.
20          MS. FRIEMAN:  -- trying to, right, address the
21 arguments that were made by Statek.
22          THE COURT:  Okay.
23          MS. FRIEMAN:  But, in any event, we don't believe
24 that the Bristol case, which is the only authority cited by
25 Statek in its memorandum of law in support of its cause of

22

1   action, supports the idea of a negligent breach of fiduciary

2   duty.  In that case the defendant lawyer admitted that he had

3   been negligent and admitted that he had breached his contract

4   with his client, the plaintiff.  But the plaintiff pushed for

5   cause of action based on breach of fiduciary duty because he

6   believed that they would thereby be entitled to enhanced

7   damages.  The court rejected the idea of there being a breach

8   of fiduciary duty and noted that not every breach by a

9   fiduciary constitutes a breach of fiduciary duty.  The Bristol

10  case limits, we say, we believe, the scope of liability for a

11  fiduciary to -- for breaches of fiduciary duty and does not

12  extend it as Statek seems to argue.  We just don't think that

13  there's anything in the Bristol case that supports this kind of

14  hybrid claim that Statek appears to be making for negligent

15  breach of fiduciary duty.  As I noted before, there's nothing

16  in the amended complaint that alleges negligence, there's

17  nothing in the amended complaint that alleges legal

18  malpractice.  It's only this amorphous idea of breach of

19  professional duty which appears to be some kind of claim for

20  negligent breach of fiduciary duty, and we don't think that

21  Statek's only authority, Bristol, supports that claim.  So in

22  addition to our belief and our submission to the Court that the

23  Claim 239 should be dismissed because it's time barred, we also

24  believe that it doesn't state a claim.

25          THE COURT:  Okay.

S-140

23

1          MS. FRIEMAN:  Thank you.

2          THE COURT:  All right.

3          MR. RITT:  I'm Kenneth Ritt from Day Pitney

4    representing Statek Corporation.  Now that we understand the

5    context in which this motion is being decided, namely a motion

6    to dismiss, it is important to start off by recognizing the

7    legal standard applicable to a motion to dismiss, and that is

8    the facts pleaded in the amended complaint are taken as true

9    and all inferences are drawn in favor of Statek.  A corollary

10   principle is that conclusory statements of fact such as the

11   defendant was negligent are not to be given any weight, and

12   therefore it follows that conclusory statements from the facts

13   alleged need not be specifically alleged.  The second point on

14   a motion to dismiss is that a motion to dismiss is an

15   appropriate vehicle for raising a limitation defense but only

16   when there's no disputed issue of fact raised by the

17   affirmative defense or the facts are completely disclosed on

18   the face of the pleadings and realistically nothing further can

19   be developed by pretrial discovery or trial on the issue raised

20   by the defense.  The defendant did in their brief cite a case

21   having to do with the motion to dismiss, and that's the Billelo

22   case, and it correctly articulates the standard in the Second

23   Circuit.  And that is it must -- and these are, this is the

24   quote -- "appear beyond doubt that the plaintiff's claims are

25   barred."

24

1          With that as the legal framework, let me first

2   address the question whether Statek has stated a claim and then

3   turn to the statute of limitations point.  The amended

4   complaint alleges facts that I think I can distill and

5   summarize very briefly.  Statek had an attorney-client

6   relationship with solicitors in Coudert's London office.

7   Coudert provided services to Statek from 1990 to January 1996

8   when the company was under the control of the bad old directors

9   Johnston and Spillane.  In July 1996 the good new directors,

10  Vendel and Verrin instructed Coudert to provide them with

11  documents and information.  Coudert undertook to carry out

12  those instructions.  Coudert did not, however, provide all the

13  information and documents it had.  If Coudert had provided all

14  the information and documents it had, Statek would have been

15  able to find and freeze assets misappropriated and hidden by

16  the bad old directors.  Because of Coudert's failure to provide

17  all the information documents, Statek missed opportunities to

18  recover assets to satisfy its judgments against the bad old

19  directors and expended unnecessary costs in its search for

20  those assets.  That's what the complaint alleges.

21          From those facts it follows that by virtue of the

22  attorney-client relationship Coudert owed Statek a duty to use

23  reasonable care, to act in Statek's best interest, including

24  the duty to use reasonable care in carrying out its client's

25  instructions.  An inference arises from Coudert's failure to

25

1  find and turn over all the documents -- and we know that they

2  didn't because they turned up later.  As recently as three

3  months ago new documents are still coming in.  So you can infer

4  from the fact that they didn't turn over everything when

5  initially asked that the failure to do so was attributable to

6  Coudert's negligence.  This is no more complicated than a

7  bailment case where you entrust goods to a bailee and they are

8  either not returned to you or they're returned damaged.  An

9  inference arises that the loss of the property or the damage to

10 the property is attributable to the bailee's negligence.

11 Statek --

12         THE COURT:  I guess that's assuming that the

13 documents that were subsequently provided were documents in

14 connection with a Coudert-Statek attorney-client relationship

15 as opposed to a Coudert-Johnston attorney-client relationship,

16 right?

17         MR. RITT:  I think that's right, and the fact -- it's

18 a --

19         THE COURT:  But that -- and that may be -- that's

20 probably not a 12(b)(6) issue.

21         MR. RITT:  I was about to say that's not a 12(b)(6)

22 issue, and the facts do indicate that Coudert and the partners

23 involved had been asked that very question many, many times,

24 who was your client, who are you acting for, and they have

25 never said to us, they have never said anywhere that we had

26

1   documents that we didn't turn over because they somehow were

2   not related to what you were asking about.  But that leads to

3   the point about to what extent can you draw the inference and

4   to what extent do we have to allege beyond what we've alleged,

5   and the point is Statek cannot and therefore we have not

6   alleged the specifics of Coudert's negligent acts and omissions

7   because that information is known exclusively to Coudert, and

8   Coudert has never explained to Statek why it failed to provide

9   all the documents and information in 1996.

10          THE COURT:  Well, let me rephrase that.  You're

11  saying that although the complaint never says Coudert was

12  negligent in failing to provide the documents, you contend that

13  the facts pled in the complaint do state a claim for negligence

14  simply by asserting that there was a request made and that,

15  based on subsequent productions, the request was not fully

16  performed when it was first made.

17          MR. RITT:  That's an inference Your Honor can draw

18  from the facts alleged, and it's a motion to dismiss.  You have

19  to draw all inferences in favor of Statek.

20          THE COURT:  And I guess the other point is if

21  Johnston was the client for some of the documents or the

22  documents that were subsequently dismissed, you're asking me to

23  infer that since Statek was a client, that the relationship

24  with Johnston if Johnston was the client, would have also have

25  led Coudert to comb its files to deal with Johnston as well,

27

1  given the potential conflict.

2          MR. RITT:  Yes.  If in fact that was Coudert's

3  position.  They've never --

4          THE COURT:  Right, and I understand you're saying

5  outside of the record --

6          MR. RITT:  Then we'd have different pleading about

7  what they should have done.  But yes --

8          THE COURT:  All right.

9          MR. RITT:  -- if it occurred to them in 1996 that

10 they had been misled by Johnston, that in fact they, at least

11 as early as 1995, had a conflict of interest, when the new

12 directors came they should have said we have a conflict of

13 interest, here's what the situation is, and it would have gone

14 from there.  But we've not alleged that.  We've never alleged

15 that they -- in this amended complaint that they understood

16 there was a conflict of interest.  There was.

17         THE COURT:  Right.

18         MR. RITT:  We believe there was.

19         THE COURT:  But the facts lay out that they were

20 doing work with -- at the instruction of Johnston whether it

21 was --

22         MR. RITT:  Yes.  What --

23         THE COURT:  -- whether he was wearing his Statek hat

24 or his Johnston hat.

25         MR. RITT:  Yeah.  I mean the partner in charge of the

28

1  engagement or retainer, Steven Beharell, says I only acted on

2  behalf of Statek and that to the extent I was doing anything

3  that Johnston told me, it was simply incidental to what I was

4  doing for the corporation.  Now, a lot of these documents that

5  don't get turned over are unequivocably Statek documents.  One

6  of the most important ones is one that just got turned over

7  three months ago, the one having to do with the eccentric

8  investor.  Because there you're talking about the notion that

9  this subsidiary that Coudert created for Statek in Europe, an

10  English company, was going to be the vehicle to make

11  investments and enter into joint venture agreements.  And so

12  the document having to do with a potential -- where Statek

13  through its English subsidiary could invest funds is clearly a

14  Statek document.

15          The others, again we only know what we know.  We've

16  alleged what we know, and we believe that it flows from that

17  that an inference can be, and on a motion to dismiss has to be

18  drawn that there's negligence, there is no need for Statek to

19  allege negligence with particularity.  So we can't do it even

20  if we wanted to until they tell us something about why they

21  didn't turn over the documents.  But, in any event, at this

22  stage in the pleadings we don't have to plead negligence with

23  particularity.  It's enough that the facts in the amended

24  complaint provide a basis for concluding that Statek suffered

25  damages caused by Coudert's negligence that were foreseeable

29

1   and not unduly remote.  That covers all the elements of

2   professional negligence under the law of England.  While

3   English law does not use the term proximate cause, I'm going to

4   suggest the English standard in practice is exactly the same as

5   the standard in California, in Connecticut and New York except

6   the element of proximate cause here in the United States simply

7   brings together the concepts of remoteness and foreseeability

8   that are separately treated under English law.

9            So essentially there is no conflict here.  This is a

10  simple negligence claim cognizable in all 50 states and under

11  the law of England.  Coudert tries to say that they -- we must

12  be claiming some kind of negligent breach of fiduciary duty.

13  Well, we're not.  What they do say again on page 27 of their

14  reply brief is a fiduciary, like anyone else, can be charged

15  with negligence.  That's exactly Statek's claim.  Coudert was a

16  fiduciary, and especially when, as Your Honor notes, there were

17  potential conflicts, they did have a problem in who was their

18  client, and there were reasons that we point out in our brief

19  as to why a firm of solicitors might have felt conflicting

20  loyalties, number one, loyalty to the client Statek

21  Corporation, but also loyalty to the person who had been giving

22  them instructions for six years, and of course loyalty to their

23  own interests in not wanting to be too closely associated with

24  a convicted felon.  But that's not the basis of the claim.

25  We're not saying that they favored either themselves or favored

30

1   Johnston over Statek.  That's not the claim.

2           Turn then to the statute of limitations.  I'm going

3   to suggest that there are at least four ways to deny this part

4   of the motion, even if Your Honor assumes that the merits of

5   this dispute will all ultimately be resolved in this court and

6   therefore that New York will be the forum for all purposes.

7   But I want to at this point address the question of Connecticut

8   limitations only because I think counsel for Coudert

9   misunderstands why we even discuss Connecticut.  We're not

10  claiming that Connecticut has the greatest interest in this

11  case or that's the law that would apply under the federal

12  choice of law rule or under the New York borrowing statute or

13  anything else.  The importance of the Connecticut statute is

14  twofold.  I'll get to the second later but the first is this.

15  I'm submitting to Your Honor that if you decided today that you

16  are going to have the merits of this claim heard in the related

17  action in Connecticut, then I submit the forum in which that

18  claim will then be adjudicated is Connecticut.  And if

19  Coudert's right, that the law of the forum state would then

20  control, which we don't think it would be, we think Judge

21  Underhill should apply -- well, I think Judge Underhill would

22  find there is no conflict because it's not barred under either

23  Connecticut or English law.  But that's the anomaly we present,

24  Your Honor.  If you had Judge Underhill decide this case he'd

25  be deciding it in Connecticut, the forum would be Connecticut.

31

1  The case law that supports that is from the <u>Enron</u> bankruptcy.

2  It's the <u>Newby</u> case, and I have to say that I think Coudert has

3  simply misread the case.  They seem to say that the court

4  sitting in Texas in a related action felt that it had to apply

5  the law of New York where the bankruptcy was.  And on the

6  contrary, they start off the discussion by saying here's what

7  Texas law is.  Because Texas was the forum in the related

8  action.  They then have a footnote that says and you know what,

9  we do note that the bankruptcy is in New York, the result

10 wouldn't be any different in New York if that were the forum.

11 But I think it's difficult to say that if this case were

12 decided in the District Court in Connecticut, that

13 Connecticut's not the forum.  But what I'm going to suggest to

14 you today, Your Honor, is you can avoid -- that's not one of

15 the four ways I'm going to suggest to deal with this is by

16 sending it back to Judge Underhill.  Each of the four ways I'm

17 going to suggest to deny this --

18       THE COURT:  Well, let me -- I mean the proof of claim

19 is filed here, right?

20       MR. RITT:  It is.

21       THE COURT:  And this is a core proceeding.

22       MR. RITT:  It is.

23       THE COURT:  So -- all right.

24       MR. RITT:  I don't think we need to get there.

25       THE COURT:  And no one has raised whether there's a

32

1  Connecticut borrowing statute.  I don't know whether there is

2  or there isn't.

3       MR. RITT:  We have mentioned it obliquely that there

4  is no real choice of law principle in Connecticut.  On further

5  thought, that's probably an overstatement.  Connecticut's

6  choice law principle has to do with whether the claim arises

7  out of common law or is a part of the statute.  There is no

8  borrowing statute though in Connecticut.  But I'm -- let's put

9  all that to the side and let's decide today we're in this forum

10 and let's anticipate that all the claims would be resolved here

11 so we don't even have the issue.

12       Each of the four ways I'm going to suggest to deny

13 the motion this morning does require a finding that the

14 negligence claim is not barred by English limitation law.  We

15 set out in our brief why that's so.  I will address quickly

16 then the argument that it's barred by English law.  It's

17 recognized that the statute runs three years from the starting

18 date.  The argument against it seems to be that it would --

19 then the claim could never be barred.  That's absurd.  But if

20 you look at the statute, it's quite clear that it's very fact-

21 specific about when the starting date conditions are met, and a

22 plaintiff cannot simply sit on its hands, it has to use

23 reasonable diligence, including hiring experts when necessary,

24 to be able to come to the state of knowledge within a

25 reasonable time that's needed to commence the action.  But it

33

1   has to know that something wrong was done, and it has to know

2   that the damage it suffered was caused, at least in some part,

3   by what the defendant did.  So again I'm going to defer mostly

4   to our brief for the proposition that English law does not bar

5   this claim.  Although I will note, I'll note one other thing,

6   and that is there's an argument here about the fact that

7   statutes of limitation can bar claims before the plaintiff

8   knows they exist.  That is certainly true in New York, that's

9   true in California, to some extent that's true in Connecticut.

10  That was absolutely true in England until 1986.  It's for --

11  because of cases just like this one that the Limitation Act of

12  1986 was put into place so that 14(a) now allows a plaintiff

13  who knows nothing about the claim some time to bring the

14  action.  Prior to 1986 this claim would have been barred under

15  the law of England too.  So the modern jurisprudence is moving

16  toward a situation where claims are barred before the plaintiff

17  knows about them.

18          So let me then get into the four ways you can deny

19  the motion.  The narrowest approach, if you want to take the

20  narrowest approach, is simply to say there is an issue of fact

21  whether Statek's retainer with Coudert includes an agreement

22  that English law will govern their disputes.  There's also an

23  issue of course also whether there's a written retainer

24  agreement that includes the choice of law.  Statek believes

25  that the parties had a written retainer agreement that provided

S-151

34

1  that English law would govern all issues in any dispute between

2  them.  But we haven't had discovery on that issue.  All we know

3  so far is, although Mr. Beharrel said the engagement letter,

4  the retainer letters would be on the file and Mr. Poster [Ph.],

5  the other partner involved here, said that was common practice,

6  he would have certainly given a client care letter or retainer

7  letter that said English law would apply, we don't have

8  discovery on what we've asked for, which is what were the

9  common terms in your retainer letters, what was your policy for

10  issuing retainer letters.  So that's another -- a matter for

11  another day.  At this point though, at this point what you have

12  to say is certainly not beyond doubt -- that's the standard,

13  beyond all doubt -- it's not beyond all doubt that such an

14  agreement exists much less that New York applies to limitation

15  defense.  So that's the narrow ground.

16          The broadest approach Your Honor could take is to

17  follow the Ninth Circuit rule in Lindsey [Ph.], which is in all

18  federal cases with exclusive jurisdiction of which bankruptcy

19  of course is only one, federal choice law rules should apply.

20  I'm going to suggest that that's not the road Your Honor should

21  take.  It's clearly against --

22          THE COURT:  That's a good --

23          MR. RITT:  -- the Second Circuit --

24          THE COURT:  -- suggestion given the Second --

25          MR. RITT:  -- precedent.  It --

35

1          THE COURT:  -- given the precedent, no.  I think you
2    should assume I'm not going to take that road.
3          MR. RITT:  I don't think so.  But the point is some
4    circuits do say if it's exclusive jurisdiction, federal choice
5    of law.  What the Second Circuit says is no, it depends on what
6    the subject matter of the law is.  So there are areas I believe
7    where it is conclusively presumed but the most articulated area
8    we seem to have is conflict law, and I will approach that.  So
9    we've thrown out approach number two, let's talk about
10   approaches three and four.  The other two approaches would
11   require a decision as to which choice of law rule the Court
12   will apply in the absence of an enforceable agreement between
13   the parties.  Within those two choices there's a narrower and a
14   broader.  The narrower middle ground would be to decide the
15   choice of law issue under the Second Circuit precedent in
16   Bianco without any regard to what the Supreme Court has now
17   said in Katz.  As Judge Haines conceded in his Law Review
18   article and which we concede here today, it may turn out that
19   Katz has nothing to do with anything except sovereign immunity.
20   It's going to have no repercussions whatsoever for bankruptcy
21   courts, and those bankruptcy courts that have talked [**audio
22   skips here 00:57:36**] are clearly mistaken.  Let's assume that.
23   Let's assume we're under Bianco.  Katz has never been decided.
24          If you take that approach, there are four ways to
25   distinguish Bianco from this case, all of which, and certainly

36

1  collectively, would allow this Court to apply the federal
2  choice of law rule without ever questioning the result in
3  Bianco.   The most important is that Bianco was an adversary
4  proceeding, it was brought by the plan administrator of the
5  bankrupt law firm Gaston & Snow against former clients for the
6  payment of fees.   The former clients were in Utah, the
7  bankruptcy proceeding was in New York, and you had a question
8  whether the New York borrowing statute applied, under which
9  case the plan administrator's claim would be valid, or whether
10 Utah law applied, in which case the plan administrator's claim
11 would be barred.   That's not the case you have here.   What you
12 have in this case is the administration and allowance of a
13 claim, not an adversary proceeding.   The significance of that
14 distinction was articulated over 50 years ago by the Supreme
15 Court in Vanston Bondholders Protective Commission v. Green,
16 1946 case.   Before I discuss Klaxon I think I have to set the
17 stage a little bit with a quick review of the Erie doctrine and
18 its progeny as discussed in Bianco as discussed by the Second
19 Circuit.
20         You start with Erie Railroad, 1938.   If jurisdiction
21 is based on diversity of citizenship, the federal courts must
22 apply state substantive law.   Clearly been the law ever since.
23 Moreover, as the Second Circuit says, therefore federal courts
24 are restricted in their ability to create federal common law to
25 displace state-created rules, and the situations in -- federal

37

1   courts may do so are limited.  Absolutely right.  Then the

2   court says before a federal court creates federal common law

3   there must be a significant conflict between some federal

4   policy or interest and the use of state law.  Absolutely right

5   again.  The initial decision of course whether to apply federal

6   law or state law is a federal choice of law issue that must be

7   made by the federal court.  It's analogous to a federal court

8   having jurisdiction to determine whether it has jurisdiction.

9   It has the power to decide whether to apply federal, state or

10   substantive law.  If you get to the second question and you say

11   federal law doesn't apply, state law applies, if you're in a

12   diversity case, then you get to Klaxon.  And in Klaxon the

13   Supreme Court extended Erie so that in a diversity case federal

14   courts must apply the choice of law rules to the forum state.

15   And the rationale is that such rules are substantive, and these

16   rules determine which state's law applies, they don't determine

17   whether state law applies.  So the first issue is always an

18   issue for the federal court.

19        What flows from that is these decisions -- Erie,

20   Klaxon, and the ones having to do with the creation of federal

21   common law, O'melveny & Myers or Atherton v. FDIC.  None of

22   those Supreme Court decisions control the issue whether a

23   bankruptcy court must apply the choice of law rules to the

24   forum.  The circuits are split under whether they should but no

25   circuit holds that Erie and Klaxon are conclusive authority

38

1  requiring a bankruptcy court to apply the federal rule.  All

2  the circuits recognize that the Supreme Court has not

3  definitively spoken, and the Second Circuit has recognized that

4  although the Supreme Court hasn't definitively spoken, the

5  Supreme Court has in fact spoken, and that's <u>Vanston</u>.  So now

6  we're back to <u>Vanston</u>.

7          The <u>Vanston</u> court 50 years ago recognized there's a

8  potential conflict between federal policies and state rules in

9  bankruptcy cases, and it's a conflict that does not exist in

10  diversity cases.  That case involved a claim by a creditor

11  against a debtor on an instrument that called for interest on

12  interest.  So the court had to decide initially whether federal

13  or state law would apply to the validity of <u>Vanston</u>.  If it

14  decided that state law applied, it would then have to decide

15  what choice of law rule to use to determine what state's law

16  applied.  But it never reached the second question in its

17  holding because it answered the first question saying federal

18  law governs because it would violate the policy of the then

19  existing Bankruptcy Act to allow interest on interest.  So it

20  didn't hold anything about the second step, what state's law

21  applied.  But it had -- the case has a few things to say in

22  both the majority and the concurring opinions.

23          Speaking for the majority, Justice Black said,

24  "Commercial obligations often have context in many states so

25  that the question of which particular state's law should

39

1  measure the obligation seldom lends itself to a simple

2  solution.   In determining which contact is the most significant

3  in a particular transaction, courts can seldom find a complete

4  solution in mechanical formulae of the conflicts of law.

5  Determination requires the exercise of informed judgment and

6  the balancing of all the interests of the states with the most

7  significant contacts in order best to accommodate the equities

8  among the parties to the policies of those states."

9          The court went on to distinguish bankruptcy

10  jurisdiction from diversity jurisdiction for choice of law

11  purposes.   Justice Black said that, "at least in the area of

12  allowance and determination of claims bankruptcy courts must

13  consider factors such as bankruptcy law and equitable

14  principles that extend beyond a simple consideration of state

15  law claims."   And I'm now quoting from the decision.   "In

16  determining what claims are allowable and how a debtor's assets

17  shall be distributed, a bankruptcy court does not apply the law

18  of the state where it sits.   Erie Railroad v. Tompkins has not

19  such implication.   That case decided that a federal district

20  court acquiring jurisdiction because of diversity of

21  citizenship should adjudicate controversies as if it were only

22  another state court.   The bankruptcy courts must administer and

23  enforce the Bankruptcy Act as interpreted by this court in

24  accordance with authority granted by Congress to determine how

25  and what claims shall be allowed under equitable principles."

40

1          It's important to note, I think, that the Supreme
2   Court specifically mentioned the allowance and determination of
3   claims.  Because that is an area, as Justice Frankfurter said
4   in his concurring opinion, where there is a strong case for
5   uniformity of bankruptcy laws.  This is pre-Katz.  This is 50
6   years ago.  In Bianco the Second Circuit recognizes this
7   interest so that at page 18 of its decision it says, "An
8   interest in uniformity can justify the creation of federal
9   common law."  But it said the interest was not strong enough in
10  the case before it, which was an adversary proceeding.  Had
11  nothing to do with the adjudication of a claim.  Against the
12  federal interest in uniformity the Second Circuit had to
13  consider the policies advanced by following Klaxon.  And the
14  principal policy interest underlying Erie and Klaxon is avoid
15  forum shopping between state and federal courts.  Of course
16  that interest has only the most attenuated application in a
17  bankruptcy case because bankruptcy cases can only be litigated
18  in a federal court.
19          So even if this federalism interest underlying
20  Klaxon, we don't want to impinge on state sovereignty, is
21  somehow strong enough to trump a federal interest in uniformity
22  in connection with an adversary proceeding, if you want to
23  assume that, it's not strong enough to require application of
24  the choice of -- the forum's choice of law rule in a contested
25  matter dealing with a debtor's claim.  That's one way to

41

1   distinguish Bianco from --

2            THE COURT:  You know, but -- you know, let me just

3   take that --

4            MR. RITT:  Yeah.

5            THE COURT:  -- as far as uniformity and expectations.

6   I mean I hear claim objections all the time in all sorts of

7   different contexts.  For example, I will hear an employment

8   discrimination claim.  You're telling me that even though the

9   employee is employed in Michigan by a Michigan corporation and

10  Michigan law has specific interests with regard to Michigan

11  corporations, that for some reason I should employ a uniform

12  federal law of employment discrimination?

13           MR. RITT:  Oh, not at all.  And I'm not going to go

14  as far -- I don't even think Judge Haines goes that far.  The

15  strongest position you'll hear, and you're not going to hear it

16  from me, is his position, and that is -- I think it goes too

17  far, but he says "federalism principles in general should have

18  no place in bankruptcy law except to the extent otherwise

19  indicated by Congress.  Indeed in the absence of an expressed

20  indication of contrary congressional intent, courts should

21  assume Congress intended to establish a uniform national law on

22  the subject of bankruptcy that pays no heed whatsoever to state

23  law."  He then, if you read his article, he does come -- I

24  think that overstates what he even says in his article.  And

25  I'm not arguing for anything, I'm concerning myself simply with

42

1  choice of law rules and what effect the federal interest in

2  national uniformity may have for questions like jurisdiction,

3  particularly supplemental jurisdiction, related action

4  jurisdiction, does it have an implication for Butner --

5          THE COURT:  Yes, but Congress lays out the

6  jurisdiction of the bankruptcy courts. That's a -- that's -- as

7  Congress has specific provisions dealing with claims, you know,

8  the cap on lease rejection claims, the cap on disallowance of

9  post-petition interest, similarly Congress has spelled out the

10  bankruptcy court's jurisdiction, so.

11          MR. RITT:  Those cases are clear.  What Judge Haines

12  talks about is in the interstices.

13          THE COURT:  Well, but that runs up against Butner and

14  the general rule that your claim is -- and your property

15  interest is based on applicable nonbankruptcy law.

16          MR. RITT:  Yeah, the property rights is the clearest

17  one to see, and I think that Judge Haines -- and again I'm not

18  arguing that Katz or the federal interest does anything to

19  change Butner, and I don't think Judge Haines is either.  But

20  actually Butner does speak to our situation in a related way,

21  and let me get into that.  Because this is only way to

22  distinguish the strength of the federal interest.  All I'm

23  saying is in Bianco the Second Circuit said, yeah, there's a

24  federal interest in uniformity.  But when I compare that to the

25  federalism interest in an adversary action I come out wrong

43

1  way, and I'm saying, well, this isn't an adversary proceeding.

2  And Vanston the Supreme Court has already told us that the

3  adjudication of claims is a stronger case for --

4           THE COURT:  But that was the case where the Act, just

5  like the Code, disallows post-petition interest.  I mean the

6  statute specifically dealt with the type of claim that --

7           MR. RITT:  I agree.

8           THE COURT:  -- was being made, the bankruptcy statute

9  dealt with it.

10          MR. RITT:  That's why it's only dicta.  It's not the

11 holding of the case.  The holding of the case is there's a

12 federal interest invalidating this instrument.  We never get to

13 the second question.  Second point.  First point is you can

14 distinguish Bianco because it's the adjudication of claim.

15 Second thing is the clients of the debtor in the Bianco case

16 could have avoided being in the New York forum.  There was no

17 personal jurisdiction over them in New York, and thus the court

18 found they had little if any connection to New York.  The only

19 reason they ended up here in New York against their will, it

20 turns out, is they misread and misunderstood the jurisdictional

21 law and didn't think they had a personal jurisdiction defense,

22 which in fact they did.  So they failed to object and they

23 found themselves here.  In our case Statek could not have

24 avoided the New York forum.  We didn't bring our action here.

25 We're here because this is where the bankruptcy is.

S-161

44

1          Third, it's not clear whether in <u>Bianco</u> the debtor's

2    position was improved.  It certainly wasn't improved vis-a-vis

3    a debtor.  It may arguably have been improved vis-a-vis its

4    client with respect to the viability of its claim against the

5    client because of the bankruptcy filing.  But that's not even

6    clear.  While the claim would have been barred in Utah, because

7    Utah had a four year statute of limitations, New York had six,

8    the services were really rendered by the attorneys of Gaston &

9    Snow out of their Boston office, and it does appear as if there

10   was an alternative forum available where the plan administrator

11   would have had jurisdiction over these clients and where the

12   statute might not have run.  What's clear in this case is

13   though but for the bankruptcy, Coudert would have had to

14   litigate this case in either England or Connecticut, where we

15   assert the claim would not have been barred by the statute of

16   limitations.  Certainly if the case were in England, New York's

17   borrowing statute wouldn't apply.  If there'd been no

18   bankruptcy and our Superior Court action in Connecticut had

19   gone forward, New York's borrowing statute wouldn't apply.

20          So if New York's borrowing statute is applied,

21   resulting in the barring of the claim, the debtor will have

22   improved its position by virtue of the bankruptcy filing, and

23   we say that's another fundamental federal interest.  I'm

24   positioning it in terms of improving the debtor's position but

25   -- and I said that in my brief.  But when I think about it,

45

1   it's probably better to talk about it the other way, which is

2   the creditor's position shouldn't be weakened or impaired

3   because of the filing of the bankruptcy action.  That never

4   arises of course in _Bianco_ because there is no creditor

5   involved there.  But that gets you to the fundamental

6   difference between an adversary proceeding and this kind of

7   contested matter if the Court is going to allow a debtor to

8   improve its position.  It's one thing for it to be at the

9   expense of a third party who may be required to fatten the

10  bankruptcy estate and another for it to be at the expense of a

11  creditor who's relying on federal law to effect an equitable

12  distribution of the estate.  A creditor should not have his

13  claim barred just because the debtor files for bankruptcy.  And

14  this is where I get into _Butner_.

15          _Butner_ is the mother of all cases that says we define

16  property rights for bankruptcy purposes in accordance with

17  state law.  Now -- and I'm not here today to try to discuss to

18  what extent _Butner_ may be impacted by _Katz_.  What I do want to

19  say is that Justice Stevens who wrote the _Katz_ decision stated,

20  "The federal bankruptcy court should take whatever steps are

21  necessary to ensure that a creditor is afforded in federal

22  bankruptcy court the same protection he would have had under

23  state law if no bankruptcy had ensued."  That's the interest

24  that we're trying to get at.

25          In the Southern District we have a case that we think

S-163

46

1  is very similar, analogous, and that's the <u>Cutler Owens</u>

2  <u>International</u> case where the judge said, "Section 502(b)(1) is

3  to be interpreted in accord with its plain intention of merely

4  preserving defenses assertable outside of bankruptcy. Thus if

5  the debtor were subject to suit elsewhere on the transaction

6  giving rise to the claim, a door closing statute should not

7  apply. Conversely, if prior to the bankruptcy it were subject

8  to suit only in the state where the bankruptcy court sits, the

9  statute should apply." So Statek could have only brought this

10 claim in New York and its claim is barred by the New York

11 limitation, okay, fine. But here Statek not only could have

12 brought the case in Connecticut, it did bring the case in

13 Connecticut, where it wouldn't be barred by the New York

14 statute, and it could have brought the case, I think, in

15 England and maybe still can under certain --

16          THE COURT: Well, it could have -- I mean it -- I

17 guess -- it seems to me there is a potential for what you're

18 arguing for, to substantially change and, it would seem to me

19 at least in terms of the burden on the court and the parties,

20 and the claim allowance process. Claimants could have brought

21 their claims outside of bankruptcy usually in many places, as

22 is evidenced here. You could have brought it in California,

23 you could have brought it in Connecticut, you could have

24 brought it maybe in New York given that Coudert was in New York

25 as a New York LLP, or in England. So I think the rule you're

S-164

47

1   asking me to consider would, in connection with any claim

2   objection, require a bankruptcy court to do a federal choice of

3   law analysis based on where the claim could have potentially

4   been brought.  It just seems to me that that's --

5           MR. RITT:  That's a practical question, and I

6   appreciate that that is probably the only valid reason, I

7   think, under Bianco for applying the forum rule is the notion

8   that it's easier.

9           THE COURT:  Well, I mean --

10          MR. RITT:  But in most --

11          THE COURT:  -- they also say that, consistent with

12  Erie and Klaxon, that the choice of law rules are in fact

13  substantive and therefore you should apply the rule where you

14  sit.

15          MR. RITT:  But Klaxon and Erie involve federalism

16  issues and diversity that has -- when I get to Katz, I think, I

17  think you'll see that there has been a change of thinking.  I

18  think where the Second Circuit went wrong primarily was in the

19  weight it gave to Klaxon and Erie's policy application in a

20  bankruptcy context.  But as a practical matter, because I've

21  thought about the problem that the Second Circuit talks about

22  and other circuits have said yeah, that's true, but simplicity

23  of application doesn't rise to the level of mandating forum

24  law, and that's this.  There's really not going to be a lot of

25  difference, I'm going to suggest, between going at it the way

S-165

48

1    the Fifth Circuit does or going at it the way the Tennessee

2    court went in SMEC, and going at it under the analysis I'm

3    talking about under the Bianco precedent for this reason.  It's

4    going to be a rare case, I think, where you actually have a

5    difference, you're going to get a different result, by applying

6    the federal choice of law and applying the forum choice of law,

7    and nobody's even going to bring up the point unless there's

8    going to be a difference.

9            And so, for example, if you look at the leading case

10   that supports the approach taken by the Second Circuit, and

11   that's the Fourth Circuit decision in Merritt Dredging, it

12   would have been the same result under either the federal or the

13   forum choice of law provision.  So you're not going to -- as

14   choice of law provisions get more and more rational and

15   reasonable, they're all going to one way or another be directed

16   toward what Vanston seems to say you have to be looking for,

17   which is what's the jurisdiction with the most significant

18   contacts.  This particular New York borrowing statute is

19   anomalous.  Because it doesn't even purport to try to answer

20   that question.  It doesn't even come close.  So I agree with

21   Your Honor, that is it's simplicity of application is the

22   argument for the forum rule.  What I'm saying is in practice

23   it's -- you're not going to be opening up the flood gates to

24   choice of law issues because it's going to be rare if ever.

25   This is a rare exceptional case is what I'm saying.

49

1          But let me go back then to the last way to

2    distinguish Bianco, and that is it did involve an involuntary

3    Chapter 11 petition, and this case involves a voluntary

4    petition.  The Second Circuit recognized a federal interest in

5    avoiding debtor forum shopping but felt it was a weak interest

6    that couldn't obviously be implicated in an involuntary

7    proceeding.  Statek is not maintaining that in this case

8    Coudert engaged in debtor forum shopping but we do suggest that

9    in the future debtor forum shopping not only among states but

10   also among countries, as bankruptcy becomes more and more

11   international, is likely to increase.  And therefore this

12   interest must be given greater weight obviously where the

13   proceeding is commenced by a voluntary position.  So to recap

14   the narrow --

15          THE COURT:  But I mean one -- I guess that ignores

16   the fact that creditors are as often in control in an

17   insolvency situation as debtors are.  Creditors filing an

18   involuntary can be forum shopping as much as a debtor can be.

19          MR. RITT:  I don't think that the -- first of all,

20   the forum shopping argument I think is the weakest of any

21   argument in favor of the federal rule.  I think it's

22   cumulative.  And all I'm saying is it adds a little bit of

23   weight.  And if it adds virtually no weight, the other three I

24   think do.  Because the narrow middle ground comes down to this,

25   that the federal choice of law rule without questioning the

50

1   result in <u>Bianco</u> can be reached by finding a federal interest
2   in the uniform treatment of creditors so that a creditor that
3   had and asserted a viable claim prior to the filing of the
4   bankruptcy petition that was not time barred in the forum where
5   the action was brought as well as in at least one other forum
6   available to it will not have that claim barred because the
7   debtor filed a voluntary petition in a state with a shorter
8   limitation period.  That would be a narrow, narrow middle
9   ground holding.

10          The broader middle ground position of course would be
11   to say that the <u>Bianco</u> court simply got it wrong, as <u>Katz</u> now
12   makes abundantly clear, and there is no reason to distinguish
13   adversary proceedings from contested matters.  If you went that
14   way, the place to look would be the decision of the Middle
15   District of Tennessee in the <u>SMEC</u> case because it involved an
16   adversary proceeding and it contains the most extensive
17   discussion of <u>Vanston</u> and the policies favoring a federal
18   choice of law rule.  I'm going to skip over the facts and just
19   go to the basis for the holding there, which was that in a
20   claim against New Jersey attorneys you look at New Jersey law.
21   First, <u>SMEC</u> said that the dicta in <u>Vanston</u> favored --
22          THE COURT:  Well, let me stop you because I think all
23   we're talking about here is the borrowing statute.  My view is
24   that if New York choice of law principles apply, if you get
25   over the borrowing statute hurdle, which doesn't deal with

51

1   choice of law principles at all, it's just a statute that

2   requires this "shorter of" determination, it seems to me that

3   under New York law you would look to English law.  Because it's

4   -- you know, the underlying claim is a professional negligence

5   claim or professional malpractice claim.

6           MR. RITT:  And that's what we're talking about.  So

7   we're clear, in Bianco it was undisputed, nobody raised an

8   issue, every single issue in the Bianco case was controlled by

9   Utah law.  Every issue was controlled by Utah law.  Except the

10  statute of limitations because of the New York borrowing

11  statute.

12          THE COURT:  Right.

13          MR. RITT:  So when you look at the SMEC case that

14  reasoning is the dicta in Vanston favoring the federal rule was

15  strong enough to indicate the Supreme Court's view and it

16  should simply be followed.

17          THE COURT:  I just disagree with that.  I just think

18  that --

19          MR. RITT:  After the way the Katz court dealt with --

20          THE COURT:  And I think Katz has --

21          MR. RITT:  -- dicta, yes.

22          THE COURT:  I think Katz has no bearing on it

23  whatsoever.  You're dealing with a sovereign immunity case and

24  a countervailing constitutional provision that Congress finally

25  trumped the state's sovereign immunity rights as a matter of

52

1  preemption.  I don't think that has anything to do with claim

2  allowance.

3          MR. RITT:  I'm going to suggest why it might.

4          THE COURT:  No, I -- I don't -- well, go ahead.

5          MR. RITT:  Okay.  I think that the reason it does is

6  to be found in the fact -- in its discussion of in rem

7  jurisdiction.  Again we're balancing two things, we're

8  balancing a federal interest against a state interest.  So when

9  Your Honor says but Erie and Klaxon, doesn't that somehow move

10  me to apply forum law, why would it?  Because you're protecting

11  some interest of the forum state.  Because that's an element of

12  sovereignty.  There are various elements of sovereignty, and in

13  some ways I'm going to suggest to Your Honor that Thomas's

14  dissent in Katz is as important for my argument as Stevens'

15  majority.  Because what Thomas points out is there's all sorts

16  of things that bring into question state sovereignty.  They run

17  a gamut.  The most important, I'm going to suggest, is

18  sovereign immunity.  On a very, very, very lower level is the

19  interest of a state in having its choice of law or borrowing

20  statute employed in a bankruptcy court.  I think if you were to

21  say that I'm not going to apply New York's forum rule for

22  choice of law, you will have nipped the interest of the state

23  of New York, much less severely than if you say I'm sorry, from

24  now on you no longer have sovereign immunity.  And part of this

25  goes back to the fact that bankruptcy jurisdiction is in rem

53

1  jurisdiction, and <u>Katz</u> says that "in rem jurisdiction does not

2  implicate state sovereignty to nearly the same degree as other

3  kinds of jurisdiction like diversity jurisdiction.  The

4  exercise of in rem jurisdiction --" this is a quote from

5  Stevens -- "does not in the usual case interfere with state

6  sovereignty even when state interests are affected."

7         And the other thing that I think <u>Katz</u> does, Your

8  Honor, and that is again we're talking about a weighing and

9  balancing, and so not only does <u>Katz</u> make clear that the state

10 interest under federalism principles is not as strong as you

11 all might have thought when it's in the bankruptcy context, but

12 I think <u>Katz</u> can be read and should be read to say that the

13 federal interest in uniformity is stronger than everyone had

14 heretofore imagined.  And again I think that it's really

15 Justice Thomas in his dissent that brings this out where the

16 question is just how strong now is that federal interest now

17 that we have the majority speaking in <u>Katz</u>.  And what he points

18 out is that "unlike other areas of exclusive federal

19 jurisdiction like patent law," Justice Thomas says, "the

20 Supreme Court has refused to give the need for uniformity the

21 weight the majority today assigns it in the context of

22 bankruptcy."  I think Judge Thomas is correctly saying until

23 today we didn't think that bankruptcy was different than patent

24 law and that the national need for uniformity in patent law was

25 anything less than what it is in bankruptcy law, and today the

54

1   majority is saying otherwise.  And that's why we believe that

2   whether you distinguish Bianco or you go with Bianco, you're

3   weighing and balancing federal interest versus state interest

4   in the context of claims adjudication.  And in that context we

5   believe the federal choice of law should be applied.

6           THE COURT:  Okay.

7           MR. RITT:  Thank you.

8           THE COURT:  Well, before you sit down let me go back

9   to the English "starting date" rule, the three year rule.  The

10  reply refers to Ms. Verrin being disappointed, writing Coudert

11  and saying, "I'm disappointed with your response," and it also

12  attaches, as does the complaint, the opinion in the looting

13  action that talks about Johnston and -- who was the woman that

14  was his -- Spillane -- acting like "international gangsters" in

15  transferring money here and there.  And it also refers to the

16  fact that shortly after his appointment the trustee in the UK

17  bankruptcy of Johnston made inquiries of Coudert and was

18  unhappy with Coudert's response, which alluded to the earlier

19  response in '96.  Given all that, why isn't the "starting date"

20  basically in '96, particularly given, you know, again the fact

21  that it was clear as stated by the Delaware court, that

22  Johnston and Spillane had engaged in this practice of moving

23  money around and looting the company and couldn't be trusted,

24  if they were the ones that had the primary relationship with

25  Coudert?  And again I'm focusing on this Heyward v. Fawcetts

55

1  case from the House of Lords which, based on my reading of it,

2  gives a pretty restrictive reading of the three year starting

3  date?

4       MR. RITT:  The requirement under subsection 5 is that

5  Statek had to have the knowledge required for bringing an

6  action in damages, in respect to the relevant damage, and the

7  right to bring such an action.  It then goes on to talk about

8  what the knowledge required for bringing an action for damages

9  in respect to the damage means, which requires under subsection

10 6 "a knowledge of both material facts about the damage in

11 respect of which damages are claimed and of other relevant

12 matters.  These are matters that would lead a reasonable person

13 who had suffered the damage to consider it sufficiently serious

14 to justify its instituting proceedings for damages against a

15 defendant."  That part of it, I agree they knew they'd been

16 damaged somehow but what did they need to know?  They needed to

17 know under 8(a) that "the damage was attributable in whole or

18 in part to the act or omission which is alleged to constitute

19 the negligence."  So what they had to know is that somehow

20 their difficulties that they started encountering after they

21 got their judgments against Johnston and Spillane, their

22 difficulties were somehow being exacerbated by some negligent

23 act of Coudert at some prior time.  I submit that Rule 11,

24 based on the information they had prior to 2002, if the case

25 had been brought in a federal court here, would not have been

56

1  sufficient.

2        THE COURT:  No, but we're talking about English law.

3        MR. RITT:  Under English law too there's no way under

4  the evidence that they had -- prior to November, December of

5  2002 there's no basis on which they could have filed an action

6  against Coudert.

7        THE COURT:  Well, in this <u>Haward v. Fawcetts</u> case --

8        MR. RITT:  Yes.

9        THE COURT:  -- Lord -- I love this, Lord Brown of

10 Eaton-under-Heywood says, "Is it enough that Mr. Haward knew,

11 as plainly he did, that Fawcetts advised him that this was a

12 sound and suitable investment --" to me, you know, that's the

13 similar advice Coudert gave, which is we've provided all the

14 information -- "and that it was on the basis of this advice

15 that he went ahead with it, or did he need to know more than

16 that?  And if so, what more?  Clearly for time to start running

17 he did not have to know that Fawcetts had as a matter of law

18 acted negligently in the giving of their advice."

19        MR. RITT:  And I agree with that.  If -- but what he

20 did have to know is that they gave certain advice which he

21 could have done more to explore what the true situation was.

22 In other words, we don't have to have -- Statek didn't have to

23 know that Coudert was negligent.  What it had to know though

24 was that when it asked for documents there actually were other

25 documents that it wasn't given.  And it had no way, even if it

57

1   hired experts and solicitors and accountants to help it out,

2   there's no way it could have known what information and

3   documents Coudert had that it hadn't been given.  There is some

4   back and forth in 1996 that they point to, but the principal

5   back and forth course was when Ms. Verrin went to see them in

6   July of 1996.  She said, I want you to give me all this

7   information and give me the files.  Incidentally, she didn't

8   say send me the files, she said, I'm here in England, right now

9   I'm here in London, give me the files.  Well, the Poster who

10  was only an associate then, said, well, I've got to talk to the

11  partner, Mr. Beharell.  And comes back and says, well, we, you

12  know, can't turn them over to you now.  But when he replies to

13  her inquiries he doesn't give her the files.  So her principal

14  complaining letter, of course, you haven't done what I asked

15  you, is principally you haven't given me any of the files.  So

16  he says, well, you know, there's not a lot of stuff, there are

17  only six little folders and why don't we just send you the

18  originals.  Where shall we send it."  They send it off to

19  California.  Based on that, how do you start a lawsuit?

20  Clearly Statek knew that they were, you know, being damaged and

21  harmed by the old directors of Statek and that there were

22  assets out there that had been moved around.  But how would

23  they know, number one, that there are additional documents and

24  information that Coudert had but Coudert wasn't telling them

25  about and, number two, that those additional documents and

58

1  information somehow would provide a lead --

2          THE COURT:  But it doesn't seem from this case, the

3  House of Lords case, that starting a lawsuit is what you're

4  supposed to do.  Lord Nicholls of Birkenhead says that "the

5  knowledge that starts the period running is that it means

6  knowing with sufficient confidence to justify embarking on the

7  preliminaries to the issue of a writ, such as submitting a

8  claim to the proposed defendant, taking advice, and collecting

9  evidence.  Suspicion, particularly if it is vague and

10 unsupported, will indeed not be enough but reasonable belief

11 will normally suffice.  In other words, the claimant must know

12 enough for it to be reasonable to begin to investigate

13 further."

14         MR. RITT:  And I'm suggesting it was not reasonable

15 to investigate further --

16         THE COURT:  It seemed reasonable to the trustee.

17         MR. RITT:  Well, in context, I think you have to put

18 this in context.  The context is the additional knowledge that

19 was acquired between 1996 and 2002, that's number one.  And

20 number two is there's probably an inclination to say okay --

21         THE COURT:  Well, I'm sorry, what was -- if you could

22 hold that thought.  What was the additional knowledge between

23 '96 and 2002?

24         MR. RITT:  One important -- I'd say the most

25 important thing that was learned, actually learned not until

S-176

59

1   2003, the most important fact, I think, the fact that finally

2   brought real scrutiny to Coudert rather than just having

3   Coudert be one of many, many -- let me start with the second

4   point to get to the first point.

5          THE COURT:  Okay.

6          MR. RITT:  The first point is the bankruptcy trustee

7   is appointed and goes about looking for Johnston's assets

8   around the world.  He doesn't focus on Coudert.  Coudert is one

9   of dozens and dozens that he sends out inquiries to.  What

10  really gets learned afterwards in addition to Coudert then

11  turning over documents that leads the trustee on a trail that

12  makes him say my God, not only did they have other documents,

13  but they actually were helpful in finding these assets.  But

14  what really focused a sense that perhaps Coudert had not been

15  forthcoming with everything even after 2002 was when the

16  bankruptcy trustee conducted an interview with David Alford in

17  October of 2003, and it's then that the bankruptcy trustee

18  learned that Alford had worked with Beharell at Coudert to set

19  up the 1990 No. 1 trust.  That's when, at the latest, certainly

20  you have these conditions met.  Again I think that what you're

21  talking about may raise, I don't think they do but they may

22  raise some issues of fact, probably not determinative of the

23  motion to dismiss but ultimately -- but if we get there, it is

24  a fact-intensive story about what did Statek know about what

25  the prior directors had done with the company --

60

1          THE COURT:  Well, I understand that.  But at the same

2   time you had this extraordinary quote in '96 from the Delaware

3   court about how these people are like gangsters, you know,

4   hitting buttons and transferring money right and left, and it's

5   also fundamental to the complaint that Coudert was representing

6   those people.

7          MR. RITT:  As were dozens of other law firms.

8          THE COURT:  Well, I understand, but, I mean, isn't

9   the first thing you do is go and investigate them and, you

10  know, you'd have a judgment, take discovery of them to enforce,

11  you know, your discovery rights to collect on assets?

12         MR. RITT:  I -- no, with all due respect, Your Honor,

13  I don't think that's the first thing you do.  I think that's

14  probably the tenth or twelfth thing you do after you've decided

15  -- after you've gotten the judgments and it's 2000.  They get

16  the judgment in 2000.  All they get in 1996 is control of the

17  company.  They get the fraud and waste judgment in December

18  2000, and the first thing they do is to try to find assets in

19  the United States, try to find assets, and when they're stymied

20  in that --

21         THE COURT:  But --

22         MR. RITT:  -- then they decide the way to go about

23  this is to put Johnston in bankruptcy, get a bank --

24         THE COURT:  But I'm assuming that the language that

25  the Delaware court used came from and was suggested to it by

S-178

61

1  the good Statek directors and that they were of that view all

2  along, including when they controlled the company.  I mean once

3  they controlled the company I don't -- why -- I guess I -- I

4  mean the nexus is pretty obvious, isn't it, between Coudert and

5  the bad guys?

6        MR. RITT:  In hindsight the nexus is obvious, knowing

7  everything we know now.  What I'm suggesting is there was no

8  obvious nexus between Coudert and the bad guys other than

9  they're be one of many law firms who had rendered services for

10  the bad guys for which the billing was not clear that the

11  services rendered had all been for the benefit of Statek.  So

12  if you look at the fraud and waste decision, a whole huge bunch

13  of the claims against the old directors was that they paid all

14  these law firms all around the world money for -- to do things

15  that didn't have a whole lot to do with the actual business

16  operations of Statek.

17        THE COURT:  Right.

18        MR. RITT:  And in point of fact there was

19  investigation done on some of the law firms that had a very

20  clear nexus to the exact things that Statek knew had been done.

21  But there wasn't a clue, there was not a clue until 2002 that

22  in fact Coudert had done some -- remember, it's not that

23  Coudert explained everything it had done while it was being

24  instructed by Johnston and Spillane.  It didn't mention most of

25  the things it had done.  All it said it did was it formed this

62

1   entity called Statek Europe and it helped Johnston, you know,

2   lease a flat.  That's it.

3          THE COURT:  Well, but it just seems to me if the

4   directors, the good directors, are making the case that

5   Johnston is looting the company, setting up a foreign

6   subsidiary that they knew nothing about, and leasing a flat for

7   his personal use would be things that you'd look into.

8          MR. RITT:  And they did.

9          THE COURT:  Well, and again under the Haward v.

10  Fawcetts case it seems to me that's enough to start the period

11  running, you know, to know that there's a potential problem.

12         MR. RITT:  I think again I'm going to simply agree to

13  disagree in the sense that under 14(a) as it is explicated by

14  the House of Lords, you're talking about questions of fact as

15  to what is reasonable under the circumstances.

16         THE COURT:  Well, that's -- sure.

17         MR. RITT:  And while --

18         THE COURT:  I think that's probably right.

19         MR. RITT:  And I do understand how Your Honor can,

20  based on what you know so far, think of those circumstances and

21  imagine a totality of circumstances in which it would have been

22  reasonable to have done more sooner.  In hindsight it's always

23  clear you could have done something more sooner, but that's

24  never the issue.  The issue is based on what you knew at the

25  time and all the other circumstances going on, including

63

1   everything else that the good directors were doing at that time

2   to obtain the judgments and then to look into other assets,

3   when you look at the whole picture of it, it's only in that

4   context I think that you can decide what is reasonable

5   diligence.  Because that's exactly what the House of Lords is

6   talking about.  And that's what this statute of limitations

7   does.  In excruciating detail it tells you what are the steps

8   that a reasonable person has to take at each step along the

9   way, and then the court applies very detailed guidance into how

10  to interpret that entire set of circumstances.  But again I

11  think that's probably not for a motion to dismiss.

12          THE COURT:  Okay.  All right.  Do you have any brief

13  response?

14          MS. FRIEMAN:  Very briefly, Your Honor.  With your

15  permission, I really want to focus on the failure to state a

16  claim in my remarks now as --

17          THE COURT:  Okay.

18          MS. FRIEMAN:  -- opposed to the statute of

19  limitations, which I would rely on my comments and our

20  submissions.

21          THE COURT:  Okay.

22          MS. FRIEMAN:  I think it's really important in --

23  sorry.  I think it's really important, in looking at whether

24  the amended complaint states a proof of claim, to actually look

25  at the amended complaint and to see what it alleges.  And Mr.

64

1   Ritt made some statements that he really doesn't have to allege

2   negligence because a conclusory statement that Coudert was

3   negligent, wouldn't be entitled to too much credence anyway and

4   statements like that I think detract from the fact that there

5   is nothing in the amended complaint that alleges negligence,

6   that alleges a failure to comply or comport with the relevant

7   standards in the community required of lawyers.  This is really

8   an effort to try to salvage something out of an amended

9   complaint that does not state a claim.  There's no -- not only

10  is there nothing in the amended complaint about negligence or

11  legal malpractice, there's nothing in Statek's submission on

12  this motion to indicate that.  They cite one case in support of

13  their existence of a close of action hearing, and that's the

14  Bristol case in England which, as I described before and is set

15  forth in our papers, doesn't support any kind of cause of

16  action such as alleged here.  You know, there is something to

17  be said for a defendant being allowed to have notice of what's

18  claimed against him.  And I think that this motion is directed

19  to the amended complaint as it exists, and the claim that Mr.

20  Ritt now asserts as being claimed therein, it's just not in

21  there.

22          THE COURT:  Well, he -- paragraph 36 says, "for

23  reasons unknown to plaintiff, Coudert did not provide Statek

24  with complete and accurate information about the Statek

25  services or the contents of all its Statek files, either when

65

1   first requested in July '96 or at anytime since."

2              MS. FRIEMAN:  Right.

3              THE COURT:  I mean why isn't that enough?

4              MS. FRIEMAN:  Well, I mean we understand the acts of

5   which they're complaining.  But what is the cause of action

6   that flows from that I'm saying and the cause of action that

7   they're now --

8              THE COURT:  Well, but a complaint could even -- it

9   doesn't have to state -- a complaint can survive a motion to

10  dismiss even if it states the wrong cause of action if the

11  facts within it do state a right cause of action.

12             MS. FRIEMAN:  Yeah, I'm just submitting that there's

13  no allegation in the complaint or anything on which you can

14  infer from the complaint that there was negligence or a failure

15  to comply with the applicable standards.  I'm just --

16             THE COURT:  But they say -- well, let me -- I mean

17  again they -- the complaint says that there was a request for

18  the information.  Now, it's true that the complaint defines the

19  "Statek services" and the "Statek files" somewhat ambiguously,

20  but I think that Coudert would know generally what it is that

21  the complaint is saying had been sought of it.  And then it

22  says that notwithstanding that it asserted that it complied

23  with that request, it didn't comply with it.  And it then sets

24  forth instances where it didn't comply because it came in

25  later.  The information was provided later.

66

1        MS. FRIEMAN:  But there's not even effort, I would

2  submit, in either the amended complaint or in the submission on

3  this motion to allege the elements of the cause of action.  I

4  mean I take your point, Your Honor.  Certainly it's not like

5  Coudert is walking around not knowing the facts that Statek is

6  complaining about.  I'm saying that they, you know, served --

7  they filed an amended complaint.  They asked specifically for

8  permission for relief from the stay so they could file an

9  amended complaint.  All right?  They filed an amended complaint

10  that was vastly different from their main complaint.  They were

11  narrowing it and pointing to what it was that they were

12  complaining of, and what they're complaining of based on their

13  amended complaint is, you know, a breach of fiduciary duties

14  and this breach of professional duties, whatever that means.

15  There's no -- it does not set forth --

16        THE COURT:  Well, why isn't that --

17        MS. FRIEMAN:  -- the elements of the cause of action

18  for malpractice or negligence.  And you will read --

19        THE COURT:  Well, but again isn't the failure to

20  return or to provide the files sufficient to be a claim for

21  negligence if it's -- I mean aren't lawyers supposed to keep

22  their files and give them over to their former clients?

23        MS. FRIEMAN:  I'm not sure that that gives rise to a

24  cause of action.  But I think the point I'm trying to make, and

25  I don't want to belabor because I see that Your Honor is not

67

1    with me on this one, is just that the --

2             THE COURT:  Well, I mean if --

3             MS. FRIEMAN:  -- moving target makes --

4             THE COURT:  -- if there's some sort of additional

5    briefing you want to make on that point, you know, because I

6    confess it took me about five reads of page 42 to realize that

7    Statek really had given up on the fiduciary duty claim, it was

8    asserting just a negligence claim.  But I mean my

9    understanding, although it's not informed by anything the

10   parties have put in their papers, is that attorneys can be held

11   liable for not breach of fiduciary duty but for breach of care

12   or liable for negligence if they lose valuable files.  Or don't

13   produce valuable files and then discover them later.  And in

14   the meantime the client is damaged because they didn't have the

15   files.  But if you want to brief that, that's fine.  I don't

16   have a problem with you submitting something on that point.

17            MS. FRIEMAN:  That's all right, Your Honor.  We'll

18   save that for another day if that's necessary.

19            THE COURT:  Well, I'm not cutting you -- I mean --

20            MS. FRIEMAN:  No, I appreciate what you're saying,

21   I'm just -- my point really is that -- and I apologize for

22   being repetitive.  My point really is that the claim that is

23   now alleged, according to Mr. Ritt's statements this morning, I

24   submit is very different from and is not found in the amended

25   complaint.  If Your Honor's position is that they could have a

68

1  claim if there's any legal basis for a claim based on the facts

2  --

3              THE COURT:  As pled in the complaint.

4              MS. FRIEMAN:  -- as pled in the complaint, then, you

5  know, I take that point.  My point is to demonstrate, to point

6  out that that's a -- this is a new allegation that we don't

7  believe is submitted in the amended complaint, and the amended

8  complaint as written and as alleged we don't think states a

9  claim.

10             THE COURT:  But why is that?

11             MS. FRIEMAN:  They've abandoned --

12             THE COURT:  Not the first point.  I understand that

13  the claim as actually asserted with the label on it is one for

14  "breach of professional and fiduciary duties."  But again

15  whether you call it something incorrectly I don't think

16  matters.  I think what matters is whether there's sufficient

17  facts for a cause of action in the complaint.

18             MS. FRIEMAN:  Let me take one more run at this if I

19  could.

20             THE COURT:  Okay.

21             MS. FRIEMAN:  In the first place, we're all agreed

22  that the breach of fiduciary duty claim has been abandoned --

23             THE COURT:  Right.  Right.

24             MS. FRIEMAN:  -- with that little exception that I --

25             THE COURT:  Right.

69

1          MS. FRIEMAN:  -- the $43,000 that I addressed in my
2    comments earlier.
3          THE COURT:  Right, although I don't see how that's a
4    breach of fiduciary duty either really, but.
5          MS. FRIEMAN:  I'm with you on that one, Your Honor.
6          THE COURT:  Okay.
7          MS. FRIEMAN:  But the second thing is so there's
8    something now alleged, breach of professional duty, that seems
9    to be left --
10          THE COURT:  Right.
11          MS. FRIEMAN:  -- in here.  The only authority that
12    Statek has cited for the existence of this breach of
13    professional duties that they've alleged in their amended
14    complaint is the Bristol case.
15          THE COURT:  Well, they didn't allege anything in the
16    complaint.  That's just in their reply papers.
17          MS. FRIEMAN:  The only -- okay, let me put it this
18    way.  The only explication of what that cause of action that
19    they offered is is in their papers and it's a reliance on the
20    Bristol case.  And as I hope we've demonstrated in our papers
21    and in my comments earlier today, the Bristol case does not --
22          THE COURT:  No, I know that doesn't apply.  The
23    professional there conceded that he was negligent.
24          MS. FRIEMAN:  I guess what I'm trying to say, Your
25    Honor, the bottom line of what I'm trying to say is Coudert has

70

1   to deal with and defend the amended complaint that was served

2   on it.

3          THE COURT:  Right.

4          MS. FRIEMAN:  And I submit that the amended complaint

5   that was served on it doesn't state a claim.

6          THE COURT:  But do you -- well, let me just -- I mean

7   do you believe that you'll be able to give me cases that say

8   that a claim is not stated in paragraph 36?

9          MS. FRIEMAN:  Do I think that there's a basis for a

10  motion to dismiss that they cannot state a claim based on

11  negligence?

12         THE COURT:  Yes.

13         MS. FRIEMAN:  Is that another way of --

14         THE COURT:  Yes.

15         MS. FRIEMAN:  -- to put --

16         THE COURT:  Yes.

17         MS. FRIEMAN:  -- such a question?

18         THE COURT:  Yes.

19         MS. FRIEMAN:  I mean if that's now what they're

20  saying, we're all clear that it's negligence, I personally do

21  not believe that that will be a sustainable claim.  I can tell

22  you that I view that it would be dismissible as a matter of

23  law.

24         THE COURT:  Okay.  Yes, I mean two different things.

25  I agree.  The first point raises all sorts of issues about who