35

1      THE COURT:  Right.

2      MR. LITTLE:  And then after the Second Circuit

3  decided the case, it -- they made a motion for reconsideration.

4  The Second Circuit didn't simply deny it because they were too

5  busy to read it.  They asked for our briefing and we briefed it

6  very thoroughly.  It was submitted to the court.  The court

7  obviously -- I think we have to assume the court read the

8  papers; it's the Second Circuit -- and they denied it, so it is

9  the law the case and it's foreclosed absolutely.

10      THE COURT:  But how can they decide that issue as a

11  factual matter?  It's not -- they have no record of it.

12      MR. LITTLE:  Well, it's not for us to question them,

13  Your Honor.  It's the law of the case.  I mean --

14      THE COURT:  Well, no, I mean --

15      MR. LITTLE:  I mean, I can address the thing on the

16  issue.  I mean, look it, Your Honor.  For years Coudert charged

17  hundreds of thousands of dollars in an ongoing attorney/client

18  relationship with Statek which was run by Johnston Spillane.

19  Their virtual executive office was in Connecticut.  And I think

20  the most remarkable thing is Ms. Frierman herself before the

21  court here actually said the following, and this is a

22  transcript of May 18th, 2009, over three years ago.  "The

23  attorney/client relationship itself between Statek and Coudert

24  was really centered in Connecticut.  Statek during the time it

25  was represented by Coudert maintained a place of business in

36

1   Connecticut.  All communications were between Connecticut and

2   London.  Bills were sent to Connecticut.  As I said,

3   communications were made and paid from Connecticut and

4   communications were between England and Connecticut."

5          Coudert was representing Statek, its client, in

6   Connecticut.  The discovery as I understand it -- and I think

7   this is -- I'm sure this is in the briefs as well -- Coudert

8   had other clients in Connecticut.  It was an international law

9   firm.  It had clients in Connecticut.  It was doing business in

10  Connecticut.

11         THE COURT:  But wouldn't the Second Circuit then be

12  acting as a trial court to be making those findings?  I mean,

13  it seems to be that the reason they denied the motion is that

14  it wasn't germane to their ruling.  I mean, it's not -- it

15  wasn't an issue on appeal.

16         MR. LITTLE:  Well, that may well be, Your Honor, but

17  we have the mandate from the Second Circuit.

18         THE COURT:  Well, I --

19         MR. LITTLE:  It's not for us to overrule the Second

20  Circuit.

21         THE COURT:  I understand that, but I don't -- I guess

22  what I'm saying is that it seems consistent to me with that

23  mandate to say that this issue is a separate factual issue.

24  They haven't decided -- I mean, I could -- certainly it's a

25  one-sentence denial of their motion.  It doesn't explain the

37

1   reasons for it, so you have to I guess read between the lines,

2   but it seems to me it's as consistent if not more so with the

3   notion that this is an issue that needs to be developed below.

4           MR. LITTLE:  There is a significant --

5           THE COURT:  I'm sorry, just to interrupt you.

6           MR. LITTLE:  Sorry.

7           THE COURT:  Isn't -- I mean, applying Connecticut law

8   includes the issue of whether there's *in personam* jurisdiction.

9           MR. LITTLE:  Not here, Your Honor, because they

10  didn't say apply Connecticut law; they said apply Connecticut

11  choice of law rules --

12          THE COURT:  Well --

13          MS. LITTLE:  -- in determining the statute of

14  limitations.  That's the instruction from the court.

15          THE COURT:  But if in fact, there is no *in personam*

16  jurisdiction, you wouldn't be -- you wouldn't get there in the

17  first place.

18          MR. LITTLE:  That may well be, but that's been

19  decided, Your Honor, and we're bound by the law of the case.

20  It's absolutely clear.

21          THE COURT:  Well --

22          MR. LITTLE:  And in addition, if I may add, Your

23  Honor, because there is another argument, it was abandoned by

24  counsel.  They -- when they made the original motion before

25  Judge Underhill in Connecticut it was both on lack of personal

38

1  jurisdiction and *forum non conveniens*.  The court did not rule

2  on the lack of personal jurisdiction and the passing remarks

3  the court made were not determinative of that issue.

4          THE COURT:  I understand that.

5          MR. LITTLE:  It ruled on *forum non conveniens*.

6          THE COURT:  Right.

7          MR. LITTLE:  And then they, who could easily have

8  agreed to the conditions of the court and this case would have

9  been long ago decided in the U.K., decided no, they'd refuse

10 and therefore, the court withdrew its motion.  At that point in

11 time, they could have pushed for a ruling on the motion to

12 dismiss for lack of personal jurisdiction.  They never did.

13 There's no pending motion, by the way, to dismiss on the

14 grounds of lack of personal jurisdiction because an amended

15 complaint was filed with new, more detailed allegations, and I

16 recognize that there's been a stay in place but they've done

17 nothing about that.

18          So for years -- I mean, this has been going on for

19 years -- we're now at the point where we finally have a

20 decision on the statute of limitations, we have clear

21 instructions from the Second Circuit, and this is not the time

22 where they can back up and say, oh, wait a minute now.  Despite

23 the fact we raised it not once but twice in the Court of

24 Appeals, we can still argue that there's a lack of personal

25 jurisdiction that prevents the court from ruling on the statute

39

1    of limitations issue.  That's just not proper.

2              THE COURT:  But where is the waiver?

3              MR. LITTLE:  Their failure to pursue the argument.

4              THE COURT:  But when?

5              MR. LITTLE:  After they refused to comply with the

6    court's suggestion of dismissing on the grounds of *forum non*

7    *conveniens*.

8              THE COURT:  But at that point, you had two things.

9    The stay was still in effect and -- well, three things.  You

10   had the amended complaint and you had the motion to dismiss on

11   the -- simply on the basis of statute of limitations.

12             MR. LITTLE:  No, Judge.  Before you lifted the stay a

13   second time, the stay permitted them to proceed against the

14   complaint on personal jurisdiction *forum non conveniens*

15   grounds.  When this -- the *forum non conveniens* thing got

16   locked up by their refusal to go along with the judge's

17   suggestion, they could have said, okay, Judge, your order still

18   would've permitted them to go back and say we need a ruling on

19   the dismiss for lack of personal jurisdiction.  Instead of

20   letting that just percolate there and then go back and litigate

21   other issues and just leave it lying there, they had an

22   obligation to pursue that.  Your order permitted them to pursue

23   it and they didn't do it.  And frankly, I still think we win on

24   the merits here.

25             THE COURT:  But is that -- is that a waiver, though?

40

1          MR. LITTLE:   I believe it is.  I believe it is.

2          The technical term is forfeiture not waiver, because

3    they did set forth in the answer the defense but it's not -- it

4    technically would be a waiver if they never raised it,

5    obviously, we know that.  But it's a forfeiture because having

6    raised it, they didn't pursue it.  And your partial relief from

7    the stay order permitted them to litigate that and they just

8    let it lie there and proceeded and it's too late now.  I mean

9    there's too much water over the bridge now for them to raise

10   this again.  And I think there's absolutely no room.  And I say

11   this with all due respect, Your Honor, I mean you know what

12   you're doing, but in the Second Circuit they raised it, on

13   their main brief they raised it in a motion for

14   reconsideration.  It was fully briefed.  The court decided

15   against them.  It's the law of the case.

16          THE COURT:   Well, the cases and the commentators say

17   that denial of a rehearing is not law of the case.

18          MR. LITTLE:   That's -- well, the -- well, maybe we

19   could go back to the Second Circuit about that.  They -- do we

20   really believe that that panel, including Judge Newman, asked

21   for briefing on this and then just denied it because they were

22   too lazy, they were just wrong-headed about it.

23          THE COURT:   No, I don't think it's because of

24   laziness; I just think it's not -- they didn't give a reason

25   but --

41

1      MR. LITTLE:  Even if it's not law of the case are you

2  really saying, Your Honor, that this Court is free to ignore a

3  specific mandate from the Second Circuit, that on remand this

4  Court is to apply Connecticut choice of law?  I don't think

5  that available, Your Honor.  I respect the fact that you

6  disagree with the Second Circuit's opinion.  I understand

7  completely what Your Honor is saying, but I don't believe that

8  there's --

9      THE COURT:  I don't disagree with their underlying

10  opinion.  I'm just trying to figure out how or what they mean

11  by saying simply apply Connecticut choice of law.

12      MR. LITTLE:  They didn't say "apply Connecticut law";

13  they said choice of law.

14      THE COURT:  I think that's what I said, Connecticut

15  choice of law.

16      MR. LITTLE:  Exactly, Your Honor, and that's on the

17  whole statute of limitations issue.  It's not choice of law,

18  okay, let's go back to personal jurisdiction.  There's no

19  choice of law involved there.  That's not a choice of law

20  issue.

21      THE COURT:  Well, I understand.  That's why I don't

22  think they needed to rule on it and they didn't.

23      MR. LITTLE:  Well, they --

24      THE COURT:  It's a separate issue that really wasn't

25  before them.  I mean --

42

1          MR. LITTLE:  It was before them, Your Honor.  It was

2   raised in the main brief.

3          THE COURT:  -- except the facts weren't before them.

4   There was no decision.  There was no decision that -- I didn't

5   rule on it, Judge Hellerstein didn't rule on it, and Judge

6   Underhill didn't rule on it.  No one ruled on that issue.

7          MR. LITTLE:  They raised the issue on appeal not once

8   but twice, and it was not accepted by the court.  The court has

9   given a clear instruction to the court.  That's where we are.

10          THE COURT:  Okay.

11          MR. LITTLE:  Your Honor, if we apply then -- if we

12   apply then -- and look it, I just respectfully disagree, Your

13   Honor.

14          THE COURT:  Okay.

15          MR. LITTLE:  And if you want more briefing --

16          THE COURT:  Well, do you have -- I mean, let me make

17   sure I understand your two arguments.  The first argument is

18   that they forfeited this, right?

19          MR. LITTLE:  Correct.

20          THE COURT:  And in support of that, you assert that

21   rather than continue to litigate, after they didn't accept the

22   Connecticut court's condition for dismissal they instead made a

23   motion to dismiss here that didn't raise --

24          MR. LITTLE:  Correct.

25          THE COURT:  -- the personal jurisdiction point.

43

1          MR. LITTLE:   Correct.   Twice.   In other words, they

2   still under your relief from the partial relief from stay

3   order, they could have gone back to Judge Underhill and said

4   okay, Judge, we don't accept this, but we need a ruling on

5   that, and that would've been the end of it, but they didn't do

6   that.   And then when it came back here, motion to dismiss on

7   statute of limitations ground, not on personal jurisdiction

8   grounds, and then on appeal --

9          THE COURT:   Well, are they --

10          MR. LITTLE:   -- they -- I'm going to get to the

11   appeal in a second, but just on the forfeiture point is there

12   any case law that says that they have to make a choice on their

13   motion to dismiss and if they don't raise lack of *in personam*

14   jurisdiction they waived it or forfeited it?

15          MR. LITTLE:   I can't quote any but there should be.

16   I mean the -- to let this case --

17          THE COURT:   I didn't see that.

18          MR. LITTLE:   To let his case languish for years with

19   them holding this in their back pocket, to litigate this all

20   the way up to the Second Circuit.   They've been on this for

21   years and for them to --

22          THE COURT:   Well, but I mean it's -- but when you

23   talk about it languishing, it -- the -- there was not a lengthy

24   delay between Judge Underhill's ruling and the motion to

25   dismiss, was there?   And then the motion to dismiss was decided

44

1    and, you know, appeals take time but I --

2        MR. LITTLE:  Well, they didn't need a whole lot of

3    time to say, Judge, we do not accept your conditions, we need a

4    ruling on the personal jurisdiction.

5        THE COURT:  But remember, this is in a context where

6    Statek was not arguing that Connecticut law applied -- that

7    Connecticut choice of law applied.  They weren't arguing that,

8    so it's like an unnecessary argument to make.

9        MR. LITTLE:  It's not unnecessary if that kills the

10   case.  I mean that's the whole point.

11       THE COURT:  But it doesn't kill the case because they

12   filed a proof of claim here.  There's jurisdiction now because

13   Statek filed a proof of claim in the Bankruptcy Court, so the

14   only reason to raise the argument was on a statute of

15   limitations argument where you're responding to an argument

16   that says that Connecticut choice of law principles applies

17   because the transferor court was Connecticut.

18       But the other issue, the *in personam* jurisdiction

19   issue for the merits, is mooted by the fact that they filed a

20   proof of claim so, you know, that invites jurisdiction here and

21   they have -- they submitted -- they did -- Coudert submitted to

22   the jurisdiction of this court by filing here so the proof of

23   claim covers it.

24       So to me, I would -- I understand your argument if

25   Statek had said we want Connecticut law to apply or it's one of

45

 1  the -- either it or federal law or English law would apply, but

 2  Statek didn't say that the law should apply.

 3              MR. LITTLE:  But I think --

 4              THE COURT:  And then you have the appeal I think,

 5  which is part two.

 6              MR. LITTLE:  Right.

 7              THE COURT:  And I mean, obviously I thought about

 8  that carefully because it was in fact remanded to apply

 9  Connecticut choice of law principles and you can certainly read

10  into that in light of Coudert's having made the argument that

11  the transferor court didn't have jurisdiction, that they

12  considered that argument and rejected it, and that I should

13  assume that the Connecticut court did have *in personam*

14  jurisdiction.  But it's -- to me that view I think requires

15  that they had decided on the merits that the Connecticut court

16  had *in personam* jurisdiction, and I don't seen how they could

17  have done that because there was no record of that, and it was

18  still in front of the Connecticut court.

19              MR. LITTLE:  If it wasn't clear on the main briefs it

20  was certainly clear in the heavy briefing on the motion for

21  reconsideration, and I know Your Honor has copies of those

22  briefs.  They've laid this whole thing out in the motion for

23  reconsideration.  We laid out our response and the court

24  decided by rejecting that.

25              And so, again, what we have is a Second Circuit

46

1    decision, a mandate with clear instructions to apply

2    Connecticut choice of law.  I don't know how they can go around

3    that and suggest this Court should say basically to the Second

4    Circuit, you know, you missed this point and so this Court is

5    not going to accept the instruction.

6              THE COURT:  No, I'm not saying -- no, let me be

7    clear.  I'm not saying that I think the Second Circuit made a

8    mistake.  I'm saying that a more likely reading of their ruling

9    is that they denied the motion because it wasn't really an

10   issue before them.  There's no -- there was no record of this

11   issue in the lower court.  There is no record of the

12   jurisdictional issue before me or Judge -- I mean I certainly

13   didn't say anything about this issue.  Judge Hellerstein didn't

14   say anything about it.  How would they have decided this issue

15   which is based upon facts, you know, the contacts that Coudert

16   had in Connecticut?  How could they have decided?  There's no

17   factual record.

18             MR. LITTLE:  If that were their thinking, Your Honor,

19   they would have remanded for a fuller record.  They would have

20   accepted the argument but they didn't.

21             THE COURT:  But did they wouldn't --

22             MR. LITTLE:  They rejected it.

23             THE COURT:  Do they need to?  I mean I guess that's

24   my point.  I don't think they need to say it because it's -- to

25   me it's obvious.  If it isn't before them, there's not reason

47

1 to decide.

2       MR. LITTLE: But it affects their ruling. If their

3 reasoning is correct and the court's reasoning is correct on

4 this -- I'm not saying it's your reasoning, but if their

5 position is correct, then obviously the decision is erroneous.

6 How can you apply Connecticut choice of law if there is no

7 personal jurisdiction in Connecticut? And so basically, it's

8 saying to the -- it's saying that we're going to assume that

9 the court denied it for another reason and then stupidly went

10 ahead and said, we instruct the District Court to apply the

11 Connecticut choice of law rules. I mean that's the only

12 conclusion that can be made.

13       THE COURT: But --

14       MR. LITTLE: Otherwise, the Court of Appeals would

15 say, having reviewed the motion for reconsideration, we reverse

16 and remand to the Bankruptcy Court with instruction to: (a)

17 first determine whether or not there's jurisdiction to begin

18 with such that Statek had a right to sue in Connecticut and

19 invoke Connecticut law; and then (b) if that happens, yes,

20 apply Connecticut choice of law. But it didn't do that and so

21 we are stuck with, all of us, whether we like it or not, with a

22 clear instruction from the Court of Appeals to apply

23 Connecticut choice of law and there it is.

24       THE COURT: Well, let me ask you, what was the record

25 before then on the issue of personal jurisdiction?

S-601

48

1          MR. LITTLE:  The very thorough briefing on the motion

2    for reconsideration reply.

3          THE COURT:  But there are no -- that's just -- there

4    are no facts, right?  Were there any facts them on the context?

5          MR. LITTLE:  I believe there were.  There was

6    discovery taken before Judge Underhill on the motion --

7          THE COURT:  No, but is that -- was that before the

8    Second Circuit?

9          MR. LITTLE:  I have to go back and look at the

10   briefs, but I do believe we cited the -- we cited to discovery

11   that was taken in Connecticut.  I have to -- I don't want to

12   speak erroneously, Your Honor.

13         THE COURT:  Okay.  But, I mean, I --

14         MR. LITTLE:  I'd have to go back and look at it.

15         THE COURT:  Well, I guess, I mean if in fact they had

16   a factual record in front of them I would understand your

17   argument.  I just --

18         MR. LITTLE:  Judge, you know where I'm lost, really,

19   that we're arguing about whether or not Coudert was subject to

20   jurisdiction in Connecticut.  Is that really a serious argument

21   in all fairness?

22         THE COURT:  I don't know.  I don't know.

23         MR. LITTLE:  But it's uncontested, Judge.  It's --

24         THE COURT:  Well, let me ask --

25         MR. LITTLE:  May I just make a point?

49

1           THE COURT:  Right.

2           MR. LITTLE:  Counsel, Ms. Frierman, in court -- it's

3   uncontested because this is what she said.  The whole

4   relationship was based in Connecticut.  They dealt with a major

5   client.  They were charging hundreds of thousands of dollars

6   for legal service that was based in Connecticut.  They have

7   other clients in Connecticut.

8           THE COURT:  Well --

9           MR. LITTLE:  How can the Connecticut long-arm statute

10  not apply?  And again, I don't think it's for us to go back and

11  do this, but I think that even if the court looks at that, it's

12  obvious.

13          THE COURT:  Well --

14          MR. LITTLE:  And I believe the Second Circuit saw it

15  as being obvious.  And if they mistakenly decided that well,

16  since this isn't totally right for a factual review, since

17  there wasn't a motion for summary judgment, it wasn't fully

18  decided, maybe we shouldn't go there.  But to me, it's

19  painfully obvious --

20          THE COURT:  Well, let me --

21          MR. LITTLE:  -- that Coudert is subject to

22  jurisdiction in Connecticut.

23          THE COURT:  I have tried to look at this practically

24  also.  It seems to me that however I rule on this, there will

25  be an appeal.  And since I am likely, unless the DSI folks can

50

1   persuade me otherwise, to say that I'm going to deny their

2   motion on the Connecticut grounds because there needs to be

3   discovery there, there's going to be delay anywhere, what -- it

4   seems to me it's more practical and will actually end up saving

5   time if people go to Judge Underhill and say, you know, is

6   there jurisdiction or not.  It was fully briefed in front of

7   him.  The record is there.  That's present for him.

8           THE COURT:  Well, I think Your Honor is looking at

9   this correctly.  Because of the 12(b)(6) standard for review,

10  the motion has to be denied.  I mean that's plain.  And so the

11  question then becomes what's the most expeditious way after

12  seven years of litigation to finally get a resolution here one

13  way or the other, whether it's procedural or substantive.  And

14  what I'd ask the Court for is a ruling that permits us to move

15  efficiently and quickly and not get bogged down on this thing.

16          The worst thing that would happen, I don't think the

17  Court is going to do this, is to say that the Court's not going

18  to follow this.  It's going to decide that (a) it's original

19  order denying the motion for reconsideration was justified

20  because there were new grounds; and/or (b) I'm not going to

21  apply the Connecticut choice of law thing and then provoke an

22  appeal with these issues all confused.

23          I think the Court's right.  The clean way and proper

24  way to do this is to deny this as a 12(b)(6) motion because

25  there's no factual record and on the -- the standard is, it has

51

1   to appear beyond doubt that there are no set of facts that

2   would support the allegations of the complaint and the

3   complaint plainly alleges sufficient facts for jurisdiction.

4   But what I would suggest is that this case be remanded to Judge

5   Underhill, the stay be lifted.

6           By the way, if I could raise one point, Your Honor,

7   there's actually -- I know it's been ages, but the original

8   motions for relief from the bankruptcy stay were made in 2007

9   and 2008.  And when the court lifted them partially, it ruled

10  that it would go back to the motions to lift the stay in the

11  future, so those motions are still pending so I don't think

12  it's necessary to make new motions.

13          What I'd ask for is that the stay be lifted so we go

14  back before Judge Underhill to deal with these issues and

15  still, as I said, I don't concede that the Court should not

16  apply the standard Connecticut choice of law, but it's pretty

17  clear to me at this point that their motion has to be denied.

18          I can -- if the court would like, I would like to

19  address the other issues.  I don't know if your suggestion

20  moots that or whether or not you'd like me to address them.

21          THE COURT:  Well, remember, it's not denying -- the

22  first hurdle you have to get over is to win on reconsideration

23  and then we focus on denial of their motion.

24          MR. LITTLE:  Right.

25          THE COURT:  And they, of course, will say that your

52

1   assertion of tolling because of the continuing wrong doctrine

2   is not plausible, but it's hard for me to know that given the

3   facts, I think, as alleged in the complaint so --

4           MR. LITTLE:  Right.

5           THE COURT:  The only thing I'd qualify is that I

6   think at this point we're more at the -- you're ignoring

7   Twombly and Iqbal a little bit there.

8           MR. LITTLE:  I'm sorry, Your Honor?

9           THE COURT:  You're ignoring Twombly and Iqbal a

10  little bit but I'm still even applying Twombly and Iqbal to the

11  complaint on this issue, it would seem to me that it's -- the

12  facts would need to be developed in order to assert that the

13  statute was not tolled.

14          MR. LITTLE:  Well, the -- I mean, I think it is clear

15  and I won't go into detail if Your Honor believes it is clear

16  that in Connecticut they still apply the law of the forum.  I

17  think the cases are absolutely crystal clear on that.

18          THE COURT:  Well, on statute of limitations, yes.

19          MR. LITTLE:  Yes, yes, so --

20          THE COURT:  I agree with that.

21          MR. LITTLE:  Okay.  Then I don't need to pursue that.

22  But under Connecticut law the course of conduct -- there are

23  two things under Connecticut law which extend the statute

24  beyond the rigid rule of three years.  You don't count from

25  1996 when Coudert was asked for files.  You count from when

53

1   because of the continuing course of conduct withholding the

2   files and because of the continuing relationship even if --

3   first of all, we believe there was an attorney/client

4   relationship, but even if there weren't, they were holding

5   files that belonged to Statek.  They had an ethical duty to

6   produce those files and by withholding those, it was a

7   continuing wrong.  They were continuing to hold property of

8   Coudert's --

9           THE COURT:  I haven't --

10          MR. LITTLE:  -- despite repeated requests.

11          THE COURT:  In either -- I have not seen in either

12  side's briefing on this that that type of conduct, withholding

13  files as a former counsel would either give rise to a

14  malpractice claim or not give rise to it.  I didn't see anyone

15  citing cases either way on that point.

16          MR. LITTLE:  Well, first of all --

17          THE COURT:  I understand the ethical argument.

18          MR. LITTLE:  Right.

19          THE COURT:  But ethics is not necessarily

20  malpractice.

21          MR. LITTLE:  Well, first of all, we contest the fact

22  that the relationship ended.

23          THE COURT:  Right, I understand that --

24          MR. LITTLE:  I mean, that's not true.

25          THE COURT:  -- you're saying that they were still

54

1   counsel and I think that's one of the facts --

2            MR. LITTLE:  They were still counsel.

3            THE COURT:  -- that would need to be developed.

4            MR. LITTLE:  And the letter that was sent to them by

5   Skadden Arps did not say we represent Statek.

6            THE COURT:  It didn't fire them.

7            MR. LITTLE:  Right.

8            THE COURT:  You could have more than one counsel.

9            MR. LITTLE:  That's right, okay.  I think that's very

10  clear.

11           THE COURT:  And it came from Statek's parent which

12  then became Statek but --

13           MR. LITTLE:  Right.

14           THE COURT:  I just -- yes, I agree with you that on

15  the easiest point for Statek to win here on the tolling, the

16  facts are not sufficiently clear from the complaint to say that

17  Coudert was no longer counsel.

18           MR. LITTLE:  Right.

19           THE COURT:  Beyond that it appears to me that there's

20  an open issue as to whether a former counsel has an obligation

21  that rises to the level of a malpractice claim if it doesn't

22  return files.

23           MR. LITTLE:  I mean, we'll --

24           THE COURT:  Neither side has cited any case law on

25  that.

55

 1          MR. LITTLE:  We'll certainly do that.  We'll

 2   supplement the briefing if that's acceptable to the Court.

 3          THE COURT:  I'm not sure I need.  I don't think I

 4   need to get there because there's the first issue, which is

 5   it's not clear when Coudert stopped being counsel so ...

 6          MR. LITTLE:  Well, it may become relevant anyway.

 7          THE COURT:  At some point, but I don't think it's

 8   relevant as far as if I go to the merits on the motion to

 9   dismiss.

10          MR. LITTLE:  But I --

11          THE COURT:  I think you win on the first point.

12          MR. LITTLE:  I also think that even if they somehow

13   develop facts sufficient to indicate that there was no formal

14   attorney/client relationship, I think it's a real stretch to

15   say it's not legal malpractice for a law firm to fail to

16   produce to a client --

17          THE COURT:  Well, I don't know.  I mean that's an

18   issue for summary judgment or for some later date.  I don't

19   think you need to brief it for this motion.

20          MR. LITTLE:  Right, okay.  So the -- what we'd ask

21   for, Your Honor, is some way where this litigation can proceed

22   without getting bogged down again.  It's been seven years and

23   we've been up and down and around on all these issues.  And it

24   seems every time that Statek's able to take a step forward,

25   there's another procedural objection raised.

56

1          THE COURT: Well, you know, statute of limitations,

2    but I can't really fault DSI for raising the statute of

3    limitations.

4          MR. LITTLE: I think that this whole case would have

5    been resolved a lot sooner if their motion to dismiss for lack

6    of personal jurisdiction was dealt with way back when before

7    Judge Underhill on the factual record that --

8          THE COURT: No, but it wouldn't. It wouldn't because

9    you could still file your proof of claim. It wouldn't have

10   mattered.

11         MR. LITTLE: It'd matter on the statute of

12   limitations, Your Honor. And now we've spent all this time

13   arguing about the statute of limitations, and now they say, but

14   wait, actually, it doesn't really apply because there was never

15   jurisdiction in Connecticut to begin with and seven years have

16   gone by; and now we're going to revisit that? Number one, I

17   don't think we can revisit it for the obvious reasons.

18         THE COURT: When did Statek first raise this issue?

19   It raised it in its motion for reconsideration which was from

20   July 31, 2009; so, yes, there have been three years since then

21   when its been on appeal. But the issue of Connecticut law

22   applying was first raised July 31, 2009 by Statek after it

23   didn't raise the issue in its defense in the motion to dismiss.

24         MR. LITTLE: But they raised it in their answer and

25   they raised it in a motion before Judge Underhill.

57

1          THE COURT:  But it -- I can only say this one more

2   time and I'll only say it one more time.  There was an

3   important intervening event which is the bankruptcy case,

4   right?  I mean they have personal jurisdiction in the

5   bankruptcy case.

6          MR. LITTLE:  That's right but they're concerned about

7   the application of Connecticut law.  They knew that issue was

8   out there, and they knew they were moving --

9          THE COURT:  They didn't because your guys didn't

10  raise it.  I certainly didn't know it was out there.  I didn't

11  research Van Dusen because no one raised it.  I mean it's --

12  the reply is pretty funny.  It said more likely Coudert did not

13  appreciate the fine nuance.  None of the parties in Global

14  Industrial Technologies or Jafare [Ph.] cited in Coudert's

15  brief on page 7 appears to identify the nuance either.  And

16  certainly neither court discussed it or decided the issue.  The

17  issue was not even implicated in Gaston and Stone.  I mean --

18         MR. LITTLE:  Well --

19         THE COURT:  They're very pleased to have thought

20  about it after it was raised.  I mean, after it was -- the

21  motion was litigated without it being considered.

22         MR. LITTLE:  What we'd ask for, Judge, because

23  there -- even though it's from 2008, there is a pending motion

24  for relief from the stay, we think that their motion -- the

25  bottom line is their motion has to be denied for whatever

S-611

58

1   reason and the case referred back to Judge Underhill.  And we

2   should proceed on all of this before Judge Underhill and not be

3   limited to this piece-meal kind of litigation.  Because if the

4   only relief from the stay is going to be let's develop the

5   facts on personal jurisdiction and then come up all the way

6   back again --

7            THE COURT:  Aren't they developed?  I mean I thought

8   it was all briefed and ready for him to decide and he limited

9   the decision to the *forum non conveniens*?

10           MR. LITTLE:  I'd have to go back and look at the

11  record, Your Honor.  I wasn't counsel of record at that point.

12           THE COURT:  I mean, the reason I would lift the stay

13  is because he'd already dealt with it.  I wouldn't lift the

14  whole thing.  I mean, I spend a lot more time with the other

15  stuff than he has.

16           MR. LITTLE:  And also, Your Honor, there's no pending

17  motion to dismiss for lack of a personal jurisdiction.  There's

18  an amended complaint.  And I know they didn't have to answer,

19  but amended complaint has to be filed.  This whole thing has to

20  be redone.  They can't --

21           THE COURT:  Well, you have --

22           MR. LITTLE:  They can't --

23           THE COURT:  You have an amended complaint.

24           MR. LITTLE:  But there's no answer.  Their answer in

25  their motion is not valid against the subsequent complaint.

59

1  They're going to have to answer it and make a new motion and

2  that should be done in Connecticut before Judge Underhill.  We

3  should go back to Connecticut and litigate that as appropriate,

4  but I still don't think that this Court or the Connecticut

5  court would be free to ignore the mandate of the Second

6  Circuit.  I think it's going to be moot because I can't

7  conceive frankly -- and again, I find it very frustrating after

8  seven years, and obviously, I don't blame the court -- but very

9  frustrating after seven years where a law firm is actually with

10  a straight face making the argument there was no jurisdiction

11  over in Connecticut when it dealt for years and charged

12  hundreds of thousands of dollars representing a client in

13  Connecticut and they have other clients in Connecticut.  I

14  don't get it.  The Connecticut long-arm statute clearly

15  applies.  And I know technically there hasn't been a ruling on

16  it yet and technically we've had motions to dismiss, but this

17  is -- this has turned into, frankly, a procedural farce.

18              THE COURT:  Okay.

19              MR. LITTLE:  Thank you, Your Honor.

20              THE COURT:  Okay.

21              MS. FRIERMAN:  Good morning, Your Honor, Karen

22  Frierman from Stern, Tannenbaum & Bell, and I have my partner,

23  David Tannenbaum with me today.

24              MR. TANNENBAUM:  Good morning, Your Honor.

25              MS. FRIERMAN:  We also are pleased and ready in

60

 1   whatever expedited briefing schedule Your Honor wants to set to

 2   address the issue you've raised about reconsideration under

 3   Rule 59 and we think that you're exactly right, that that needs

 4   to be resolved before any of these other issues can be

 5   resolved.  And I think that it's very significant that the

 6   Second Circuit, not only as Your Honor said, didn't just

 7   reverse the case but remanded it for further proceedings here

 8   for Your Honor to decide the motion for reconsideration, but in

 9   fact expressly pointed out that the appeal from the main

10   decision was untimely.  And I think that's an important

11   distinction that they made, that that -- they were not

12   addressing that but only the reconsideration motion.

13          I want to address briefly, and I apologize I'm going

14   to jump around a little bit because I want to address some of

15   the points that came up in your discussion with Mr. Little, but

16   I want to talk for a moment, if I could, about this idea that

17   there was some kind of waiver or forfeiture by Coudert of the

18   personal jurisdiction defense in Connecticut.  And I think it's

19   helpful to put some actual dates on the actual events up there

20   to see how, in our view, ridiculous the idea that there was any

21   waiver or forfeiture was.

22          On February 3, 190 -- 2006, excuse me, February 3,

23   2006, Coudert made a timely motion in the Connecticut District

24   Court to dismiss the complaint there for lack of personal

25   jurisdiction and on *forum non conveniens* grounds.  In March 23,

61

1    2007, the -- which was then a Connecticut state court case was

2    remanded to the District Court following Statek's bankruptcy

3    filing.   In September --

4              THE COURT:  You mean, Coudert's bankruptcy filing?

5              MS. FRIERMAN:  Coudert's bankruptcy filing, I'm

6    sorry.

7              THE COURT:  And what was the petition date for

8    Coudert?

9              MS. FRIERMAN:  Do you know the petition date?

10             MR. TANNENBAUM:  September 2006.

11             MS. FRIERMAN:  September 2006.

12             THE COURT:  So -- and when was the state court action

13   brought?

14             MS. FRIERMAN:  The state court action was commenced

15   in November of 2006.

16             MR. TANNENBAUM:  5.

17             MS. FRIERMAN:  5.  Excuse me, November of 2005.

18             THE COURT:  2005.  2005.

19             MS. FRIERMAN:  And there was an express allegation in

20   the complaint at that time that Coudert was in dissolution

21   already at that point.  So the case gets removed to the

22   Connecticut District Court following Coudert's bankruptcy

23   March 23, 2007.

24             On March 5, 2007, Your Honor so ordered the parties

25   stipulation allow -- granting relief from the automatic stay so

62

1   that the Connecticut court could oversee discovery on and

2   decide the pending motion on jurisdiction and *forum non*

3   *conveniens*.  And in the course of that, the parties before

4   Judge Underhill both said that all discovery on that issue had

5   been complete by the time Judge Underhill read his decision.

6          Judge Underhill rendered his decision on February 21,

7   2008, which as Your Honor knows, originally dismissed the case

8   on *forum non conveniens* grounds.  He then withdrew that opinion

9   and put some conditions on the withdrawal, which were designed

10  to protect any statute of limitations from tolling during that

11  period between his decision and refiling only.

12         So that was May 8, 2008, the Connecticut District

13  Court was reinstated.  The Connecticut District Court

14  reinstated the action there May 8, 2008.  Less than a month

15  later on June 2, 2008, Statek moved for relief from the stay,

16  again to file an amended complaint so it could assert what it

17  described as English law claims.

18         On August 21, 2008, Your Honor so ordered the

19  stipulation that lifted the automatic stay solely for the

20  purpose of allowing Statek to file that amended complaint,

21  specifically provided that no answer was required by Coudert,

22  and directed the parties to mediate their dispute under the

23  auspices of the Connecticut -- of the New York Bankruptcy

24  Court.

25         So at that point, the case was back in the hands of

63

 1  the Bankruptcy Court.  Coudert had to deal, as Your Honor said,

 2  with the claim in any event.  It made no sense and there was no

 3  reason for it to go back to Connecticut at that point and there

 4  certainly was no knowing or deliberate waiver that you would

 5  necessary to find a waiver of that claim.

 6         THE COURT:  Well, let me ask you procedurally.  It's

 7  clear that the parties acknowledged connection with the first

 8  complaint and answer that discovery was finished, it was

 9  complete on the issue of *forum non conveniens* and personal

10  jurisdiction.

11         MS. FRIERMAN:  Yes.

12         THE COURT:  But there has been an amended answer --

13  excuse me, an amended complaint filed since then.

14         MS. FRIERMAN:  Yes.

15         THE COURT:  So if one were to litigate the issue of

16  *in personam* jurisdiction at this point, what would be the

17  procedural basis for it?

18         MS. FRIERMAN:  Well, we could certainly -- if Your

19  Honor, wants the case to go back to Judge Underhill for

20  decision on that motion, then I would suggest that the stay be

21  lifted and the earlier stay saying that Coudert does not have

22  to respond to the complaint be taken out of any further order

23  and we can either file an answer or we can make a pre-motion

24  ans -- we can make a pre-answer motion.  Then it will be teed

25  up again before Judge Underhill.

64

1      THE COURT:  Would there be any additional discovery

2  or do you just go on the old record?

3      MS. FRIERMAN:  I do not at this moment think there

4  would be any need for additional discovery.  In fact, the

5  amended --

6      THE COURT:  I mean, the amended complaint narrowed --

7      MS. FRIERMAN:  Exactly.

8      THE COURT:  -- the issues.

9      MS. FRIERMAN:  In fact, the amended complaint

10  narrowed the issues and from our perspective, and I don't want

11  to argue the motion before Your Honor, but I think that it

12  narrowed the issues to such an extent that it's going to be --

13  you know, Judge Underhill already thought that there was no

14  basis for *in personam* --

15      THE COURT:  Well, I don't know what he thought.  I

16  mean I think the parties have quoted things from what he said

17  that stand for themselves, but they have to be looked at in the

18  context of how he ruled so -- let me ask you a different

19  question.

20      There was a gap of nine or ten months between the

21  filing of the complaint in Connecticut state court and the

22  Chapter 11 filing, November 5, 2005; the Chapter 11 filing was

23  September of 2006.  That filing would have tolled the statute

24  of limitations.

25      MS. FRIERMAN:  I'm sorry, Your Honor, which filing?

65

1          THE COURT:  The Chapter 11 filing would have tolled

2    the statute of limitations because at that point it's tolled.

3    So I guess conceivably if you had prevailed on the lack of

4    personal jurisdiction, then the statute conceivably could have

5    run between November 5, 2005 and September 2006, so maybe I

6    spoke too soon when I said that the lack of personal

7    jurisdiction was only an issue in connection with the statute

8    of limitations argument as opposed to the underlying merits.

9    Are you following me on this?

10         MS. FRIERMAN:  I think that what Your Honor said

11   earlier, if I understood it and which I think was correct, is

12   that the only reason because Coudert had to deal with the proof

13   of claim that was filed in this action --

14         THE COURT:  Right.

15         MS. FRIERMAN:  -- regardless of anything that

16   happened in Connecticut, didn't happen in Connecticut, happened

17   anywhere else in the world.  But the only time that it became

18   relevant for Coudert to come to grips, so-to-speak, to raise

19   again the issue of the lack of personal jurisdiction was when

20   Statek for the first time raised the Van Dusen Ferrens transfer

21   issue.

22         THE COURT:  Right, I did say that.  Now I'm wondering

23   whether I was wrong in that there's like nine months in there

24   where the statute could have run if you got the -- if I found

25   or that Connecticut had found -- Connecticut court found that

66

1    the original complaint couldn't stand because there was no

2    *personam* -- no *in personam* jurisdiction.

3             MS. FRIERMAN:  I'm sorry, Your Honor.  I'm not sure

4    I'm 100 percent following you.  Which nine months are we

5    focusing on?

6             THE COURT:  Between November 5, 2005 and the petition

7    date, the Chapter 11 petition date.  I'm not sure that that

8    period is really a issue anyway, though.

9             MS. FRIERMAN:  Well, I think it's our position that

10   by November 2005 the statute had already run.

11            THE COURT:  Right.

12            MS. FRIERMAN:  I mean, I don't know if that answers

13   your question.  I'm not sure I'm completely understanding where

14   you're going, but Statek -- but Coudert did timely respond to

15   the November complaint --

16            THE COURT:  Right.

17            MS. FRIERMAN:  -- by asserting the defense.

18            THE COURT:  Right.

19            MS. FRIERMAN:  So I don't see where --

20            THE COURT:  Well, their argument is that you should

21   have kept pressing it all the way through and you're saying you

22   didn't have to keep pressing it and we didn't waive it by not

23   pressing it because in fact we didn't have to keep pressing it,

24   we had these other arguments that were much more relevant.

25            MS. FRIERMAN:  Right, and because the case was really

1  at that point centered here.

2          THE COURT:  On the issue of whether federal choice of

3  law principles applied or New York or English apply.

4          MS. FRIERMAN:  As it developed, yes.

5          THE COURT:  Right.  Okay.

6          MS. FRIERMAN:  You know, I also want to say that as

7  Your Honor pointed out, you know, we cite the cases in our

8  brief that there's really no precedential value to the Second

9  Circuit's denial of the motion for rehearing.  And I think

10 that, you know, some -- the discussions that are going on here

11 prove why that's the case.

12         THE COURT:  Well, I agree with that.  I mean they did

13 say, though, remanded to apply Connecticut choice of law

14 principles they could have said remanded to consider the issue

15 in light of, among other things, the applicability of choice of

16 law principles.

17         MS. FRIERMAN:  Right, but I think that the reason

18 that the denial of the rehearing is not of any precedential

19 value or one of the reasons for that is that it's just reading

20 tea leaves.

21         THE COURT:  No, I understand that point.

22         MS. FRIERMAN:  Right.

23         THE COURT:  And the law is on your side on that

24 point.  I'm focusing not on the denial of the rehearing, but on

25 the actual remand which said apply Connecticut choice of law

68

1    principles.  Statek says with, you know, with some force that

2    they didn't say apply Connecticut choice of law principles

3    after you decide that you should (a) reconsider under Rule 59

4    and (b) determine that there's -- there was *personam*

5    jurisdiction in the transferor court.  They didn't say either

6    of those things.  They just said -- they just jumped to the

7    third step.  They say it's a third step and a final step.  It's

8    in essence as if the order said get to the merits of the motion

9    to dismiss.

10            MS. FRIERMAN:  But I think that as, again, Your Honor

11   said earlier, the Second Circuit didn't say -- didn't treat the

12   issue at all in their decision and that may very well have been

13   because the issue was not teed up before them.  They had no

14   basis on which to determine whether there was one and --

15            THE COURT:  Well, is there a factual record?  I mean

16   did they have access to Judge Underhill's factual record?

17            MS. FRIERMAN:  I do -- I am 95 percent certain that

18   the papers in support of the motion to dismiss before Judge

19   Underhill were not in the record on appeal.

20            THE COURT:  And in any event --

21            MS. FRIERMAN:  I think that all they would have

22   had -- I think that the only thing that might have been in the

23   record on appeal is Judge Underhill's decision itself but not

24   the underlying --

25            THE COURT:  Which didn't cover the issue of *in*

69

1   *personam* jurisdiction.

2         MS. FRIERMAN:  Only in his comments --

3         THE COURT:  Right.

4         MS. FRIERMAN:  -- on his views as to that.

5         THE COURT:  Okay.

6         MS. FRIERMAN:  And in fact, just to go back for a

7   moment to a point that we've been discussing before Your Honor

8   about when Statek for the first time even raised the specter of

9   Connecticut law applying, their original complaint itself was

10  reported to be asserted claims based on New York law, so even

11  then there was no basis.  But you know, we -- I'm happy to

12  discuss all -- you know, any and all of the issues that have

13  been raised, but we do think that the Rule 59 motion should be

14  resolved first.

15        THE COURT:  Okay.  Well, I mean, let's assume that I

16  got to the merits of the motion to dismiss.

17        MS. FRIERMAN:  Okay.

18        THE COURT:  It did seem to me that first <u>Baxter</u> and

19  most of the subsequent case law from Connecticut treats a

20  statute of limitations as not being governed by choice of law

21  Connecticut principles that would go to the interest analysis,

22  but they stick with it as when you're focusing just on statute

23  of limitations, as a Lex 4 analysis that again looks at --

24  unless it's a statute that's part of the underlying statutory

25  cause of action, as a procedural statute and therefore

70

1   Connecticut law would apply.

2           I mean, I know you cite two or three cases that go to

3   the contrary arguably, although arguably they're dicta, but

4   they don't seem to really get into this with the level of

5   overruling Baxter.

6           MS. FRIERMAN:  Well, I mean I --

7           THE COURT:  Or could because they're either lower

8   court cases or a District Court case.

9           MS. FRIERMAN:  No, they certainly could not overrule

10  Baxter, but I think that they certainly indicate a feeling by

11  the lower courts in Connecticut and in Connecticut District

12  Court that the issue is not in fact settled and that

13  particularly after the other cases, Jaqway [Ph.] and O'Connor

14  on the substantive law, that it's not clear that Baxter would

15  in fact be -- still be upheld by the Connecticut Supreme Court.

16          And, in fact, I have found what Judge Underhill says

17  on the subject and this is in a case called Dennany v. Knights

18  of Columbus, 2011 WestLaw 3490039, and that's on August 10th in

19  2011.  And in this case, Judge Underhill said that at page 3

20  that:

21          "Statute of limitations are deemed procedural under

22  Connecticut law and therefore, Connecticut courts traditionally

23  apply Connecticut's statute of limitations when the plaintiff

24  is pursuing a common law cause of action.  Nevertheless, there

25  has been several recent District Court decisions rejecting the

71

1    traditional approach and instead applying the statute of

2    limitations of the state with the most significant relationship

3    to the suit consistent with the restatement second conflict of

4    laws."

5           So I think that certainly Judge --

6           THE COURT:  What did he do in that?

7           MS. FRIERMAN:  Well, in that case, he didn't decide

8    because the law would be the same under either of the potential

9    jurisdictions, but --

10          THE COURT:  So maybe you want him to decide

11   everything too?

12          MS. FRIERMAN:  I'm sorry?

13          THE COURT:  Maybe you want him to decide everything

14   too.

15          MS. FRIERMAN:  Well, we're happy to have the matter

16   before Your Honor.  But I think it's indicative that it's not

17   quite so crystal clear that Baxter which pre-dates the cases

18   that I cited in my brief that Your Honor alluded to and Justice

19   Underhill's decision in the Dennany case that Connecticut is

20   still so wedded to what even Statek referred to in earlier

21   papers as a legal anachronism an outdated approach to the

22   choice of laws.  And I would think that the better approach

23   would be, in fact, to look and see which date has the more

24   significant relationship.

25          And it's particularly powerful here because of the

72

1   issues about personal jurisdiction over Coudert in Connecticut

2   because Statek itself is asserting that it's asserting claims

3   under English law and because, in fact, when the complaint was

4   amended, the old complaint had lots of terrible allegations of

5   horrible things that Coudert allegedly did while it was, I'll

6   say representing Johnston and Spillane, and I put it that way

7   only because I don't want to get in right now to a question of

8   whether or not and when it was terminated by Statek.  But in

9   the pre-1996 era of Statek, the first complaint is full of

10  horrific allegations of things that Coudert did.  When they

11  amended the complaint, it's down to a single allegation

12  relating to this alleged failure to turn over all of the files.

13  That occurred in 1996, by which point Statek has said over and

14  over again that it had no presence in Connecticut at all.  It

15  was a California corporation with no presence in Connecticut

16  during the times relevant to the amended complaint.

17        So really, would Connecticut be so high bound that

18  it's going to insist on applying Connecticut statute of

19  limitations to a case involving a plaintiff that had no place

20  of business in Connecticut during the relevant period of time,

21  alleged wrongdoing by a law firm in Great Britain which they

22  allege was in violation of English law, that had a bankruptcy

23  in New York.  I just don't think that it's so quick to conclude

24  that Connecticut would do so and, in fact, I submit that it

25  would not.

73

1        And I just want to point on quickly that -- and I can
2   talk about the English borrowing statute and what the impact of
3   that would be.  I think I go through it pretty well in my
4   brief, but I just want to point out that for the first time in
5   their reply papers on this subject, Statek tries to rely on a
6   different provision of the English Limitations Act, Section 32,
7   which is entitled "Fraud Concealment and Mistake," and I did
8   spend some time doing some research on what that statute
9   covers.

10       Now there's no allegation in this case and there's
11  never been any allegation in this case that the statute of
12  limitations should be tolled by virtue of any fraud or
13  concealment.  So Statek says in their reply papers that there
14  was a -- like Section 32 of the English Limitation Act tolls
15  the statute because of mistake.  It doesn't really identify
16  what the mistake is, whose mistake it is, but if you look at
17  the cases under Section 32, it's clear that it relates to the
18  kind of unilateral mistake that would in the United States, in
19  New York be the basis for a reformation claim of a contract,
20  not because you thought you had a cause of action and you
21  didn't.

22       There's a case called <u>Thompson v. Arnold</u>, which is
23  reported at -- I'm sorry, Your Honor.  There's a case called
24  <u>Kearns v. McCann Fitzgerald</u>, which actually is a very good
25  case -- clear case relating to the same statute under Irish

74

1    law, which is 2008 WestLaw 2872605.  And then there's a case of

2    Philips Higgins v. Harper, which is at 1954 WestLaw 15596.  And

3    there an attorney went to work for --

4          THE COURT:  Can I interrupt.  Why should I even -- I

5    don't understand why I should even be considering this.  I mean

6    again, this is like --

7          MS. FRIERMAN:  Too late.

8          THE COURT:  -- too late.

9          MS. FRIERMAN:  Yeah, I agree.  I agree.

10         THE COURT:  And it's -- foreign law is a mixed

11   question of law and fact, so I mean they didn't present the

12   facts to me of this issue in --

13         MS. FRIERMAN:  I agree.

14         THE COURT:  -- in connection with the opposition of

15   the motion to dismiss, so this seems to me --

16         MS. FRIERMAN:  I agree.  It was in there.  I just

17   wanted to raise the point that we don't think it's applicable

18   and that the case Sheldon is also easily distinguishable.

19         THE COURT:  Okay.

20         MS. FRIERMAN:  So this brings us all I guess to the

21   last issue, if Your Honor would like to hear us, and that's as

22   to whether or not in our view the claim would be timely under

23   the application of Connecticut statute of limitations.

24         THE COURT:  All right.

25         MS. FRIERMAN:  As we all know, it's a three-year

75

1   statute of limitations and it's really important to remember

2   and well settled in Connecticut law that the statute begins to

3   run with the date of the act and omission and not the date when

4   the alleged wrong was discovered.

5          Statek relies on the continuing course of conduct

6   tolling doctrine as Your Honor has recognized, and we think

7   it's significant at all that they don't rely on the continuing

8   representation document.  We think that's an acknowledgment

9   that there really was no continuing representation in the --

10  that period.  But it's clear in Connecticut that this exception

11  to the statute of limitations is narrowly and sparingly applied

12  because it contravenes the strong policy of the State of

13  Connecticut in favor of repose, and it's also in the

14  International Strategies case clear that it's a proper subject

15  on a motion to dismiss.

16         We -- in order to establish the continuing course of

17  conduct, Statek would be required to show later wrongful

18  conduct or a special relationship giving rise to a continuing

19  duty.  What's the continuing wrongful conduct?  Under their

20  theory -- and they've changed a little bit -- first, they said

21  that when the -- when more documents were produced to the

22  Trustee in 2004 that that was additional wrongful conduct

23  because in their view at that point not everything was

24  produced.  So the first theory was doing the right thing is

25  additional wrongful conduct.  But now they've changed that and

S-629

76

1   they say that the later production was only evidence that

2   Coudert previously failed to disclose all the information it

3   had, so if it's only evidence that they failed to produce

4   everything that they had originally, then I don't seen where

5   there's wrongful conduct.

6            THE COURT:   Because you're saying that's really

7   discovery as opposed to --

8            MS. FRIERMAN:   Right, correct.

9            THE COURT:   As opposed to continuing conduct.   But I

10  think they're relying on the second prong of the rule, which is

11  an ongoing duty --

12           MS. FRIERMAN:   Right, well --

13           THE COURT:   -- through a special relationship.

14           MS. FRIERMAN:   Right, exactly.   And I think that

15  that's key.

16           THE COURT:   And you know, the issue is, does either

17  the fact that they continued as counsel or were prior counsel

18  rise to the level of a special relationship?

19           MS. FRIERMAN:   Well, you know, the whole problem that

20  I think that we have with their argument is that it makes the

21  statute of limitations endless.

22           THE COURT:   Well, only for defendants who have a

23  special relationship.

24           MS. FRIERMAN:   But even so, then it makes it endless.

25  The only time the statute of limitations would ever end under

S-630

77

1   their theory, as I understand it, is when the defendant 100

2   percent satisfies their duty, so it's sort of --

3          THE COURT:  No, I mean if you establish, for example,

4   that Coudert was terminated in -- pick a date -- 2002, anytime

5   before November 5, 2005, then -- you know, then the

6   relationship ends unless there's the failure of a former

7   counsel to provide files is enough to create malpractice.

8          MS. FRIERMAN:  Right.  Well, but what they say is

9   that -- you know, they try to rely on the Connecticut Rules of

10  Professional Conduct to create this duty in a former, even in a

11  former attorney.

12         THE COURT:  Well, that one, you know, I think they

13  have the burden as far as the tolling is concerned, so the fact

14  that neither side submitted case law on this is probably to

15  their detriment and not yours, but on the first point, don't I

16  need to decide when Coudert was terminated and no longer was

17  counsel?  I mean it would seem to me that if they're counsel,

18  they have a special relationship and therefore, their ongoing

19  failure to provide files is -- fits within the Rule I think or

20  the exception to the Rule.

21         MS. FRIERMAN:  Well, I think that, Your Honor, I

22  disagree to this extent, I think that there's case law that we

23  cite in our brief that really indicates that what's happening

24  here was not a continuing failure but really a failure once in

25  1996 to turn over the documents, and that's why we think even

S-631

78

1    Sanborn, which Statek had relied on previously, as well as the

2    Bellemare [Ph.] case --

3            THE COURT:  I understand that.  I think they lose on

4    the first prong of the test because that they're really turning

5    it into a discovery rule which Connecticut doesn't have, but

6    there's a second prong which is that a duty that remains in

7    existence.

8            MS. FRIERMAN:  But until when?

9            THE COURT:  Until they stop being counsel.

10           MS. FRIERMAN:  But I think that their position is

11   that the duty continues even after they stop being counsel so

12   it's like endless.

13           THE COURT:  Well, I understand that, but as long as

14   the first issue is a live issue, I don't see how I can rule in

15   a motion to dismiss that the statute has been tolled because

16   it's still a live issue.  I'd have to take -- you know, you'd

17   have to develop it with sufficient facts, either have a motion

18   for summary judgment or if you can go to trial on it.

19           MS. FRIERMAN:  Let me focus then specifically on that

20   narrow issue for a moment.  When Coudert stopped being counsel

21   for Statek and, you know, I think that we should take Statek at

22   its own word.  And in its complaint it says at least two times,

23   maybe more, but two times that I saw this morning when I was

24   flipping through it, that Coudert represented Statek from 1990

25   to 1996, period.  That's their -- that's their allegation in

S-632

79

1   their complaint.  Two times they say it, if not more.

2         They also make the same claim in -- they made the

3   same claim in their opposition to our motion to disallow the

4   claim at pages 2 and 6, and they make it in their -- they even

5   made it in the Second Circuit Appeal Brief at page 7.  I think

6   that this idea that they spend from, I think it was, you know,

7   the early 90s, if not the late 80s, chasing after Johnston and

8   Spillane, multiple lawsuits in Delaware, finding out all these

9   horrific things that Johnston and Spillane supposedly did to

10  Statek, finding out in the course of those things that there

11  were questions raised about the behavior of some of Statek's

12  attorneys, questions raised about the propriety of some of

13  Coudert's bills that have said in the -- that the Delaware

14  Court mentioned in that decision, and they find all of these

15  things out, they have to fight tooth and nail to get control of

16  the company back, and bring a lawsuit to do that.

17        Finally, Mr. Vendel, through his nominee or himself,

18  is vindicated that he is the sole shareholder of Statek and he

19  kicks Johnston and Spillane finally to the curb.  Coudert is

20  still representing him.  Skadden Arps writes them a letter,

21  Mr. Vendel is now in control where he belongs.  Don't do

22  anything with the money you're holding in your trust account.

23  Is it really plausible?  Does that pass a straight-face test

24  that Statek is relying on the legal representation of Coudert

25  Brothers after that, really?  And then even when they come and

80

1   they ask for -- so several months later they come and they say,

2   give us your files, Ms. Waring from Statek goes in, and this is

3   in the pleadings, this is not extra pleading, it's in the

4   pleadings that they go and they say we'd like your files and

5   they get some information, and they write another letter to

6   Coudert and they say that's not what I asked you for; I asked

7   you for X-Y-and-Z.  And Coudert sends another letter and says

8   oh is this what you asked for?  And in their complaint, they

9   demonstrate that they were dissatisfied with the responses that

10  they were getting in 1990 from Coudert to their requests.

11  We're supposed to believe that they thought that Coudert was

12  still their lawyers, really?

13          Johnston and Spillane lived like potentates, I think

14  that the Delaware said.  Drug consiglieres, money here, money

15  there, money everywhere, stealing every penny blind while

16  Coudert was representing them.  Of course, if I was Statek, I'd

17  continue to use Coudert.  Who wouldn't?  It makes sense to me.

18  Really, that's plausible?  That entitles them.  They talk about

19  their delay.  That entitles them to keep Coudert on the hook in

20  this case when they waited all of those years.  They had bigger

21  fish to fry.  There's no question about it.  In the 90s they

22  had bigger fish to fry.  They had to find Johnston.  They had

23  to find Spillane.  They had to find this David Alfred

24  character.  They had to start this bankruptcy in England.  They

25  were plenty busy.  They were plenty busy trying to collect the

S-634

81

1 money that Johnston and Spillane had stolen from them.

2         When they finally come around to it and they have

3 enough time and they have breathing room, then they decide to

4 go after Coudert, and the basis for their case now for being

5 able to do that after all those years is because Coudert was

6 still my lawyer.  Coudert was still your lawyer?  Really?

7 That's plausible under Iqbal?  I think that there's enough

8 information before Your Honor of the record in their pleadings,

9 in the decisions of the Delaware Court that we have cited in

10 our brief for you to conclude that they were not the lawyer

11 after 1996.  They say they were not the lawyer after 1996.

12 They say it twice at least in their complaint.

13         THE COURT:  Well, they actually don't say that.  They

14 say they represented them from 1996 to 1999.

15         MS. FRIERMAN:  From 1990 to 1996.

16         THE COURT:  Right.

17         MS. FRIERMAN:  That's correct.  That's correct.

18 That's what they say twice and they've said it in their papers

19 also.  And in the absence of that relationship there's no duty

20 that tolls the statute of limitations.  It turns it into a

21 discovery statute which Connecticut has said time and time,

22 again, the statute is not.  And which Connecticut has time and

23 time again recognized that sometimes has harsh results.

24 Sometimes your cause of action -- you lose your cause of action

25 before you know about it.  That's the way it goes.  It's a

82

1  doctrine of repose and Coudert is entitled to repose even under

2  the Connecticut statute.

3         THE COURT:  Okay.

4         MS. FRIERMAN:  And the only other thing I would just

5  say is that for the same reason, you know, we don't think that

6  the policy behind the doctrine of continuing the course of

7  conduct applies because really what it's aimed at is trying to

8  preserve a relationship between entities to see if the problem,

9  whatever it is, can be worked out or will work itself out.

10  And, you know, as I said, we don't think that there was any

11  relationship that could be salvaged at that time.

12         And finally, unless there's anything else Your Honor

13  wants to ask me that we might have -- I might have passed over

14  is that -- no, I think that that's -- you know, I think that

15  that's it other than the arguments that we make in our brief

16  unless there's anything else Your Honor wants to ask us.

17         THE COURT:  Okay.

18         MR. LITTLE:  Your Honor, may I have just a few

19  minutes?

20         THE COURT:  Sure.

21         MR. LITTLE:  Not to re-do any argument.

22         THE COURT:  No, that's fine.

23         MR. LITTLE:  I'm really surprised at that dramatic

24  rendition of all that Statek went through.  If anything, that

25  proves the point.  Coudert was well aware standing back

83

1   watching this insane litigation where Statek had to litigate

2   for years to get control back where they demonstrated that

3   Coudert moved money to the Isle of Guernsey, that they bought

4   property for Johnston Spillane, that they moved artwork for

5   Johnston Spillane, that they rent an apartment in London, and

6   they sat back and then when they were requested for documents,

7   they just gave them the limited set of documents.  And it

8   wasn't until 2002, 2004, 2008, 2009 when they thought that this

9   property of Statek, when they realized that they had billed

10  Statek for these services, that Statek was the only client ever

11  on their books, that they thought that that was okay.

12          If anything, that proves the malpractice point that

13  year after year when they begrudgingly would give up documents,

14  they weren't giving up everything.  That's the malpractice

15  here.  And the continuing relationship is based not only in the

16  fact that they represented Coudert for years and charged them

17  for it, but they continued to hold their property.  That's a

18  special relationship.  A lawyer has an obligation to return

19  property to a client on request.  They were requested

20  repeatedly and I'm not saying that every time they gave

21  documents that's a violation.  That's crazy.  No one has said

22  that.  The fact is that demonstrates they still had more

23  property.

24          And to counsel's rhetorical argument that means it's

25  endless; that's right.  If your client is committing

S-637

84

1   malpractice endlessly, then they are exposed to suit endlessly

2   until it stops.  And if Coudert finally in 2009 gave up all the

3   documents, okay, then it ends.  It's not endless.  It's endless

4   when they still are violating their ethical obligation to

5   return the property of their client.  Thank you, Your Honor.

6           THE COURT:  Okay.

7           MR. LITTLE:  Oh, one other thing, Your Honor.  I just

8   want to make sure that I didn't misunderstand.  I don't believe

9   that a remand to Judge Underhill on the jurisdic -- personal

10  jurisdiction point would be a valid result here.  The motion

11  should be denied --

12          THE COURT:  Well, it wouldn't be a remand.  It would

13  be -- I would give people an opportunity to obtain relief from

14  the stay, only that it wouldn't --

15          MR. LITTLE:  But that would be evading the Second

16  Circuit's mandate.  The Second Circuit instructed that

17  Connecticut choice of law apply.  It didn't mean that somehow

18  the case could be referred back or however the procedure is to

19  Judge Underhill, who then -- and then they'd argue there's no

20  personal jurisdiction and then there would be a decision that

21  Connecticut choice of law doesn't apply.  That would be an

22  evasion of the Second Circuit's decision.  And like it or not,

23  that's the decision that has to be followed and faced.

24          THE COURT:  Okay.  All right, well, I would like

25  additional briefing on this, on two issues.  The first is the