Case 1:13-cv-08578-LTS Document 16-15 Filed 12/17/13 Page 1 of 100
060622826dddDoDo552661-1FileFiled08/09/0613Entered08/09/0613 15:430713 MeExhibindum
Order Order Memorandem on a Decisieg 19 Pgf 23 of 31

the apple. . . .' 'The standard for granting a Rule 59 motion for reconsideration is strict.'")

(quoting Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998), cert. denied, 133 S. Ct.

1805 (2013), and Shrader v. CSX Transp. Inc., 70 F.3d at 257). See also McGee v. Dunn, 2013

U.S. Dist. LEXIS 55732, at *9 (S.D.N.Y. Apr. 16, 2013) (parties may not use a motion under

Local Rule 6.3, entitled "Motions for Reconsideration or Reargument," to "advance new facts,

issues or arguments not previously presented to the court"); Bace v. Babitt, 2012 U.S. Dist.

LEXIS 92441, at *35-*36 (S.D.N.Y. May 10, 2012) ("[A] motion to reconsider should not give

the moving party another bite at the apple by permitting argument on issues that could have been

or should have been raised prior to the original motion.") (citations and internal quotation marks

omitted); Cobalt Multifamily Investors I v. Shapiro, 2011 U.S. Dist. LEXIS 119346, at *27

(S.D.N.Y. Sept. 9, 2011) ("A motion for reconsideration is not appropriately filed as a vehicle

for a party dissatisfied with the Court's ruling to advance new theories.") (citation and internal

quotation marks omitted); Associated Press v. U.S. Dept. of Defense, 395 F. Supp. 2d 17, 19

(S.D.N.Y. 2005) ("It is settled law in this District that a motion for reconsideration is neither an

occasion for repeating old arguments previously rejected nor an opportunity for making new

arguments that could have been previously advanced[.]") (citations omitted); Richard Feiner &

Co. v. BMG Music Spain, 2003 WL 21496812, at *1 (S.D.N.Y. June 27, 2003) ("[P]laintiff is

advancing new arguments without excuse as to why these arguments were not raised previously,

and these arguments are therefore not cognizable on a motion for reconsideration."); 

Novomoskovsk Joint Stock Co. "AZOT" v. Revson, 1999 U.S. Dist. LEXIS 15022, at *2-*3

(S.D.N.Y. Sept. 27, 1999) ("New arguments . . . are not to be considered [on a motion for

reconsideration] unless there is some valid reason they could not have been previously advanced

when the motion was originally argued."); In re Lamberti, 2006 Bankr. LEXIS 2140, at *5

(Bankr. S.D.N.Y. Aug. 16, 2006) ("A party who fails to present their strongest case in the first

instance generally has no right to raise new theories or arguments in a motion to reconsider.")

(citation and internal quotation marks omitted).

The rule prevents litigants from unduly prolonging the trial stage of litigation, limited

only by the number of theories they might assert after their initial arguments prove unavailing, or

requiring courts to anticipate the parties' potential legal theories even if not raised. Associated

Press v. U.S. Dep't of Defense, 410 F. Supp. 2d 147, 152 (S.D.N.Y. 2006) ("Otherwise,

disappointed litigants would be forever raising new arguments and there would be no end to

litigation.") (citation omitted); Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y.

1988) ("The purpose of the rule is to ensure the finality of decisions and to prevent the practice

of a losing party examining a decision and then plugging the gaps of a lost motion with

additional matters.") (citation and internal quotation marks omitted); Parrish v. Sollecito, 253 F.

Supp. 2d 713, 715 (S.D.N.Y. 2003) ("Reconsideration of a court's previous order is an

extraordinary remedy to be imployed sparingly in the interests of finality and conservation of

scarce judicial resources.") (citation and internal quotation marks omitted).

Because of its adverse effect on the litigation process, therefore, courts rarely grant a

motion for reconsideration, even if it is based on alleged manifest injustice, when the movant

could have advanced the legal argument before its motion for reconsideration. See Women's

Integrated Network, Inc. v. United States Specialty Ins. Co., 495 Fed. Appx. 129, 131 (2d Cir.

2012) ("Even if we were to assume, without deciding, that the district court misconstrued the

insurance policy or misapplied governing law in granting dismissal, we would not conclude that

this is a case presenting 'exceptional circumstances' warranting relief.  The proper recourse for

[appellant] was to file a timely appeal to this court[.]") (citation and internal quotation marks

omitted); Som Nath Chitkara v. N.Y. Tel. Co., 45 Fed. Appx. 53, 55 (2d Cir. 2002); Analytical

Surveys, Inc. v. Tonga Partners, L.P., 2009 U.S. Dist. LEXIS, at *4-*5 (S.D.N.Y.  May 28,

2009), aff'd, 684 F.3d 36 (2d Cir. 2012), cert. denied, 133 S. Ct. 1805 (2013); In re PT-1

Commc'ns, Inc., 463 B.R. 599, 606 (Bankr. E.D.N.Y. 2011), aff'd, 486 B.R. 9 (E.D.N.Y. 2012).

Analytical Surveys is instructive.  Although the movant's new legal theory could

possibly have changed the outcome of the case, the District Court found that it was "not

manifestly unjust" to deny the motion because the other side "should not be required to respond

to new arguments now."  Analytical Surveys, Inc. v. Tonga Partners, L.P., 2009 U.S. Dist.

LEXIS, at *11-*12.  Indeed, to grant the motion for reconsideration "would unduly undermine

[the adversary's] compelling interest in finality" and the adversary, rather than the movant,

"would suffer a manifest injustice."  Id. (citing Parrish v. Sollecito, 253 F. Supp. 2d at 715).  The

Second Circuit agreed, finding that the trial court had not abused its discretion given that the

appellant had not called its present legal argument to the court's attention before it granted

summary judgment.  684 F.3d at 52-53.  Just as a court cannot be said to have overlooked

controlling facts or law that were not raised to it before the motion for reconsideration, rarely if

ever will a ruling be manifestly unjust or constitute clear error if the basis for reconsideration

was not manifest to the court and the other side until the losing party raised it after the ruling.

A manifest basis to reconsider does not exist here.  First, while the decision whether to

apply Connecticut choice of law rules is a pure question of law, the outcome of the choice of law

question was not clear to this Court or the District Court even after the argument was raised by

Statek's reconsideration motion.[15]  It clearly was not evident before Statek filed its

---

[15] The Second Circuit acknowledged, further, "[W]e recognize that our opinion in In re
Gaston employs some broad language, in dicta, that could be read as reaching every state law

reconsideration motion, when both parties argued that other choice of law regimes, not Connecticut's, applied. See supra note 14. Moreover, the actual application of Connecticut choice of law rules to the facts set forth in the Claim is, as noted above, a mixed question of law and fact, and, as discussed above, there is no clear answer to whether the limitations period for Statek's Claim was tolled for approximately 6 years by Connecticut's "conspicuously fact-bound" continuing course of conduct doctrine. Haas v. Haas A.2d at 720. It is decidedly unclear now, therefore, whether the application of Connecticut choice of law principles would prevent Statek's Claim from being time barred, as of course it was unclear when Statek made its reconsideration motion, which did not even mention the tolling issue. Under the circumstances, no "manifest injustice" or "clear error" requires the Court to vacate the Reconsideration Order.

**4. The law-of-the-case doctrine does not require granting the reconsideration motion on remand; instead, it supports its denial.**

Statek has argued, however, that the Second Circuit's remand requires this Court to vacate the Reconsideration Order. Clearly this would be so if the Circuit had directed the vacatur of that order or reversed the Court's first alternative holding, either expressly or implicitly. "[W]here issues have been explicitly or implicitly decided on appeal," the lower court "is obliged, on remand, to follow the decision of the appellate court." Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006) (citing United States v. Minicone, 994 F.2d 86, 89 (2d Cir. 1993); United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001), cert. denied, 549 U.S. 1334 (2007)). A lower court "generally may not deviate from a mandate issued by an appellate court" because the lower court "has no discretion in carrying out the mandate," and "the appellate court retains the authority to determine whether the terms of the mandate have been 'scrupulously and fully carried out.'" In re Ivan F. Boesky Sec. Litig., 957 F.2d 65, 69 (2d Cir. 1992) (quoting

Case 1:13-cv-08578-LTS   Document 16-15   Filed 12/17/13   Page 5 of 100

06-5222-cv   Document 55   Filed 08/09/13   Entered 08/09/13 15:43:07   Memorandum
Order and Decision on Remand   Pg 23 of 28   of 31

<u>United States v. E.I. Du Pont De Nemours & Co.</u>, 366 U.S. 316, 325 (1961)).  <u>See also</u> <u>Am.</u>
<u>Hotel Int'l Grp, Inc. v. OneBeacon Ins. Co.</u>, 374 Fed. Appx. 71, 73-74 (2d Cir. 2010).

    This result derives from the law-of-the-case doctrine, under which "a decision on an issue
of law made at one stage of a case becomes binding precedent to be followed in subsequent
stages of the same litigation" such that "when a court decides upon a rule of law, that decision
should continue to govern the same issues in subsequent stages in the same case." <u>Liona Corp.</u>
<u>v. PCH Assocs. (In re PCH Assocs.)</u>, 949 F.2d 585, 592 (2d Cir. 1991) (citations and internal
quotation marks omitted).  Thus, the mandate rule "forecloses relitigation of issues expressly or
impliedly decided by the appellate court." <u>Ben Zvi</u>, 242 F.3d at 95 (citations omitted).

    The corollary to that rule, however, consistent with its derivation in the law-of-the-case
doctrine, is that "if an issue was not part of the appellate decision," the lower court "may
consider the matter," <u>Burrell</u>, 467 F.3d at 165 (citing <u>Minicone</u>, 994 F.2d at 89 (citation and
internal quotation marks omitted)), and should generally be governed by the prior law of the case
-- that is, its prior ruling.  <u>In re PCH Assocs.</u>, 949 F.2d at 593; <u>Am. Hotel Int'l Grp, Inc. v.</u>
<u>OneBeacon Ins. Co.</u>, 611 F. Supp. 2d 373, 378-80 (S.D.N.Y. 2009), <u>aff'd</u>, 374 Fed. Appx. 71 (2d
Cir. 2010).  <u>See generally</u> <u>United States v. Uccio</u>, 940 F.2d 753, 757-58 (2d Cir. 1991) (where
appellate court has not ruled, law of the case governs lower court's ruling on remand, and, while
not inviolate, lower court should adhere to its prior rulings "absent cogent or compelling reasons
to deviate, such as an intervening change of controlling law, the availability of new evidence, or
the need to correct a clear error or prevent manifest injustice" and be "informed principally by
the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the
benefit of the [law-of-the-case] doctrine.") (citations and internal quotation marks omitted).  <u>See</u>
also United States v. Stanley, 54 F.3d 103, 107 (2d Cir. 1995), cert. denied, 516 U.S. 891 (1995);

Gowanus Indus. Park v. Arthur H. Sulzer Assocs., 2013 U.S. Dist. LEXIS 45493, at *10-*12

(E.D.N.Y. Mar. 23, 2013).

   To determine whether an issue was decided on appeal, the lower court "should look to

both the specific dictates of the remand order as well as the broader 'spirit of the mandate.'"

Burrell, 467 F.3d at 165 (citing Ben Zvi, 242 F.3d at 95).

   Upon review of the Second Circuit's opinion and order, as well as the argument and

briefing before the Circuit, it is clear that the Circuit did not expressly reverse this Court's first

alternative holding, which denied Statek's motion to reconsider because it was based on a new

legal argument.  The opinion does not mention that alternative holding.  See In re Coudert Bros.

LLP, 673 F.3d at 180.

   Did the Second Circuit's mandate implicitly decide the issue?  To be implicitly decided,

the issue would first need to have been raised to the Circuit, because an issue cannot be

implicitly decided unless it was "squarely" presented.  Meacham v. Knolls Atomic Power Lab.,

358 Fed. Appx. 233, 236 (2d Cir. 2009), cert. denied, 131 S. Ct. 414 (2010).  Failure to raise the

issue on appeal is tantamount to its waiver.  Parmalat Capital Fin. Ltd. v. Bank of Am., 671 F.3d

261, 270-71 (2d Cir. 2012) (alternative holding that had not been raised either before the District

Court or the Second Circuit in the initial appeal was "impliedly decided" to have been waived

and should not have been entertained on remand).  See also Am. Hotel Int'l Grp. Inc. v.

OneBeacon Ins. Co., 374 Fed. Appx. at 74 ("[A] decision made at a previous stage of litigation,

which could have been challenged in the ensuing appeal but was not, becomes the law of the

case; the parties are deemed to have waived the right to challenge that decision, for '[i]t would be

absurd that a party who has chosen not to argue a point on a first appeal should stand better as

regards the law of the case than one who had argued and lost.'") (quoting County of Suffolk v.

8-744

Stone & Webster Eng'g Corp., 106 F.3d 1112, 1117 (2d Cir. 1997) (quoting Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981)).

Here, Statek never addressed this Court's alternative holding in its briefs to the District Court and the Second Circuit. See Case No. 10-2723-cv, Dkt Nos. 28, 46, 63; Case No. 09 Civ. 9561, Dkt. Nos. 9, 13, 18. Statek also did not raise the alternative holding at oral argument before the Second Circuit. See Oral Argument on April 29, 2011, In re Coudert Bros. LLP, 673 F.3d 180 (2d Cir. 2012) (No. 10-2723-cv).

In light of the foregoing, the Court should follow it prior alternative holding. The American Hotel line of cases controls. In American Hotel, the District Court granted a motion for summary judgment on the basis that the oral agreement at issue and an oral contract modification were unenforceable under New York's Statute of Frauds. Am. Hotel Int'l Grp. Inc. v. CGU Ins. Co., 2004 U.S. Dist. LEXIS 5154, at *24-*25 (S.D.N.Y. Mar. 26, 2004). Alternatively, the court held that, even if New York law did not apply, the oral contract modification was unenforceable under Pennsylvania law because it was not supported by consideration. Id. at *25 n.7. The court subsequently denied a motion for reconsideration, Am. Hotel Int'l Grp. Inc. v. OneBeacon Ins. Co., 2005 U.S. Dist. LEXIS 9420 (S.D.N.Y. May 17, 2005), which was appealed.

The appellant argued that the District Court had improperly held that New York law governed and that Pennsylvania's Statute of Frauds would have allowed enforcement of the oral agreement. Aramarine Brokerage, Inc. v. OneBeacon Ins. Co., 307 Fed. Appx. 562, 564 (2d Cir. 2009). Agreeing, the Second Circuit reversed, holding that the District Court should have applied Pennsylvania law under New York's choice of law rules. Id. at 564-65. However, the

Circuit did not reverse or affirm the alternative basis for the District Court's grant of summary

judgment. Id. at 565.

On remand, the District Court held that its alternative ruling based on the lack of

consideration under Pennsylvania law, "did not run afoul of the Second Circuit's decision" and

concluded, further, that this was "not inconsistent with" the Second Circuit's mandate to retry the

claim already invalidated under its alternative Pennsylvania law holding. Am. Hotel Int'l Grp.,

Inc. v. OneBeacon Ins. Co., 2009 U.S. Dist. LEXIS 29638, at *4 (S.D.N.Y. Apr. 6, 2009).

Denying a second motion for reconsideration, the court held that its alternative holding, not

having been ruled on by the Circuit, remained the law of the case. Am. Hotel Int'l Grp. Inc. v.

OneBeacon Ins. Co., 611 F. Supp. 2d 373, 378-80 (S.D.N.Y. 2009):

> In the case in which the mandate of the appellate court does not address a
> particular issue, the appellate judgment, on this issue, *does not establish the law of
> the case,* and on appeal from the judgment rendered after remand, it may be
> reviewed by the appellate court. *It remains, however, that the issue was decided
> by the district court in an earlier case and was not disapproved by the appellate
> court. It is, therefore, the law of the case.*

Id. at 379 (emphasis in opinion) (quoting In re PCH Assocs., 949 F.2d at 593 (quoting 1B

Moore's Federal Practice ¶ 0.404[4.-3], at 131)).

The District Court then declined to exercise its discretion on remand to reconsider and

overturn its alternative holding not decided by the Circuit, reasoning as follows,

> Although a district court on remand has the discretion to reconsider an issue that
> was not decided by the Court of Appeals, the law of the case doctrine counsels
> against doing so. See Uccio, 940 F.2d at 758. A court's decision on whether to
> apply the law of the case doctrine turns principally on whether 'reconsideration is
> necessary to avoid injustice.' Scottish Air, 152 F.R.D. at 25 (internal quotation
> and citation omitted). The Second Circuit has advised that a court should adhere
> to its own prior rulings, absent 'cogent' or 'compelling' reasons to deviate, such
> as an intervening change of controlling law, the availability of new evidence, or
> the need to correct a clear error or prevent manifest injustice. Uccio, 940 F.2d at
> 758 (internal quotations and citations omitted).

Am. Hotel, 611 F. Supp. 2d at 379.

On appeal, the appellant argued that the District Court "failed to comply with [the Second Circuit's] previous mandate" because "by vacating the district court's judgment in its entirety, [the order] impliedly rejected the district court's alternative holding." Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co., 374 Fed. Appx. 71, 73 (2d Cir. 2010). The Second Circuit affirmed the District Court's decision on remand, however. Id. at 73-74. In so ruling, the Circuit recognized that it "did not speak directly to" or "address" the District Court's alternative holding in its first decision: "[n]or did this Court address the district court's alternative finding . . . that the . . . [a]greement, even if valid under the statute of frauds, would have failed for want of consideration." Id. at 73. Therefore, the District Court's alternative holding remained the law of the case because it was not "expressly or implicitly addressed on appeal," and the District Court "did not err in determining that [the Second Circuit's] order left that holding undisturbed." Id. at 74.

As in American Hotel, the Second Circuit did not address this Court's alternative basis for denying Statek's reconsideration motion -- that Statek raised its argument under Van Dusen and Ferens and requested the application of Connecticut law for the first time in its motion for reconsideration. The reversal and remand do not implicitly overrule that holding. As in American Hotel, the alternative holding therefore remains the law of the case and, as discussed above, may not be ignored absent compelling reasons to deviate from it, which do not exist here. See also United States v. Stanley, 54 F.3d at 107-08.

## Conclusion

For the foregoing reasons, Statek's motion for reconsideration, on remand, should be

denied.  Counsel for the Plan Administrator should submit a proposed order to chambers

consistent with this ruling.


Dated:  August 19, 2013
        White Plains, New York


_____

United States Bankruptcy Judge

1          UNITED STATES BANKRUPTCY COURT
2            SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------X
    In Re:                              :   06-12226 (RDD)
4                                       :
        COUDERT BROTHERS, LLP           :   300 Quarropas Street
5                                       :   White Plains, New York
                       Debtor.          :
6   ------------------------------------X   October 24, 2013

7        TRANSCRIPT OF STATEK CORPORATION'S SECOND MOTION FOR
         RECONSIDERATION OF THE COURT'S ORDER ON REMAND DENYING
8         STATEK CORPORATION'S MOTION FOR RECONSIDERATION AND
         MEMORANDUM OF DECISION ON REMAND ON STATEK'S MOTION FOR
9            RECONSIDERATION OF CLAIM DISALLOWANCE ORDER;
         MOTION TO STRIKE DOCUMENTS CONTAINED IN APPELLANT'S
10       DESIGNATION OF CONTENTS OF RECORD FOR APPEAL FILED BY
    KAREN S. FRIEMAN ON BEHALF OF DEVELOPMENT SPECIALISTS, INC.;
11       OBJECTION TO MOTION OBJECTION TO PLAN ADMINISTRATOR'S
         MOTION TO STRIKE DOCUMENTS CONTAINED IN APPELLANT'S
12       DESIGNATION OF CONTENTS OF RECORD FOR APPEAL FILED BY
           CHRISTINE OKIKE ON BEHALF OF STATEK CORPORATION
13           BEFORE THE HONORABLE ROBERT D. DRAIN
                UNITED STATES BANKRUPTCY JUDGE
14

15  APPEARANCES:

16  For Statek                 ANTHONY W. CLARK, ESQ.
                               J. ERIC IVESTER, ESQ.
17                             Skadden Arps Slate Meagher & Flom
                               Four Times Square
18                             New York, New York 10036

19  For Development            KAREN S. FRIEMAN, ESQ.
      Specialists:             DAVID S. TANNENBAUM, ESQ.
20                             Stern, Tannenbaum & Bell
                               380 Lexington Avenue
21                             New York, New York 10168

22

23
                               SHARI RIEMER
24  Court Transcriber:         TypeWrite Word Processing Service
                               211 N. Milton Road
25                             Saratoga Springs, New York  12866


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service

2

1   (Proceedings began at 10:50 a.m.)

2           THE COURT: Okay.  Coudert.  So this is Statek's

3   current or second Rule 59 motion.

4           MR. CLARK:  Good morning, Your Honor.  Tony Clark

5   and Eric Ivester, Skadden Arps for Statek.  It's always

6   pleasure to appear in Your Honor's courtroom.

7           THE COURT: It's been a while but it's nice to see

8   you too.

9           MR. CLARK: The last time -- these digs are a little

10  bit better than the digs down in Bowling Green.  I like it up

11  here.

12          THE COURT: Okay.

13          MR. CLARK: Look, Your Honor, I'm happy to discuss

14  whatever the Court might find helpful and I know that Your

15  Honor often has your own ideas about what the focus ought to

16  be at a hearing like this but for my part I can try to be

17  brief and get straight to the point.

18          THE COURT: Okay.

19          MR. CLARK: In the Court of Appeals February 2012

20  decision from the prior denial of Statek's first

21  reconsideration motion the Court "remanded the -- " "remanded

22  in part to the bankruptcy court with instructions to apply

23  Connecticut's choice of law rules in deciding Statek's motion

24  to reconsider.

25          Respectfully, Your Honor, I don't think there's any

3

1  way to read that instruction as leaving any discretion in this

2  Court to do --

3  　　　　THE COURT: All right.  But I already decided that.  I

4  mean I had supplemental briefing on that issue and I decided

5  to the contrary.

6  　　　　MR. CLARK: You did.  You did, Your Honor.  So in

7  response to our current motion what the plan administrator has

8  argued is that we failed to show either number one, an

9  intervening change in the law or number two, any facts that

10  were overlooked by the Court on the remand decision, either of

11  which would be sufficient to warrant the Court's

12  reconsideration on that remand decision.  We disagree.  We

13  think we've shown both of those.

14  　　　　First, on the change in the applicable law, the plan

15  administrator is now arguing, appears to be arguing that the

16  burden is on Statek to show that its complaint was timely

17  filed under what we all know now is controlling Connecticut

18  law on the statute of limitations and that Statek failed to do

19  so and that it's too late now to permit Statek to amend its

20  complaint to plead facts showing timeliness.  To the extent

21  the Court agrees with that analysis and those assertions, that

22  would reverse the normal burden on what Your Honor held was a

23  12(b)(6) motion to dismiss.

24  　　　　THE COURT: But what is the change in -- what is the

25  change in intervening law?

4

1          MR. CLARK: It's the law of Rule 12(b)(6), Your

2    Honor.  On a (12)(b)(6) motion, which is what the Court

3    indicated it was treating the motion to disallow our claim

4    as --

5          THE COURT: Right.

6          MR. CLARK:  -- it is up to the moving party to show

7    on the face of the complaint, the allegations that are made

8    that there is no basis for relief and in this case that means

9    that the complaint shows on its face that it was not timely

10   filed.  It's not a burden on Statek to show that the complaint

11   was timely filed and at the remand hearing, Your Honor I think

12   what Your Honor said or indicated was that if you were to get

13   to the merits of the reconsideration motion and ultimately the

14   disallowance motion Your Honor appeared to recognize that in

15   that situation you would deny the disallowance motion because

16   you couldn't tell as a matter of fact from the allegations

17   that were made that the complaint was not timely filed.

18         If the Court now agrees with what the plan

19   administrator is arguing that would reverse that presumption.

20         THE COURT: But that's -- well --

21         MR. CLARK: And that would be the change in law, Your

22   Honor.

23         THE COURT: But that's just saying I was wrong,

24   right, that I interpreted the law incorrectly?

25         MR. CLARK: No, I don't think --

5

1    THE COURT: I think the change in law prong is to

2    reflect literally a change in the law, not something that the

3    deciding -- the trial court did contrary to the law.

4    MR. CLARK: And all I'm saying, Your Honor, is that

5    as I understand this record and I've been trying to wade

6    through it.  I'm at a disadvantage to the Court and the plan

7    administrator's counsel.  You've all have been living with

8    this for years and I for weeks but the change in the law in

9    effect appears to be that because our claim is being denied

10   and Your Honor was applying Connecticut statute of limitations

11   law Your Honor had indicated at the hearing that under that

12   law you did not see a basis for determining on the face of the

13   complaint that it was not timely filed and yet it is still

14   being disallowed or in Rule (12)(b)(6) --

15   THE COURT: Well, I think that -- I think that is

16   really a misreading of the opinion.  I applied Connecticut law

17   to the issue of whether the complaint was timely, or, to the

18   contrary, time barred, and concluded that it could be timely

19   if certain facts were shown, and some of those facts I think

20   you do have a burden on as far as tolling is concerned.

21   MR. CLARK: Right.

22   THE COURT: But at the end of the day I concluded

23   that was neither here nor there because it didn't matter,

24   because the second basis for my original order --

25   MR. CLARK: The alternative holding.

6

1        THE COURT: Right.  Is what was controlling.  And

2   basically the only conclusion I took from the application of

3   Connecticut law was that there was nothing that came out and

4   slapped you over the head -- slapped me over the head and said

5   well, this was a miscarriage of justice.  There's nothing that

6   special about Connecticut law that would override the very

7   powerful rule that one should not be allowed to raise new

8   issues after the fact.

9        MR. CLARK: So let me get to that.

10        THE COURT: Okay.

11        MR. CLARK: And frankly I do think that is clearly

12   the more important of the two points that I wanted to discuss

13   here.

14        THE COURT: Just to be clear, as far as change of

15   law, I mean when I first read the motion I thought well, maybe

16   they're arguing that the change in law was the Second

17   Circuit's determination under Ferens and Van Dusen that I

18   should apply Connecticut law, but to me that's not really a

19   change in law because you all argued that in 2009.

20        MR. CLARK: I appreciate that.

21        THE COURT: So -- but this other point I don't think

22   really is --

23        MR. CLARK: In fairness to Your Honor in your opinion

24   you did do the analysis under Connecticut law and came to the

25   conclusion that you really couldn't come to the ultimate

7

1   conclusion.

2         THE COURT: To the ultimate conclusion.

3         MR. CLARK:  One way or the other and all I was

4   saying is that if that's all that was before the Court and it

5   was on the disallowance motion then it gets denied because --

6         THE COURT: Well, I agree with that, but it <u>wasn't</u>

7   all that was before the Court and it was really -- I think I

8   said this on Page 28 of the Lexis cite.  It states, "Statek

9   asserts that as long as the application of Connecticut choice

10  of law principles would force a determination of the facts on

11  the tolling issue the Court must vacate the reconsideration

12  order.  This argument, however, ignores the limited and

13  extraordinary nature of reconsideration under Rule 59;" and

14  then that leads into the Rule 59 discussion.

15        MR. CLARK: On that prong, Your Honor, and as I read

16  through my notes and did a word count I find the word

17  respectfully shows up an awful lot of times so I want the

18  Court to understand that these are respectful arguments but it

19  does appear to me anyhow, and I am the new kid on the block.

20  I haven't lived with this thing the way you all have for many

21  years but it did appear to me -- it does appear to me that the

22  Court may have overlooked a critical fact, a procedural fact

23  but a critical fact in reaching your decision on remand that

24  the alternative holding from the original reconsideration

25  ruling that Statek didn't timely raise the Connecticut law

8

1   argument and that Connecticut law and not New York applies as

2   the Court of Appeals has now held, that that argument wasn't

3   raised on the appeal to the Second Circuit and therefore

4   wasn't decided.

5        I think the appeal record shows that the issue was

6   in fact raised and that it was necessarily if implicitly --

7   certainly wasn't discussed in those terms.  The Second Circuit

8   didn't say as for Judge Drain's alternative holding we do the

9   following.  So when I say implicitly that's what I'm

10  acknowledging, that it was decided by the Court.

11       Now, Your Honor found, and I apologize that --

12  because we keep talking about timeliness here, that I didn't

13  raise this issue earlier.

14       THE COURT: This came up in the reply.

15       MR. CLARK: Well, I'll tell you how it happened, Your

16  Honor.  We filed the motion for, the second motion for

17  reconsideration and then in over the transom came this motion

18  to strike which I think is technically on today and I won't

19  any adjectives to describe it but as I read the motion to

20  strike it was a very simple motion.  I'm sitting there and I

21  was reading it and I have my own thoughts about how to respond

22  to it on the merits of the motion to strike and in the middle

23  of the motion or towards the end of the motion was this short

24  but passionate argument that really had nothing to do with the

25  motion to strike about what the Second Circuit did have argued

9

1    before it and did or did not consider and a light went off in
2    my head.  Your Honor had said in your remand decision that
3    Statek hadn't raised the alternative holding issue before the
4    Second Circuit.
5           Now, we respectfully disagree on the grounds that
6    the entire thrust of Statek's appeal was that the
7    reconsideration should have been granted because the Court
8    applied New York law and should have applied Connecticut law
9    and that it was an abuse of discretion to do so.  The brief
10   doesn't say it in these words but it was a -- that law should
11   have been applied regardless of when the issue first came up.
12   But Your Honor said Statek hadn't raised the issue on the
13   appeal and therefore the Court of Appeals because it hadn't
14   been raised by Statek couldn't have considered it and couldn't
15   have implicitly decided it.
16          As I was reading the motion to strike it struck me,
17   this paragraph making this argument on the merits about what
18   was and wasn't considered in the Second Circuit struck me as a
19   little Shakespearian.  Me thinks they protest too much.  Why
20   are they making this argument in this brief, and the light
21   that went off was, you know, I did go back after I read Judge
22   Drain's remand decision and I read everything that Statek
23   filed in the Second Circuit Court of Appeals.  But what I
24   hadn't focused on was what the plan administrator had filed
25   and Your Honor didn't say anything in your remand decision

10

1  about what the plan administrator had filed either.  So I

2  thought I should go read their brief.  I had read it once

3  quickly but I went back and I read it again not so quickly and

4  carefully and what I found in that brief was a concise short

5  to the point but I think squarely on point argument that Your

6  Honor's decision should have been affirmed based on the

7  alternative holding and it's what we quote from Page 10 of

8  their brief in the Second Circuit Court of Appeals, the quote

9  being Statek --

10       THE COURT:  Right.  I've read it.

11       MR. CLARK:  And the one point I wanted to make about

12  that, Your Honor, it is concise.  Clearly it wasn't the

13  central point of their papers.  It wasn't the central point of

14  the appeal.  It was a point that was made and the emphasis on

15  the word not is super concise but it gets to the timeliness

16  point.  So by making that argument before the Court of Appeals

17  perhaps they could have made it more forcefully.  They could

18  have made it at greater length.  They could have made it more

19  impassioned.  I don't know, but they made the argument and

20  maybe today they wish they hadn't but they did.

21       So, Your Honor, I believe on the basis of that brief

22  that the argument was presented to the Court of Appeals and

23  the Court of Appeals necessarily presumptively considered it

24  and rejected it in holding as it did.  Again, what the Court

25  of Appeals said, and I think they meant what they said when

11

1   they said, "remand in part to the bankruptcy court with

2   instructions to apply Connecticut choice of law rules in

3   deciding Statek's motion to reconsider," I think they were

4   instructing and directing that you get to the merits of that

5   motion and do so applying Connecticut law and respectfully I

6   think the first half, three-quarters of your remand decision

7   does that. It just comes up short of doing the last piece

8   which says therefore reconsideration is granted disallowing --

9   the prior decision is vacated and the disallowance motion is

10  denied. I think by not doing that and going on to the

11  alternative holding which is as I say I think was fairly

12  presented to the Court of Appeals. Your Honor failed to,

13  respectfully failed to implement the mandate on remand.

14          Now, just one last point, Your Honor, on the

15  timeliness.

16          THE COURT: Well, on this point --

17          MR. CLARK: Yes.

18          THE COURT: -- again you're right. You and your

19  firm weren't involved until recently on this matter. I did

20  raise the issue of the alternative holding at the hearing on

21  remand and I directed the parties file supplemental briefs on

22  it including the issue of the effect of the remand, whether it

23  in fact remands as to -- is the law of the case and basically

24  says that this is what in effect the Court shall as long as

25  Connecticut law can provide an avenue for a complaint here

12

 1  that's the end of the story.  No one raised this point, again.

 2  I mean it's like deja vu all over again I think.

 3          MR. CLARK: Actually, Your Honor, and I want to -- I

 4  want the record to be as clear as it can be.

 5          THE COURT: Okay.

 6          MR. CLARK: My predecessor counsel actually in the

 7  supplemental briefing on the remand that Your Honor asked for

 8  at the hearing --

 9          THE COURT: Right.

10          MR. CLARK: -- it filed a piece of paper which I

11  will tell you says something different than what I just said

12  to you about what was in fact raised on appeal before the

13  Court of Appeals.  What they said, and I point it out in

14  fairness so Your Honor is specifically aware of this, at Page

15  4 of their supplemental brief note 1, and they're talking

16  about what they call the technical rule.  That's their words

17  for your alternative holding.  They say, "Counsel for Coudert

18  raised the technical rule on appeal to Judge Hellerstein in

19  the District Court.  Judge Hellerstein did not affirm the

20  denial of the motion for reconsideration on that basis but

21  ruled on the legal question on the merits.  On the following

22  appeal to the Second Circuit counsel for Coudert was correct

23  [not —] in not raising the technical rule and only arguing the

24  issue on the merits.  The technical rule was no longer an

25  issue after the District Court's de novo review."  That's what

13

1   they argued.

2          THE COURT: Right.

3          MR. CLARK: I'm not throwing stones, Your Honor, but

4   they were wrong.  They were wrong about that, and when we go

5   up on appeal if we go up on appeal if Your Honor sticks to the

6   remand decision, I wouldn't want it said to the Court of

7   Appeals that I didn't raise this directly with Your Honor

8   because however the Court views it I think the Court of

9   Appeals, the appeals court will find it helpful to have your

10  thoughts with the argument squarely presented to you.  As I

11  said, it's -- the argument they made about your alternative

12  holding is one paragraph in a 60 page brief and -- so as I

13  say, it's concise but it's there and that's the fact that I

14  don't think or at least it doesn't appear has been fully

15  considered by the Court in connection with the remand and

16  that's why I think that's the most important reason why --

17         THE COURT: Okay.

18         MR. CLARK:  -- reconsideration should be granted.

19         THE COURT: I interrupted you.  You were going to say

20  something else about timeliness, I think.

21         MR. CLARK: I was going to quote Felix Frankfurter,

22  Your Honor.  Wisdom some -- too often wisdom doesn't come at

23  all so we shouldn't reject it when it comes late.  We've been

24  making these arguments --

25         THE COURT: I have to tell my children that.  They'll

14

```
 1   really like that.

 2            MR. CLARK: I tell my children that all the time and

 3   you know what they say to me, Felix Hot Dogs.  I don't think

 4   it sunk in with them either.

 5            Your Honor, if the Court has any other questions I

 6   can respond to it.  I'd be pleased to address it.

 7            THE COURT: Well, this motion was coupled with the

 8   request to -- for leave to amend the complaint.

 9            MR. CLARK: Yes.

10            THE COURT: And I think that -- I mean to my mind at

11   least that request -- I was trying to imagine what the

12   complaint, would look like.  I think what it would look like,

13   the amended complaint, would be one that would lay out more

14   facts to justify tolling.

15            MR. CLARK: Yes.  In some it would say that they --

16   just so everybody knows, it would say that Coudert -- neither

17   Coudert nor Statek ever purported to terminate the

18   relationship prior to the filing of the lawsuit at issue here.

19   So it would say that and it would also point out that then and

20   now Coudert had an obligation to turn over all the property

21   and files and they still haven't done it.  That's the gist of

22   the argument.

23            THE COURT: But -- that's fine and that is consistent

24   with what I thought at a minimum would be in your mind, but to

25   me I don't think a complaint needs to allege that.  I think
```

15

1   that the tolling issue is something that is raised in response

2   to a defense and therefore you don't need to put those facts

3   in the complaint.

4           MR. CLARK: Exactly.

5           THE COURT: So it seems to me that's kind of a red

6   herring.

7           MR. CLARK: Well, that -- candidly, Your Honor, your

8   statement just now on the record really does take care of the

9   first argument that we made about the change in the law.  Your

10  Honor clearly isn't intending to apply any different

11  presumption on a (12)(b)(6) motion --

12          THE COURT: No.

13          MR. CLARK:  -- that otherwise would be applied.  So

14  that takes care of that.

15          THE COURT: Okay.

16          MR. CLARK: The real issue then is whether the Court

17  has as a matter of procedural facts considered what was in

18  fact argued by the other side through the Second Circuit and

19  therefore was considered by the Second Circuit in ruling as it

20  did.  And as I say, I think however Your Honor comes down on

21  that I think the appellate courts would probably benefit from

22  your thoughts on it.

23          THE COURT: Well, since you're still standing up

24  let's go to the other motion, the motion to strike.

25          MR. CLARK: The motion to strike?

16

1    THE COURT: Right.  To me it is -- they can always go
2  and look at the ruling on reconsideration but I'm not sure the
3  briefing is really that relevant to it.  It's really the
4  ruling, isn't it, or the record of today's hearing?  I'm just
5  not sure it's -- it just to me it's sort of a cluttering up of
6  the record although I'm assuming you would appeal the motion
7  to reconsider too so that would be in front of it anyway.
8    MR. CLARK: That was exactly my point in the reply,
9  Your Honor, and it will be and I agree -- having served as an
10  appellate clerk not in the federal courts but to the Delaware
11  Supreme Court I appreciate an uncluttered record.  I did then
12  and I suppose -- I expect the clerks now do read those
13  records.  Given the sort of technical pitfalls that Statek is
14  running in the past I'm confident that -- well, really
15  confident that you're going to grant my second reconsideration
16  motion but if I get that wrong we will as a matter of
17  providing the entire record to the appellate courts I'm sure
18  we'll put in -- we'll designate their brief, our briefs, this
19  transcript and Your Honor's decision, whatever it is.  So that
20  was why I said their motion was I think to give them -- to
21  give the devil his due, I think it was a technically correct
22  motion but an unnecessary one because this is all going to go
23  up one way or another.
24    THE COURT: Anyway.  Okay.  All right.  That's fair.
25    MR. CLARK: Thank you, Your Honor.

17

1           THE COURT: Okay.

2           MS. FRIEMAN: Good morning, Your Honor.  Karen

3    Frieman, Stern, Tannenbaum & Bell with my partner David

4    Tannenbaum.

5           MR. TANNENBAUM: Good morning, Your Honor.

6           THE COURT: Good morning.

7           MS. FRIEMAN: I'll be really brief because I more or

8    less agree with the comments that Your Honor made in response

9    to Mr. Clark's assertions about that there's been no change in

10   the controlling law including regarding Rule (12)(b)(6) or in

11   connection with any of the issues of law that Your Honor did

12   tackle in the decision on remand.  So I just really briefly

13   want to address this idea that the Court overlooked something

14   in ruling on the motion on remand and in particular the claim

15   that it overlooked that the plan administrator put the Rule --

16          THE COURT: The paragraph, the paragraph in the

17   appellate brief.

18          MS. FRIEMAN: The paragraph in the appellate brief;

19   and honestly, Your Honor, I don't think that there's any way

20   that that paragraph could be read as the plan administrator

21   putting that issue before the Second Circuit.  In fact, prior

22   counsel for Statek, Hughes Hubbard said exactly the opposite.

23   So let me take a step back and break it into two pieces.

24          First of all, Your Honor couldn't have overlooked it

25   when you ruled on the remand because no one brought it to your

18

1   attention and in fact Hughes Hubbard argued the opposite or

2   conceded the opposite.  So for that reason alone

3   reconsideration isn't appropriate.

4          But on the second hand I do not think that there's

5   any way you can give a fair reading of that one paragraph

6   which was contained not in an argument section but -- in our

7   brief but in the statement -- in the statement of the case

8   describing what the prior decision had been, and I'm sure that

9   Your Honor has read it for yourself.  I don't want to take the

10  time to read it into the record.

11         THE COURT: No, I read it.

12         MS. FRIEMAN: I don't think that that's a fair

13  construction that that put it into play.  And moreover, Your

14  Honor, I submit that the question is whether appellant raised

15  that issue on appeal in the Second Circuit.  The cases speak

16  about if something is not raised it's waived, that if the --

17  if they did not challenge it then it couldn't have been

18  decided.  So I think that it would be -- that paragraph --

19  there's no way that paragraph could be viewed as the issue

20  having been presented to the Second Circuit or decided on it.

21         And I also think that that argument is inconsistent

22  with what the Second Circuit ultimately did.  The Second

23  Circuit did not reverse the denial of reconsideration and

24  order the Court to address the disallowance motion under

25  Connecticut law.  It remanded the motion for reconsideration

19

1  itself to the Court for your reconsideration, which obviously

2  we think you properly did applying Rule 59.

3           The only other point that I would make very briefly,

4  Your Honor, and it's an argument that hopefully we'll never

5  have to have but because Mr. Clark mentioned it I just want to

6  briefly comment on it, and that is he indicated that if the --

7  they did some day amend the complaint or even if we didn't we

8  understand I guess now what their argument would be on the

9  merits if it came to that, that neither Coudert nor Statek

10 purported to terminate the relationship, the attorney-client

11 relationship but as we've established in some set of briefing

12 along the way here there's no -- there's no requirement in the

13 law that someone take affirmative steps.

14          THE COURT: But that's for the future.  I mean

15 that's --

16          MS. FRIEMAN: Right.  Yes, that's correct.

17          THE COURT: That's not --

18          MS. FRIEMAN: So --

19          THE COURT:  -- before me today.

20          MS. FRIEMAN: Then I guess the last thing I want to

21 just very briefly touch on is our motion to strike the

22 contents of designations of the record -- from the

23 designations of the record and tell you where we were coming

24 from when we made it.  At the time they designated -- made the

25 designations the only notice of appeal that was pending was

20

1   the notice of appeal from the decision on remand.  Their

2   motion papers in support of their -- the present motion for

3   reconsideration is not part of the record on that decision.  I

4   had not even filed our opposition papers so I couldn't --

5   certainly couldn't counter designate.

6          THE COURT: Right.

7          MS. FRIEMAN: Now, they now say that if Your Honor

8   rules against them they'll appeal from this ruling and it will

9   all go up anyway and that's fine.  I have no problem with that

10  but at that moment --

11         THE COURT: That's fine.  I think Mr. Clark is right;

12  technically it was right and this is an area where I -- what's

13  done on appeal where technicalities really count still.  So I

14  don't have a problem with that.

15         MS. FRIEMAN: Thank you, Your Honor.  So unless you

16  have any other questions that's all I really wanted to comment

17  on.

18         THE COURT: All right.  Well, I have before me,

19  first, a motion by Statek Corporation for reconsideration

20  under Bankruptcy Rule 9023, which incorporates Federal Rule of

21  Civil Procedure 59, my order on remand denying Statek's prior

22  motion for reconsideration, also under Rule 9023 incorporating

23  Federal Rule of Civil Procedure 59.  The present motion, which

24  I admit has a certain flavor of an Escher drawing or more

25  colloquially putting on a wet bathing suit for the second time

21

1   feel to it, seeks reconsideration of, again, an order denying

2   reconsideration on remand of a prior order of the Court.  The

3   circumstances are laid out in my memorandum of decision, which

4   appears at In re: Coudert Brothers LLP, 2013 Bankr. Lexis 3360

5   (August 19, 2013).  The standard for consideration of a Rule

6   59 motion is well established and is discussed at unusual

7   length in that opinion, and I won't repeat it here except to

8   state that it is viewed as a request for extraordinary relief,

9   that it is not a vehicle for a second bite at the apple or

10  relitigating the underlying motion on the merits but, rather,

11  should be granted in limited circumstances.  That is, where

12  the Court made a clear error of law (which is essentially an

13  opportunity for the Court on its own to correct an obvious

14  mistake), or ignored or overlooked controlling decisions or

15  factual matters that might have materially influenced the

16  earlier decision, or to prevent manifest injustice.

17         Here, Statek asserts three grounds for

18  reconsideration.  The first two are fairly easily disposed of.

19  First, Statek contends that the Court made a clear error of

20  law in determining that the Second Circuit's remand, as

21  discussed in the memorandum of decision that I previously

22  cited, was the law of the case not only with respect to the

23  specific direction in the remand, which is to apply

24  Connecticut choice of law principles to the Court's

25  determination of whether Statek's claims are timely or as the

22

1  Court had previously found in its first order denying

2  reconsideration are not timely, controls also with respect to

3  the second basis for the Court's prior order denying the prior

4  motion for reconsideration, which is that the motion should be

5  denied because the basis for Statek's contention that the

6  claims were indeed timely had not been argued to the Court

7  previously.

8          I had invited not only argument but additional

9  supplemental briefing on that very issue on remand.  I

10 received the parties' supplemental briefs and concluded in the

11 memorandum of decision that appears at 2013 Bankr. Lexis 3360

12 that in fact the remand did not apply to the second basis for

13 my prior reconsideration order, which is also the basis for

14 which I on remand denied the motion for reconsideration.  So

15 that really is at this point only a proper topic for appeal

16 as, opposed to one for reconsideration.

17         Secondly, Statek argues that there's been a change

18 in the controlling law since the Court's determination of its

19 original reconsideration motion.  As I stated during oral

20 argument, I had originally thought that this argument by

21 Statek was premised upon the Second Circuit's determination

22 that led to the remand order that Van Dusen v. Barrack, 376

23 U.S. 612 (1964), and Ferens v. John Deere Co., 494 U.S. 516

24 (1990), required the application of Connecticut choice of law

25 principles.  However, it appears clear from oral argument

23

1   today that that was not the point made by Statek in the

2   present motion before me nor could it have been since that was

3   the basis for Statek's appeal.   It was also the basis for

4   Statek's original motion for reconsideration which you made in

5   2009, and it really is not the type of change in controlling

6   law that a Rule 59 motion should be based upon.

7          Instead, Statek has argued that the Court in the

8   memorandum of decision at 2013 Bankr. Lexis 3360 ruled the way

9   it did because it placed or shifted the burden in a new way

10  with regard to the assertion of the affirmative defense of the

11  statute of limitations and the counter-assertion of tolling

12  principles under Connecticut law.   This is premised on the

13  fact that in the first portion of the memorandum of decision

14  after I concluded that Connecticut law would recognize tolling

15  under certain circumstances I further concluded that on the

16  present record those circumstances had not been established.

17  From that, Statek apparently believed that I had further

18  reached the conclusion that it had failed to show tolling for

19  purposes of (12)(b)(6).   That, however, is not the case.

20         I believe it's clear from my memorandum of decision

21  (but if it isn't it should be clear now) that I concluded

22  merely that the answer on whether Connecticut law would permit

23  the assertion of Statek's claims or, to the contrary, would

24  find that they're time barred is one that requires further

25  factual development.   Having reached that analysis, I then

24

1    found starting at Page 28 of the memorandum of decision that

2    the analysis has little to no bearing on the ultimate outcome

3    because of the second alternative ground in the original Rule

4    59 ruling, which concluded that Statek should not prevail

5    under Rule 59 because it had not raised the Van Dusen and

6    Ferens arguments until after the Court had made its decision

7    and in fact had argued for basically every possible

8    application of other jurisdictional -- other jurisdictions'

9    law with the exception of Connecticut law.   I believe that the

10   opinion makes this especially clear, actually, starting on

11   Page 28.   So that aspect of the present motion also does not

12   justify relief under Rule 59.

13          Finally, and this is a closer question, Statek in

14   its reply to the plan administrator's objection to its present

15   Rule 59 motion has pointed to a paragraph in Coudert's brief

16   to the Second Circuit in which Coudert does point out that

17   Statek has not appealed the second aspect of the Court's

18   opinion, which, again, was that the Rule 59 motion should be

19   denied because Statek did not raise the Van Dusen argument

20   until too late, i.e. until after the Court ruled.

21          As I stated in the memorandum of decision, the Court

22   reviewed the appellate record and actually listened to the

23   oral arguments to see whether in fact the second prong of the

24   Court's decision ever was considered, and concluded that

25   Statek had never addressed it in its appeal and as importantly

25

1   if not more importantly that the Second Circuit had not

2   considered it.  Certainly in the hearing on remand this was

3   the view taken by the parties, including, expressly, by

4   Statek, including in the supplemental briefing that I asked

5   for on the law of the case issue and on the meaning of the

6   remand.  I do not believe I overlooked this paragraph or this

7   argument, therefore, which as noted by counsel for the plan

8   administrator today appears in the procedural history section

9   of the appellate brief.  Of course only the Court of Appeals

10  really knows, I think, what was before it and they're

11  certainly free to disagree with me if in fact they did

12  consider this issue.  But I have concluded that it did not, in

13  part because of the true paucity of the record on the issue

14  both in front of Judge Hellerstein and on appeal to the Second

15  Circuit, and because Statek never raised it on appeal, and

16  because of the position of this paragraph in the brief, and,

17  perhaps most importantly because I find it almost

18  inconceivable that the Second Circuit would have on this

19  record meant to rule contrary to extremely well established

20  case law (which I went into in painful detail in the

21  memorandum of decision) on the importance of limiting Rule 59

22  relief to not include the arguments and its -- the incredibly

23  adverse effect a change in that caselaw would have on how

24  trial courts conduct their business.

25          This principle has continued to be reiterated,

26

1   including by the Second Circuit after its ruling, after its

2   remand ruling, as noted by the plan administrator in its

3   brief, including in Bank of America National Association v.

4   AIG Financial Products Corp., 2013 WL 322922, Page 3 (2d Cir.

5   January 29, 2013), and a host of District Court cases.  I just

6   don't believe they decided this issue.  If they had, I think

7   there would be banner headlines.

8            So I don't believe that this basis for the motion,

9   which again was asserted in the reply (but that's fine), also

10  supports Rule 59 relief.  So I will deny the motion for the

11  reasons stated and obviously will find out the answer on

12  appeal.

13           As far as the second motion before -- well, let me

14  just say before I turn to the second motion before me.  There

15  was an additional prong in the present Rule 59 motion, which

16  was a motion for leave to amend Statek's complaint as set

17  forth on the record.  That request really was tied into

18  Statek's concern that the Court would require a showing in the

19  complaint with regard to a tolling response to a statute of

20  limitations defense.  I do not believe a complaint must show

21  that.  That's an issue that would be developed in essence in a

22  special factual hearing once the defense is raised and the

23  tolling argument is raised in response.  The request was

24  coupled with a motion for leave under Rule 59 and therefore

25  is -- was procedurally proper but I've concluded that in

27

1  weighing the balance between a request under Rule 15 made
2  after the entry of judgment that in light of the unnecessary
3  nature of the amendment and the fact that at least on the
4  basis of my ruling today it would be futile anyway, because it
5  wouldn't deal with the real reason I denied the motion for
6  reconsideration on remand, that the motion for leave under
7  Rule 15 also should be denied.  See <u>Williams v. CitiGroup,</u>
8  <u>Inc.,</u> 659 F.3d 208, 213 through 214 (2d Cir. 2011).
9          Then, turning to the second motion, which is the
10 motion by the plan administrator to strike a portion of
11 Statek's designation of record on appeal, this motion sought
12 to strike the inclusion of the materials, the pleadings and
13 ultimately I guess the Court's order on the present
14 reconsideration motion as part of the appellant record as a
15 legal matter.  That's correct.  It wouldn't properly be part
16 of, I believe, the appellate record, but, as Mr. Clark noted
17 the clear likelihood of an appeal from my present decision, it
18 will be part of <u>that</u> record and I'm sure will be accessible to
19 the Second Circuit, which is also always free to look at a
20 reconsideration ruling since that's a matter of public record
21 on the docket.
22         So I'll grant that motion to strike but obviously
23 there will be a whole second record on the present motion in
24 light of the inevitability of an appeal.
25         So I'm going to ask you on behalf of the plan

28

1    administrator to email chambers the two orders, and you should

2    copy Mr. Clark on those so he can make sure they're consistent

3    with my ruling.

4              MS. FRIEMAN: Of course, Your Honor.   Thank you.

5              MR. CLARK: Thank you, Your Honor.

6    (Proceedings concluded at 1:25 p.m.)

7                        *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

1      I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                          _____

6                               Shari Riemer

7   Dated:   October 28, 2013

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                                    Chapter 11

COUDERT BROTHERS LLP,                      Case No. 06-12226 (RDD)

                       Debtor.

## ORDER DENYING STATEK CORPORATION'S
## SECOND MOTION FOR RECONSIDERATION

Upon the motion of Statek Corporation ("Statek") (a) for reconsideration of this

Court's August 23, 2013 order on remand, which denied Statek's motion for

reconsideration of the Court's July 21, 2009 order disallowing Statek's Claim 239, and (b)

for leave to amend its second amended complaint (collectively, the "Second

Reconsideration Motion"); and this Court having reviewed the Statek's memorandum of

law in support of the Second Reconsideration Motion, dated September 6, 2013, the

memorandum of law of Development Specialist Inc., as Plan Administrator for Coudert

Brothers LLP ("Coudert"), in opposition to the Second Reconsideration Motion, dated

October 18, 2013, and Statek's reply memorandum of law in further support of the Second

Reconsideration Motion, dated October 22, 2013; and this Court having reviewed all of the

prior proceedings had herein; and upon the record of the non-evidentiary hearing held by

the Court on the Second Reconsideration Motion on October 24, 2013 (the "Hearing"); and

this Court having set forth its decision and reasoning on the record at the Hearing (the

"Decision"); and good and sufficient cause existing for the relief set forth herein for the

reasons stated in the Decision, it is hereby

ORDERED THAT:

1.    Statek's Second Motion for Reconsideration is denied; and

2.    This Court retains jurisdiction with respect to all matters arising from or

related to the implementation of this Order.

Dated: White Plains, New York
        October 25, 2013

        /s/Robert D. Drain
        THE HONORABLE ROBERT D. DRAIN
        UNITED STATES BANKRUPTCY JUDGE

J. Eric Ivester
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Telephone: (212) 735-3000

Thomas J. Allingham II
Anthony W. Clark
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000

*Counsel for Statek Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

In re:                    :     Chapter 11
                    :

COUDERT BROTHERS LLP,    :     Case Nos. 06-12226 (RDD)
                    :

                    :

           Debtor.    :
                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>AMENDED NOTICE OF APPEAL</u>

      Pursuant to 28 U.S.C. § 158(a)(1), Statek Corporation ("Statek") hereby appeals

to the United States District Court for the Southern District of New York from the Order

Denying Statek Corporation's Second Motion for Reconsideration, dated October 25, 2013 (the

"Second Reconsideration Order") (Docket No. 1610), entered in the above-captioned proceeding.

A copy of the Second Reconsideration Order is attached as Exhibit A.

           Statek previously has filed a Notice of Appeal relating to the Order On Remand

Denying Statek Corporation's Motion For Reconsideration, dated August 23, 2013 (the "Order

on Remand") (Docket No. 1552), and the Memorandum Of Decision On Remand On Statek's

Motion For Reconsideration Of Claim Disallowance Order, dated August 19, 2013, attached to

the Order on Remand (the "Memorandum Decision") (Docket No. 1550) (collectively, the "Prior

Notice of Appeal").  The Prior Notice of Appeal, and the underlying Order on Remand and

Memorandum Decision appealed from, are incorporated by reference herein.  This Amended

Notice of Appeal amends the Prior Notice of Appeal.

        Given the related issues raised in the Prior Notice of Appeal and for the

administrative convenience of the parties and the Court, Statek respectfully requests that all

Notices of the Appeal filed by Statek be procedurally consolidated and treated as one appeal for

all purposes, including, without limitation record designation and briefing.

        The parties to this appeal and their respective counsel are identified hereto as:

**Appellant and Counsel**

**Statek Corporation**
**Skadden, Arps, Slate, Meagher & Flom LLP**
Four Times Square
New York, New York  10036
Telephone: (212) 735-3000
Attn:   J. Eric Ivester, Esq.

     and

One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Attn:   Thomas J. Allingham II, Esq.
       Anthony W. Clark, Esq.

*Counsel for Statek Corporation*

**Appellee and Counsel**

**Development Specialists, Inc., Plan Administrator for Coudert Brothers LLP**
**Stern, Tannenbaum & Bell LLP**
380 Lexington Avenue
New York, New York 10168
(212) 792-8484
Attn:   David S. Tannenbaum, Esq.
       Karen S. Frieman, Esq.

2

S-781

*Counsel for Development Specialists, Inc., Plan Administrator for Coudert Brothers LLP*

      Statek Corporation reserves the right to amend this Amended Notice of Appeal.

Dated: New York, New York
     November 7, 2013

                    Respectfully submitted,

                    */s/ Anthony W. Clark*
                    J. Eric Ivester
                    Skadden, Arps, Slate, Meagher & Flom LLP
                    Four Times Square
                    New York, New York  10036
                    Telephone: (212) 735-3000
                    Fax: (212) 735-2000
                    eric.ivester@skadden.com

                    - and -

                    Thomas J. Allingham II
                    Anthony W. Clark
                    Skadden, Arps, Slate, Meagher & Flom LLP
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    Telephone: (302) 651-3000
                    Fax: (302) 651-3001
                    thomas.allingham@skadden.com
                    anthony.clark@skadden.com

                    *Counsel for Statek Corporation*

8-782

# EXHIBIT A

725402-WILSR01A - MSW

8-783

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                              Chapter 11

COUDERT BROTHERS LLP,                               Case No. 06-12226 (RDD)

                              Debtor.

## ORDER DENYING STATEK CORPORATION'S
## SECOND MOTION FOR RECONSIDERATION

Upon the motion of Statek Corporation ("Statek") (a) for reconsideration of this

Court's August 23, 2013 order on remand, which denied Statek's motion for

reconsideration of the Court's July 21, 2009 order disallowing Statek's Claim 239, and (b)

for leave to amend its second amended complaint (collectively, the "Second

Reconsideration Motion"); and this Court having reviewed the Statek's memorandum of

law in support of the Second Reconsideration Motion, dated September 6, 2013, the

memorandum of law of Development Specialist Inc., as Plan Administrator for Coudert

Brothers LLP ("Coudert"), in opposition to the Second Reconsideration Motion, dated

October 18, 2013, and Statek's reply memorandum of law in further support of the Second

Reconsideration Motion, dated October 22, 2013; and this Court having reviewed all of the

prior proceedings had herein; and upon the record of the non-evidentiary hearing held by

the Court on the Second Reconsideration Motion on October 24, 2013 (the "Hearing"); and

this Court having set forth its decision and reasoning on the record at the Hearing (the

"Decision"); and good and sufficient cause existing for the relief set forth herein for the

reasons stated in the Decision, it is hereby

ORDERED THAT:

1.     Statek's Second Motion for Reconsideration is denied; and

2.     This Court retains jurisdiction with respect to all matters arising from or

related to the implementation of this Order.

Dated: White Plains, New York                    /s/Robert D. Drain
       October 25, 2013                      THE HONORABLE ROBERT D. DRAIN
                                             UNITED STATES BANKRUPTCY JUDGE

{00042636.DOC}                                2

S-785

| | | |
|---|---|---|
| DOCKET NO.: | : | SUPERIOR COURT |
| | : | |
| RETURN DATE: NOVEMBER 22, 2005 | : | JUDICIAL DISTRICT OF STAMFORD |
| | : | NORWALK |
| STATEK CORPORATION and TECHNICORP | : | |
| INTERNATIONAL II, INC. | : | AT STAMFORD |
| | : | |
| VS. | : | |
| | : | |
| COUDERT BROTHERS LLP, STEVEN | : | |
| BEHARRELL, DEAN POSTER, JOHN DOE I, | : | |
| JOHN DOE II, JOHN DOE III, JOHN DOE IV, | : | |
| JOHN DOE V and SANDRA SPILLANE | : | OCTOBER 28, 2005 |

## COMPLAINT

Statek Corporation ("Statek") and Technicorp International II, Inc. ("TCI II"), by their attorneys Day, Berry & Howard LLP, as and for their complaint in this matter, hereby allege as follows:

### NATURE OF ACTION

1.      This case arises out of an international money laundering, mail and wire fraud, bankruptcy fraud, tax evasion and murder for hire conspiracy. The principals in the conspiracy are Hans Frederick Johnston ("Johnston") and Sandra Spillane ("Spillane"), Johnston's long-time business associate, companion and confidante. Statek and its parent, TCI II, were the primary victims of the scheme. Johnston and Spillane siphoned millions of dollars from Statek and TCI II to support their lavish lifestyles. Coudert Brothers LLP ("Coudert"), at Spillane's and Johnston's direction, participated in, facilitated and covered up Johnston's and Spillane's defalcation scheme through its counsel of Johnston, in his personal capacity, at Statek's expense. Statek and TCI II bring this complaint against Coudert, various Coudert partners and Spillane for fraud, breach of

-1-

S-786

fiduciary duty, legal malpractice, fraudulent concealment and negligence arising from their

participation in, assistance with and concealment of Johnston's international defalcation scheme.

## PARTIES AND SIGNIFICANT NON-PARTY INDIVIDUALS

2.     Statek is a California corporation engaged in the manufacture of micro-electronic

components.  At all relevant times and until 1996, Statek maintained a principal place of business

at 20 Acosta Street, Stamford, Connecticut, from which its only two officers and directors

conducted Statek business.

3.     TCI II is a Delaware corporation and is the parent corporation of Statek.

4.     Coudert is a Limited Liability Partnership formed under the laws of the State of

New York.  Coudert maintains offices throughout the world and holds itself out as an international

law firm.  Coudert's partners have voted to dissolve the partnership, and the firm is in the process

of dissolution.

5.     Beharrell, Thompson & Co. was a London-based law firm that merged with

Coudert.  At all relevant times, Beharrell, Thompson & Co. was a partner, an agent and an affiliate

of Coudert.

6.     Steven Beharrell ("Beharrell") is an individual residing in England.  At all relevant

times, Beharrell was a Coudert partner.  Beharrell was Chairman of Coudert from September 2001

to April 2003.

7.     Dean Poster ("Poster") is an individual residing in England.  At all relevant times,

Poster was a Coudert partner.  Poster is a former head of Coudert's London office.

S-787

8.      John Does I through V are Coudert partners who are present or former members of Coudert's Executive Board.  References in this Complaint to "Coudert" shall include, where appropriate, Beharrell, Thompson & Co., Beharrell, Poster and/or John Does I through V.

9.      Spillane is an individual residing in Stamford, Connecticut.

10.     Johnston is an individual who, at all relevant times until his arrest in 1998, resided in the State of Connecticut.

11.     Nicholas Stewart Wood is the duly appointed trustee of the estate of Johnston in connection with a bankruptcy proceeding pending in the Supreme Court of the Judicature of England and Wales in the United Kingdom of Great Britain (the "Foreign Court").

12.     Pursuant to 11 U.S.C. §304, Trustee Wood commenced an ancillary proceeding in the United States Bankruptcy Court for the District of Connecticut related to and arising out of Johnston's bankruptcy proceeding pending in the Foreign Court.

## RELATIONSHIP BETWEEN THE PARTIES

13.     At all relevant times, TCI II operated Statek as a wholly owned subsidiary. Johnston and Spillane solely and exclusively operated TCI II.

14.     At all relevant times through January 1996, Johnston and Spillane were the sole directors of Statek.

15.     In 1990, Statek allegedly engaged Coudert, by and through Johnston and Spillane as officers and directors of Statek, *inter alia*, to form a British subsidiary of Statek.

-3-

S-788

16.     Beharrell was the partner at Coudert responsible for managing the Statek engagement.

17.     Spillane and Johnston, as officers and directors of Statek, directed Coudert with regard to Coudert's representation of Statek.

18.     Also in 1990 while formally representing Statek, Coudert assisted Johnston, in his personal capacity, *inter alia*, with the formation of certain asset protection trusts and with the analysis and execution of various asset protection schemes used by Johnston to divert significant assets from TCI II and Statek.

19.     Coudert also counseled Johnston, personally, regarding (a) the formation and funding of shell corporations used by Johnston in his defalcation scheme, (b) the movement of assets from the United States to Europe to cover up Johnston's diversion of funds from Statek and TCI II, and (c) strategies for various litigation matters brought by and/or arising out of the operations of Statek and TCI II.

20.     Beharrell was the partner at Coudert responsible for managing the work performed by Coudert for Johnston, personally.

21.     In a telephone conversation on March 22, 1991, Johnston directed Coudert not to take instructions on his matters from anyone other than Spillane and Johnston without prior approval.

22.     Coudert used fees paid by Statek to cover all charges for the work it performed for Johnston, personally.  At no time did Coudert send a billing statement to Johnston in his personal capacity.

-4-

S-789

23.    Coudert directed billing statements related to the Statek engagement to Statek's administrative offices in Stamford, Connecticut.

24.    In notes of a meeting on July 2, 1990 with Johnston, Spillane and David Alford ("Alford"), the man who introduced Johnston and Beharrell and who acted as a front for many Johnston asset protection vehicles, Beharrell indicates that Coudert is "to bill Statek Corporation care of Technicorp International Inc. at the Stamford, Connecticut address." Technicorp International Inc. is a Johnston shell corporation unrelated to TCI II.

25.    Coudert sent all billing statements related to matters handled by Coudert for Johnston, personally, to Statek at Statek's offices in Stamford, Connecticut.

## FACTUAL BACKGROUND

26.    In 1984, Miklos Vendel, a Swiss national ("Vendel"), and Johnston formed TCI II to acquire Statek. Johnston and Vendel agreed that they would own the shares of TCI II in proportion to their respective equity capital investment and that TCI II would own 100 percent of Statek.

27.    Despite their agreement, Johnston never made his agreed upon capital contribution and concealed that fact from Vendel.

28.    Johnston and Spillane, Johnston's long-time business associate, companion, and confidante, became officers and directors of TCI II and Statek. From 1984 to January 1996, Johnston and Spillane exclusively managed and controlled TCI II and Statek from their offices at 20 Acosta Street, Stamford, Connecticut. During that time, Johnston and Spillane had full access to the respective companies' funds and corporate records.

S-790

29.     At all relevant times, Johnston and Spillane were TCI II's only officers and made up at least a majority of TCI II's board of directors.

30.     For years after Johnston and Vendel formed TCI II and TCI II acquired Statek, Johnston and/or Spillane provided Vendel with almost no financial information about Vendel's investment in TCI II and Statek.

### CIVIL PROCEEDINGS BETWEEN THE PARTIES

31.     In October 1993, after Johnston and Spillane repeatedly refused to provide Vendel with any information concerning TCI II and Statek, Vendel commenced a lawsuit on behalf of himself and his nominee, Arbitrium (Cayman Islands) Handels AG ("Arbitrium"), in the Court of Chancery of the State of Delaware (the "Delaware Court") seeking permission to inspect TCI II's books and records (the "Books and Records Action").

32.     Following a settlement of the Books and Records Action, Vendel obtained copies of some documents concerning TCI II, including documents that showed that Johnston and Spillane had concealed critically important information from Vendel.

33.     The documents revealed that Johnston had failed to contribute his agreed upon share of equity capital to TCI II.

34.     The documents also revealed that the TCI II board of directors adopted, without Vendel's knowledge or approval, a charter amendment purporting to convert Vendel's voting stock to non-voting stock.

35.     The documents also revealed that, without Vendel's knowledge or approval, the TCI II board of directors (a) adopted a charter amendment purporting to triple TCI II's outstanding

S-791

shares and (b) issued all of the newly created shares to Johnston, for no consideration, thereby purporting to make Johnston the majority shareholder of TCI II.

36.     The documents also revealed that, starting in 1984, Johnston and Spillane caused Statek and TCI II to transfer millions of dollars to Johnston and Spillane and to entities controlled by them.  Johnston and Spillane recorded many of those transfers on TCI II's books as undocumented, interest free "loans."  Johnston and Spillane initiated those transfers from Statek's administrative offices in Stamford, Connecticut.

37.     In May 1994, acting in his capacity as the majority stockholder of TCI II, Vendel, through his nominee, Arbitrium, delivered to TCI II a written consent in lieu of a stockholders' meeting (the "Consent").  In the Consent, the majority stockholding in TCI II voted to remove Johnston and Spillane as directors of TCI II and to elect Vendel as TCI II's sole director.

38.     Johnston and Spillane refused to acknowledge the validity of the Consent.

39.     On May 5, 1994, Vendel and Arbitrium commenced a lawsuit in the Delaware Court, pursuant to Section 225 of the Delaware General Corporation Law, against Johnston, Spillane, and nominal defendant TCI II, to determine the lawful directors of TCI II (the "Section 225 Action").

40.     On January 5, 1996, after a trial on the merits, the Delaware Court decided the Section 225 Action in Vendel's favor, validating the Consent and Vendel's election as the sole director of TCI II.  Arbitrium (Cayman Islands) Handels AG v. Johnston, No. 13056, 1996 Del. Ch. LEXIS 1, at *49 (Del. Ch. Jan. 5, 1996) (the "Section 225 Decision").  A copy of the Section 225 Decision is attached hereto as Exhibit A and is incorporated herein by reference.

S-792

41.     On January 11, 1996, the Delaware Court entered an Order removing Johnston and

Spillane as officers and directors of TCI II and directing them to surrender to Vendel control of

TCI II's and Statek's property, including all records.  Arbitrium (Cayman Islands) Handels AG v.

Johnston, No. 13056 (Del. Ch. Jan. 11, 1996) (implementing order).  As the sole director of TCI II,

Vendel thereupon caused Johnston and Spillane to be removed from their positions as directors

and officers of Statek, TCI II's wholly-owned subsidiary.

42.     On March 30, 1998, the Delaware Court found that Johnston and Spillane had

opposed the Section 225 Action and had conducted their defense of that proceeding in bad faith.

The Delaware Court ordered Johnston and Spillane to pay Vendel's attorney's fees associated with

the Section 225 Action.  Arbitrium (Cayman Islands) Handels AG v. Johnston, No. 13056, 1998

Del. Ch. LEXIS 41, at *8 (Del. Ch. Mar. 23, 1998, modified Mar. 30, 1998) (the "Fee Decision").

A copy of the Fee Decision is attached hereto as Exhibit B and is incorporated herein by reference.

43.     The Delaware Court noted in the Fee Decision:

[B]y maintaining the corporate records in manner that was haphazard and
difficult for an outsider to decipher, the defendants made it extremely
problematic to uncover, and later prove, what financial and other transactions
had occurred within TCI II and related entities during the eleven or so years of
the defendants' stewardship.

Id.

44.     On March 31, 1998, the Delaware Court entered judgment against Johnston and

Spillane in the amount of $1,644,952.00 (the "First Delaware Judgment").  Arbitrium (Cayman

Islands) Handels AG v. Johnston, No. 13056 (Del. Ch. Mar. 31, 1998) (implementing order).

-8-

45.     After he assumed control of TCI II and Statek, Vendel retained forensic accountants to conduct an audit of TCI II's and Statek's books and records.

46.     The audit revealed that Johnston and Spillane had diverted at least $28.5 million from TCI II and Statek during their tenure as officers and directors of TCI II and Statek. In some instances, Johnston and Spillane diverted TCI II and Statek assets to one of several "shell" companies controlled by Johnston and Spillane. Johnston and Spillane managed TCI II and Statek and orchestrated the movement of these assets from Statek's administrative offices in Stamford, Connecticut.

47.     On June 26, 1996, TCI II and Statek commenced a lawsuit in the Delaware Court against Johnston and Spillane for fraud, breach of the fiduciary duty of loyalty, and waste of corporate assets, seeking recovery of the assets diverted by Johnston and Spillane (the "Fraud and Waste Action").

48.     On September 14, 1998, the trial in the Fraud and Waste Action commenced.

49.     On September 16, 1998, while incarcerated in London, Johnston filed a voluntary petition, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court") in a clear attempt to frustrate and disrupt the Fraud and Waste Action.

50.     On September 19, 1998, TCI II and Statek filed a motion seeking relief from the automatic stay to permit the trial in the Fraud and Waste Action to continue.

51.     On September 25, 1998, after notice and hearing, the Connecticut Bankruptcy Court granted the motion for relief from stay.

41609886.6 089544-00000
October 27, 2005 11:37 AM

-9-

S-794

52.     On or about February 1, 1999, TCI II and Statek filed a motion to dismiss the Chapter 11 case, pursuant to Section 1112(b) of the Bankruptcy Code, arguing that Johnston had commenced the Chapter 11 case in bad faith.

53.     On April 20, 1999, after notice and hearing, the Connecticut Bankruptcy Court granted the motion to dismiss and entered an order dismissing Johnston's Chapter 11 bankruptcy case.

54.     On May 31, 2000, after a trial on the merits in the Fraud and Waste Action, the Delaware Court issued an opinion finding that Johnston and Spillane had diverted $10,501,329.00 from TCI II and $19,812,942.00 from Statek. Technicorp Int'l II, Inc. v. Johnston, No. 15084, 2000 Del. Ch. LEXIS 81, at *186 (Del. Ch. May 31, 2000) (the "Fraud and Waste Decision"). A copy of the Fraud and Waste Decision is attached hereto as Exhibit C and is incorporated herein by reference.

55.     The Delaware Court noted in the Fraud and Waste Decision that "it is now abundantly manifest that ever since Statek was acquired in 1984, the defendants have engaged in a pattern of massive fraudulent diversions of Statek's (and TCI II's) assets, and concealments of the same." Id. at *164.

56.     The Delaware Court also noted in the Fraud and Waste Decision that "Johnston and Spillane lived like jet-setting potentates. They traveled extensively and lavishly in this country, in the Bahamas, and throughout Western Europe, all at these corporations' expense, while keeping the corporate books and records in such a way as to minimize, if not altogether avoid, the risk of being held accountable." Id. at *2-3.

S-795

57.    The Delaware Court also noted in the Fraud and Waste Decision that "Mrs. Spillane moved money in huge amounts to Johnston [Entities] and back to Statek and back out of Statek, with an elan and skill of a drug cartel consigliere.  This money moves at the speed of light and in huge amounts."  Id. at *76.

58.    On September 7, 2000, the Delaware Court entered judgment, jointly and severally, against Johnston and Spillane for wrongful diversion of funds from TCI II and Statek in a total amount of $30,314,271.00 (the "Second Delaware Judgment").  Technicorp Int'l II, Inc. v. Johnston, No. 15084 (Del. Ch. Sept. 7, 2000) (implementing order).

59.    While not counsel of record in the court proceedings, Coudert advised Johnston, individually, with respect to each of these civil proceedings and played an active role in developing Johnston's litigation strategies in connection therewith.

60.    Beharrell regularly participated in meetings and conference calls with Johnston's trial team to discuss strategy and to assist with the representation of Johnston in these civil proceedings.

61.    Immediately prior to Johnston's testimony in the Section 225 Action, Beharrell flew to New York on the *Concorde* to meet with Johnston concerning the case.  Coudert billed Statek for the trip, including for the exorbitant airfare.

62.    In addition, Beharrell developed an analysis and prepared detailed calculations designed to further Johnston's efforts to steal TCI II and Statek from Vendel through a proposed settlement of the Section 225 Action.  Beharrell also took an active role in settlement negotiations.

-11-

S-796

63.    At all relevant times, Coudert knew or should have known of the status of the proceedings and of the ultimate outcomes.

### JOHNSTON BANKRUPTCY PROCEEDINGS

64.    On or about July 11, 2002, Vendel, TCI II and Statek, judgment creditors of Johnston, filed a petition (the "Bankruptcy Petition") with the Foreign Court, pursuant to the United Kingdom's Insolvency Act of 1986 (the "Insolvency Act"), requesting the Foreign Court to enter a Bankruptcy Order against Johnston.

65.    On or about September 27, 2002, the Foreign Court issued a Bankruptcy Order against Johnston (the "Bankruptcy Order"), adjudging Johnston bankrupt.

66.    On or about October 2, 2002, the Foreign Court appointed Nicholas Stewart Wood (the "Trustee") as the trustee of Johnston's bankruptcy estate pursuant to the Insolvency Act.

67.    The Trustee's responsibility is to investigate the assets and affairs of Johnston.

68.    Johnston maintained funds and/or other assets in the United States, including in the State of Connecticut, both in his own name and in the names of others acting under his direction or control, including various nominees, designees, agents and/or other persons or businesses.

69.    Johnston, through various international money laundering schemes, investments in art, antiques and collectibles, directly and through agents, colleagues, associates and co-conspirators, has been able to collect, secrete, transfer, conceal and otherwise impair the identification of millions of dollars of assets, property, cash and pieces of precious art.

70.     Upon information and belief, Johnston and his collaborators routinely moved money, art, antiques, collectibles and other assets across the country and around the world. The movement of the money, art, antiques, collectibles and other assets was intended to and has served to frustrate and impair efforts by the Trustee, Statek and TCI II to identify and marshal assets that belong to Statek and TCI II.

71.     Both Coudert and Spillane assisted Johnston with and participated with Johnston in the movement and concealment of assets diverted from Statek and TCI II.

72.     Both Coudert and Spillane assisted Johnston with and participated with Johnston in the movement and concealment of assets available to respond to the Second Delaware Judgment.

## CRIMINAL PROCEEDINGS AGAINST JOHNSTON IN THE UNITED KINGDOM

73.     On April 21, 1998, the London Metropolitan Police, New Scotland Yard, arrested Johnston and held him on remand.

74.     On October 21, 1998, as amended September 14, 1999, London's Central Criminal Court indicted and charged Johnston with solicitation of murder and conspiracy to murder Vendel and Margaritha Werren ("Werren"), an officer of TCI II and a director of Statek.

75.     Sometime between November 1997 and April 1998, during the pendency of the Fraud and Waste Action, Johnston had paid criminals in Ireland an initial sum of UK£65,000 to murder Vendel and Werren.

76.     From September 20, 1999 through September 23, 1999, Johnston was tried at the Old Bailey in London.

S-798

77.     The London court found Johnston guilty on three charges, including solicitation of murder and two counts of using a false instrument (passport or driver's license), and sentenced Johnston to six (6) years in a London prison.

78.     On or about July 10, 2001, the London prison released Johnston and deported him to the United States.

## COUDERT'S PARTICIPATION IN JOHNSTON'S DEFALCATION SCHEME

79.     Coudert provided counsel to Johnston, personally, in connection with his efforts to siphon assets from Statek and TCI II and to conceal those assets from Vendel, TCI II, Statek and the Trustee.

80.     Coudert also assisted Johnston, personally, *inter alia*, with the formation of various legal entities required for Johnston to carry out his scheme to defraud TCI II, Statek and Vendel.

81.     Coudert also directly participated in Johnston's defalcation scheme and assisted him in carrying it out.

82.     At all relevant times, Coudert knew or should have known that Johnston was using Statek assets for his own personal gain and that Coudert's legal counsel to Johnston, in his personal capacity, provided Johnston with the framework and the legal mechanisms both to carry out and to cover up his defalcation scheme.

### Asset Protection Trusts

83.     Johnston and Spillane executed the defalcation by directing TCI II and Statek funds, often using TCI II and Statek checks, to Johnston's and/or Spillane's innumerable aliases

S-799

and/or "shell" companies or to domestic and offshore bank accounts and trusts established for the sole purpose of perpetrating the fraud.

84.    In 1990, as part of his scheme to hide the assets diverted from TCI II and Statek, Johnston asked Coudert to assist him with the creation of an asset protection trust in the Jersey Islands, to be called the 1990 No. 1 Trust.

85.    In connection with the formation of the 1990 No. 1 Trust, Johnston insisted on confidentiality in an effort to maintain the secrecy of his fraudulent scheme.

86.    In a letter to Beharrell dated November 11, 1990, Johnston stated:

Further to the new Jersey company, I believe that you, David [Alford, the man who introduced Johnston and Beharrell and who acted as Johnston's front for the Jersey company,] and I are agreed that: (1) This matter will be regarded as absolutely private and confidential (2) No correspondence in that connection will go to anyone at this point other than David [Alford] -- (and none will in any way come to me!) (3) You will limit access to this matter within your office.

87.    In a letter dated February 26, 1991, Johnston further instructed Coudert not to send personal faxes to him at Statek's California offices without calling first. Johnston wanted to be able to pick up personal faxes before anyone could read them.

88.    At a meeting in Beharrell's office on January 7, 1991, Beharrell, Alford and David Morgan, an attorney with David Morgan, Whitehead & Co. in Jersey, Channel Islands who was working with Coudert on the 1990 No. 1 Trust, outlined procedures for handling bank transactions on behalf of the 1990 No. 1 Trust. Those procedures included making Beharrell a signatory on the trust's bank accounts.

-15-

S-800

89.    Consistent with the January 7, 1991 meeting, Beharrell was a signatory on the accounts and safe deposit box associated with the 1990 No. 1 Trust.  He also held a key to the safe deposit box associated with the 1990 No. 1 Trust.  Consequently, Beharrell had access to all funds and property in the trust.

90.    As part of his defalcation scheme, Johnston funneled millions of dollars from Statek and TCI II through the 1990 No. 1 Trust.

91.    Statek was neither a settlor nor a beneficiary of the 1990 No. 1 Trust.

92.    Despite the fact that Statek was neither a settlor nor a beneficiary of the 1990 No. 1 Trust and that Johnston used the trust to siphon funds from Statek and TCI II, Coudert billed Statek for all work performed by Coudert for Johnston with respect to the 1990 No. 1 Trust.

93.    In October, 1995, shortly after the conclusion of the trial in the Section 225 Action, Alford, on behalf of Johnston, directed the liquidation of the 1990 No. 1 Trust.

94.    Beharrell assisted Johnston with the liquidation of the 1990 No. 1 Trust, including instructions to David Morgan, an attorney with David Morgan, Whitehead & Co. in Jersey, Channel Islands who was working with Coudert on the 1990 No. 1 Trust, that liquidation of the trust did not require a formal Deed of Appointment and Termination of the Trust.

95.    At all times, Coudert knew that Johnston intended to fund the 1990 No. 1 Trust with Statek assets.  In an interview with the Trustee in August 2004, Beharrell commented that all funds came from Statek and that Johnston "never seemed to have any money of his own."

96.    Further confirming Coudert's knowledge of Johnston's defalcation and fraudulent funding of his asset protection vehicles, Beharrell wrote in a letter dated October 30, 1990 to

41609886 6 089544-00000
October 27, 2005 11 37 AM

-16-

S-801

David Morgan at David Morgan, Whitehead & Co. in Jersey, Channel Islands regarding the funding of one of Johnston's asset protection trusts: "Sums up to a value of approximately $1 million will most likely be transmitted in the coming weeks."

97.     Coudert also assisted Johnston with the formation of a 1991 No. 1 Trust and a No. 2 Trust and a No. 3 Trust.

98.     At all relevant times to October 2004, Coudert concealed from Statek and the Trustee the work that it performed on behalf of Johnston, in his personal capacity, including formation of the 1990 No. 1 Trust and other asset protection vehicles.

**Art and Collectibles**

99.     In addition to Coudert's involvement in Johnston's diversion of funds from Statek through his asset protection trusts and offshore companies, the firm assisted Johnston, personally, with the acquisition and subsequent movement and hiding of folk art, stamps, coins and other collectibles.

100.     One of the vehicles used by Johnston and Spillane to launder the monies they misappropriated from Statek and TCI II was the purchase of millions of dollars worth of folk art, stamps, coins and other collectibles.

101.     As to the folk art, stamps, coins and other collectibles, Johnston and Spillane used funds diverted from Statek and TCI II to purchase valuable items from numerous dealers and auction houses. To make the purchases, Johnston and Spillane used Statek checks, as well as checks from their shell companies to which millions of dollars of Statek and TCI II funds had been diverted.

S-802

102.   Coudert assisted Johnston with the purchase of stamps, art and collectibles using funds diverted from Statek and TCI II.

103.   In a handwritten letter to Beharrell's assistant on November 14, 1993, Johnston instructed Coudert to send a payment to a German stamp auction house for the purchase of rare stamps.

104.   By letter dated November 15, 1993, Beharrell sent a check in the amount of DM22,000.00, on behalf of Johnston, to Heinrich Koehler Auctions in Berlin, Germany for the purchase of rare stamps.

105.   Coudert knew or should have known that Johnston used funds diverted from Statek and TCI II to purchase stamps, art and collectibles, including the payment made by Coudert to Heinrich Koehler Auctions on behalf of Johnston, as Beharrell commented in an August 2004 interview with the Trustee that all funds came from Statek and that Johnston "never seemed to have any money of his own."

106.   Also in 1993, Coudert participated in the cover up of Johnston's looting of TCI II and Statek by assisting Johnston with the procurement of special storage space in Europe for his art collection.

107.   Poster stated in an October 20, 1993 memo to Beharrell: "In relation to the question of storage, Artworld Shipping have secure, humidity controlled storage facilities at their Kentish Town base in Northwest London at £5,000 per annum for a 10ft by 10ft room with 8ft clearance. They can also build a room to requirements."

S-803

108.   Coudert also identified a company in Holland that could provide a storage facility for Johnston's art collection.

109.   In connection with the procurement of storage space in Europe for Johnston's art collection, Coudert understood that Johnston's purpose for moving the art was to hide the art from Vendel.

110.   An October 15, 1993 memo from Julian James, a Coudert employee, to Beharrell, states:

> I further understand that the corporation owns valuable works of art which they wish to move to this jurisdiction.  However, they are concerned that if the Plaintiff [Vendel] became aware that these works of art had been moved to this jurisdiction then they might apply for some sort of freezing (Mareva) order in England preventing their transfer to another jurisdiction.

111.   Coudert also provided legal advice to Johnston concerning possible tax and customs obligations associated with the movement of his art and collectibles from the United States to Europe.

112.   With Coudert's assistance, Johnston moved the art and collectibles to Europe to hide the assets from TCI II, Statek, and Vendel.

113.   In October, 1994, Johnston and Spillane entered into an agreement with certain art dealers to sell off the majority of the folk art and to direct the sale proceeds back to Johnston and Spillane.

114.   Coudert knowingly assisted Johnston and Spillane to acquire the art, stamps and collectibles with assets stolen from Statek and TCI II and to conceal the art, stamps and collectibles from TCI II, Statek and Vendel.

41609886 6 089544-00000
October 27, 2005 11:37 AM

-19-

S-804

115.    Later, Coudert concealed from Statek and the Trustee the work that it performed on behalf of Johnston, in his personal capacity, including Coudert's active participation in the acquisition of Johnston's art and collectibles and the hiding of those assets from TCI II, Statek and Vendel.

**Real Estate Transactions**

116.    Coudert also advised Johnston, personally, concerning various real estate transactions.

117.    The firm assisted Johnston with the lease of an apartment at Crown Lodge in London.

118.    Statek paid the rent on the Crown Lodge apartment, despite the fact that Statek had no significant business in London and that Johnston used the apartment solely to carry out his scheme to defraud Statek and TCI II.

119.    Coudert knew that Statek was paying the rent on the Crown Lodge apartment and that Johnston utilized the apartment principally as a base of operations for his fraudulent enterprise. In fact, Coudert routinely forwarded Statek's rent payments to the landlord in London.

120.    Notwithstanding the fact that Statek, through Coudert, paid the rent on the Crown Lodge apartment, Coudert routinely referred to the Crown Lodge apartment as belonging to Johnston.

121.    In another real estate matter, Coudert advised Johnston, personally, regarding titling of his home in the Bahamas.

S-805

122.   Johnston both purchased the Bahamas home and paid for significant renovations

and improvement to the home with funds diverted from Statek.

123.   In an October 9, 1991 letter to Beharrell, Alford states:

A matter I did not raise with you concerns a house in Nassau, Bahamas.
Effectively this is Fred's house; it cost about USD 1,000,000 and a further USD
700,000 will have been spent on it by the end of this year.

It is owned by a Corporation, Beverly Lane Limited, of which all the issued
shares – 995 – are in my name.

\*       \*       \*

My question is that in the event of my death could there by any tax problems?
If the property were to be sold could there, again, be a tax problem?

124.   In response to Alford's letter, Beharrell wrote:

[W]e do have a problem of physically transferring the shares in the event of
your death. Who would execute any share transfer? This is a worry with an
individual acting as a nominee rather than a trust corporation. I think we should
consider this in connection with all the other assets in order to create a structure
which is sufficient on a variety of levels. How we place the ownership of this
corporation will however depend on what Fred wants to happen to the shares in
the event of his demise.

125.   In a Memorandum dated October 26, 1993 to Johnston and Spillane, Beharrell

stated:

For the reasons which we discussed I think it is important that you change the
Trustee holding the 995 issued shares in Beverly Lane Limited. It is really not
sensible to have these held by an individual such as David [Alford] and I therefore
suggest that you arrange for CI Law Trustees Limited to act as your nominee in
respect of this holiday.

126.   In the Fraud and Waste Decision, the Delaware court found that Johnston had used

Statek funds to purchase the Bahamas house and imposed "a constructive trust…upon the

-21-

S-806

defendants' stock in Beverly Lane and upon the Bahamas house, to secure the payment of the judgment." The Fraud and Waste Decision at *143.

127.    Coudert actively assisted Johnston and his associates with the concealment of real estate assets that Coudert knew had been acquired with Statek funds.

128.    Coudert, at the direction of Johnston and Spillane, billed Statek for the real estate work (as well as the asset protection and art-related work) that Coudert performed for Johnston, personally, in connection with Johnston's diversion of assets from Statek and TCI II.  To cover up the improper payments, Coudert issued "dummy" bills to Statek.

129.    In a billing statement to Statek for services provided for the period November 1, 1990 through December 31, 1990, Coudert states, "TO OUR FURTHER PROFESSIONAL CHARGES in connection with advice on setting up a UK distribution company with due care and attention throughout." The bill also references the following disbursements: "Postage, telephone, facsimile, photocopying charges." However, in the corresponding cover letter to Spillane, Lucy Wayne of Coudert notes:

> I enclose a note of our fees up to 31st December 1990.  Please note that these
> fees are in respect of advice given regarding the flat rented by Fred [Johnston]
> in London and that the disbursements sum includes a £100 deposit paid by us on
> behalf of Statek for the supply of electricity to the flat.

**Coudert's Concealment of Johnston's Fraudulent Scheme**

130.    Following the Delaware Court's ruling in the Section 225 Action, Coudert further assisted Johnston to secure the assets diverted from Statek and TCI II, as well as any resulting fruits of his fraud.  At that time, Coudert concealed from Statek the work that it performed on

-22-

S-807

behalf of Johnston, individually, including formation of the 1990 No. 1 Trust and its subsequent liquidation, the acquisition and movement of art, stamps and collectibles in Johnston's collection and the counsel and advice concerning Johnston's real estate holdings.

131.   By letter dated January 15, 1996 to Coudert, Thomas Allingham of Skadden, Arps, Slate, Meagher & Flom ("Allingham"), counsel to Vendel in the Section 225 Action and to Statek and TCI II in the Fraud and Waste Action, notified Coudert of the Section 225 Decision by the Delaware Court. In that letter, Allingham requested an accounting of all funds held by Coudert for the benefit of Statek.

132.   By fax dated January 17, 1996, Coudert responded to Allingham's January 15, 1996 letter and identified funds in its "Client account" for Statek. However, Coudert failed to identify other accounts in which Coudert held funds in favor of Statek.

133.   On July 12, 1996, Werren, a director of Statek, met with Poster, a partner at Coudert, regarding Coudert's representation of Statek and Johnston. During that meeting, Werren requested, *inter alia*, that Coudert identify the specific legal work performed by Coudert and paid for by Statek and that it provide Statek with copies of all files related to work performed by Coudert and paid for by Statek.

134.   In a July 24, 1996 letter to Werren, Poster stated:

> ...I have now had an opportunity to speak to Steven Beharrell, the partner responsible for Statek to find out what work has been done by this firm in the past. Over the years there has been substantial activity on behalf of Statek in respect of its wish to understand the electrical manufacturing market in the U.K. In that connection there were a series of exchanges of ideas, and opportunities and general consideration of the market over the years. None of this ever led to any investment or joint venture.

S-808

In that letter, Poster also notes that Coudert provided assistance to Statek, at Statek's expense, for the lease at Crown Lodge for Johnston. Other than Crown Lodge, the letter contains no mention of the extensive work performed by Coudert for Johnston, in his personal capacity, and paid for by Statek.

135.   By letter dated July 30, 1996 to Coudert, Werren again requested information regarding the work performed by Coudert and for copies of Coudert's files. In an August 14, 1996 response, Poster stated:

> Our letter of 24th July provided a summary of all the work we have done. It seems somewhat wasteful to copy all of our files for you. Why do we not simply send you all the originals? They do not amount to much because very little written work was ever done.

Again, Coudert failed to mention the extensive work it performed for Johnston, individually. In fact, Coudert stated in the letter, "We know nothing about any real estate investments made by any Statek entity in the United Kingdom, Bahamas or elsewhere."

136.   On September 17, 1996, Coudert shipped six Statek files to Werren at Statek's California offices.

137.   Despite the fact that Statek had paid for all of the legal work performed by Coudert for Johnston, in his personal capacity, Coudert did not send Statek any files or documents related to the work performed by Coudert for Johnston, personally.

138.   On October 24, 1996, Statek sent a letter to Coudert indicating that Coudert had provided incomplete information regarding the "breakdown of all payments made in application of Statek's funds...."" On November 20, 1996, Coudert responded as follows:

S-809

> We had understood that you were requesting information relating to our Client account. It appears that you also want information relating to our office account and I enclose a breakdown of all transactions on the office account in both our general sterling and general U.S. $ accounts.

139.    At no time in 1996 did Coudert provide Statek with complete and accurate information regarding the work performed by Coudert and paid for by Statek, including all work performed by Coudert for Johnston, personally.

140.    By letter to Coudert dated October 22, 2002, the Trustee sought files and documents from Coudert related to Johnston and to any assets that should be included in Johnston's bankruptcy estate.

141.    In its November 4, 2002 response, Coudert again denied having done any work for Johnston, individually, and referred the Trustee to the six files that Coudert had previously produced to Statek. However, in that letter, for the first time, Coudert makes reference to Johnston's art collection:

> The only papers relevant to Mr. Johnston which I have found in our residual file appear to be a folder of papers relating to an art collection he wanted to bring to Europe. I am enclosing copies of all the papers related to that matter. I have no information about whether Mr. Johnston followed up on this information.

Despite the extensive work that Coudert performed in connection with Johnston's defalcation scheme, including formation of the 1990 No. 1 Trust and other asset protection entities, Coudert again failed to produce copies of its files related to that work.

142.    On December 12, 2002, the Trustee wrote to Coudert and stated, "It is my understanding that you assisted the bankrupt [Johnston] with numerous affairs and I shall therefore

S-810

be grateful if you would provide me with copies of your fee notes in relation to the Bankrupt and Statek in order that I can establish the exact nature of the advice provided."

143.    On January 22, 2003, Coudert responded to the Trustee's December 12, 2002 letter as follows:

> We did not assist the bankrupt personally, but only in his capacity as an officer of Statek. We never issued any fee notes to him. As to the Statek fee notes, I do not think you are entitled those without Statek's approval. In any event, Statek is, I believe, your major creditor and they have all the files and fee notes themselves.

144.    In 2004, the Trustee sought to conduct a formal interview of Beharrell.

145.    In a July 22, 2004 email correspondence to Beharrell, the Trustee wrote, "Please confirm your availability for attending an interview at my premises on 11, 12 or 13 August 2004."

146.    By reply email to the Trustee on July 26, 2004, Beharrell wrote, "Please advise the purpose of this interview as I never advised Mr. Johnston – only Statek – and we have provided all our files to that company. I know nothing about Mr. Johnston's personal affairs."

147.    Later on July 26, 2004, the Trustee wrote to Beharrell, "The purpose is to clarify whether or not you have provided full disclosure of your files to Statek as we think that may not be the case. With regard to the bankrupt's personal affairs, we have evidence showing that you were involved in his personal affairs and we wish to discuss those with you as well."

148.    In response, Beharrell stated, "I'm afraid you are mistaken and I don't want to waste a trip to Euston. If you wish to meet me here, that will be OK and we will establish a time that suits."

149.   On July 28, 2004, the Trustee followed up with Beharrell by email to confirm his availability for an interview on August 12, 2004.

150.   On August 9, 2004, Beharrell confirmed his availability for the interview on August 12, 2004.  With the interview imminent, Beharrell finally admitted to providing legal advice to Johnston, in his personal capacity.  Specifically, Beharrell wrote:

> In light of your letter, since I did not recall doing any personal work for Fred Johnston, other than Statek setting up his Chelsea flat, I called David Alford, who introduced me to him, to ask him if he recalled us doing personal work for him.  He reminded me that we had helped set up a Jersey Trust, called the 1990 No. 1 Trust.  I have had our records searched under that name and found a file, which I am sending to you.  It appears the trust was closed in 1995.  There is reference to a safe deposit and a Bahamian property, but I have no knowledge of what happened to these.  If you'd like to defer the meeting until you've had a chance to review the file, that will be OK, as I expect to be here most of August. I will also send over our Ledger account for Statek.  We have none for Johnston or the trust.

151.   Coudert produced the 1990 No. 1 Trust file to the Trustee under cover letter dated August 9, 2004.  In that letter, Beharrell states, "For completeness I am also enclosing the correspondence related to my involvement in March 1995 in the attempted settlement of Mr. Vandel's [sic] claims against Mr. Johnston, since that appears to have involved advising Fred Johnston in his personal capacity as well as the Company."

152.   The Trustee hastily reviewed the newly disclosed files and proceeded with the interview of Beharrell on August 12, 2004.

153.   In a follow up letter to Beharrell, the Trustee wrote:

> In your letter dated 22 January 2003 you stated that Coudert Brothers "did not assist the bankrupt personally, but only in his capacity as an officer of Statek" and by e-mail to Miles Ripley dated 26 July 2004 you said "I never advised

-27-

S-812

Mr. Johnston – only Statek". However, your e-mail of 9 August 2004 suggests that Mr. David Alford reminded you that you had undertaken personal work for Mr. Johnston and your letter of 9 August 2004 encloses files which "appears to have involved advising Fred Johnston in his personal capacity as well as [Statek]". I am therefore unclear as to whether you acted for just Statek or Statek and the bankrupt.

154.    On October 12, 2004, Beharrell responded to the Trustee as follows:

I cannot add anything to what I already previously told you. Any work done for Mr. Johnston was minor and incidental; it seems to have been, in practice, introducing him to David Morgan's law firm. Any retainer letters etc. would have been in the files you have. I doubt that anything would have been sent to Fred Johnston for what was a personal courtesy incidental to the corporate work. We had no separate terms of business at the time.

155.    From January, 1996 through August, 2004, Coudert concealed the comprehensive and extensive services that it provided to Johnston, in his personal capacity.

156.    Coudert's concealment of the work it performed for Johnston, personally, aided Johnston's defalcation scheme by hindering the ability of Statek and the Trustee to discover and to recover assets that Johnston had diverted from Statek and TCI II and had hidden throughout the world.

**Improper Transfer Of Statek Funds From Coudert Trust Account**

157.    Coudert's "Transaction Statement for Statec's [sic] Account" indicates that Coudert transferred $43,557.47 in Statek funds from Coudert Brothers General US Dollar Account by check number 53105140 dated May 12, 1995. That check cleared Coudert's account on May 31, 1995.

158.    Neither Statek nor the Trustee has been able to account for the $43,557.47 payment.

159.    Statek did not receive the payment from Coudert.

-28-

S-813

160.   Coudert has failed to identify the recipient of the May 31, 1995 payment.

## COUNT I (Fraud)

1-160.   Statek and TCI II incorporate Paragraphs 1 through 160 into Count I as though fully set forth herein.

161.   In connection with its work for Johnston, in his personal capacity, Coudert knowingly participated in and facilitated Johnston's defalcation scheme.

162.   Johnston and Spillane conspired with Coudert to defraud Statek and TCI II.

163.   As the Delaware Court found in the Fraud and Waste Action, Johnston and Spillane wrongfully diverted funds from TCI II and Statek in the total amount of $30,314,271.00. See Fraud and Waste Decision, attached hereto and made a part hereof as Exhibit C.

164.   Coudert actively participated in Johnston's scheme to loot TCI II and Statek by (a) creating the legal framework and strategy that allowed Johnston and Spillane to divert the assets from TCI II and Statek, (b) providing direct assistance to Johnston and Spillane in connection with the diversion of assets from TCI II and Statek and (c) playing a key role in covering up and concealing the diverted assets and the fraudulent activity from Statek, TCI II, Vendel and the Trustee.

165.   Coudert's actions violate New York Lawyer's Code of Professional Responsibility DR 7-102, which prohibits law firms and their attorneys from counseling or assisting a client in conduct that they know to be illegal or fraudulent.

S-814

166.    The Second Delaware Judgment remains unsatisfied and, with statutory interest, exceeds $75 million.

### COUNT II (Breach of Fiduciary Duty)

1-160.  Statek incorporates Paragraphs 1 through 160 into Count II as though fully set forth herein.

161.    From 1990 through 1996, Coudert represented Statek.

162.    By virtue of the attorney-client relationship between Coudert and Statek, Coudert owed Statek a duty of loyalty and honesty, including the duty to avoid representations that would create a conflict of interest with respect to Coudert's representation of Statek.  New York Lawyer's Code of Professional Responsibility, DR 5-105.

163.    Coudert also owed Statek a duty not to "[p]rejudice or damage the client during the course of the professional relationship." New York Lawyer's Code of Professional Responsibility, DR 7-101.

164.    While representing Statek, Coudert also advised Johnston, personally, on numerous legal matters, including the diversion and secretion of assets from Statek.  The work performed by Coudert for Johnston, individually, created a conflict of interest with respect to Coudert's representation of Statek.

165.    Coudert issued dummy bills to Statek and collected payment from Statek to cover all work performed by Coudert for Johnston, in his personal capacity.

-30-

S-815

166.    In connection with its work for Johnston, personally, Coudert knowingly participated in and facilitated Johnston's defalcation scheme, including the theft of assets from Statek.

167.    As the Delaware Court found in the Fraud and Waste Action, Johnston and Spillane wrongfully diverted funds from TCI II and Statek in the total amount of $30,314,271.00. <u>See</u> Fraud and Waste Decision, attached hereto and made a part hereof as Exhibit C.

168.    As an active participant in Johnston's scheme to loot TCI II and Statek, Coudert created the legal framework and strategy that allowed Johnston and Spillane to divert the assets from TCI II and Statek, provided direct assistance to Johnston and Spillane in connection with the diversion of assets from TCI II and Statek and played a key role in the cover up and concealment of their actions from Statek, TCI II, Vendel and the Trustee.

169.    Coudert participated in Johnston's and Spillane's fraud and theft of Statek funds at the same time that it represented Statek in various corporate matters.

170.    Coudert had a duty to withdraw from the representation of both Statek and Johnston or to disclose the conflict of interest to both Statek and Johnston.  New York Lawyer's Code of Professional Responsibility, DR 5-105.

171.    Coudert neither withdrew from the representation of Statek and Johnston nor disclosed to Statek and Johnston the conflict of interest.

172.    Coudert breached its fiduciary duty to Statek by providing legal services to Johnston, personally, adverse to the interests of Statek, by billing Statek for those services and by failing to disclose to Statek the conflict of interest.

41609886.6 089544-00000
October 27, 2005 11 77 AM

-31-

S-816

173.   Coudert's failure to disclose the conflict of interest prevented Statek and TCI II from discovering Johnston's defalcation scheme and caused Statek and TCI II to suffer losses as a result of that scheme.

174.   Coudert is liable to Statek for damages arising from Coudert's breach of fiduciary duty to Statek including, but not limited to, joint and several liability for the full amount of the Second Delaware Judgment, disgorgement of all fees paid to Coudert by Statek, the value of Johnston's collection of art, stamps and collectibles, all funds deposited with Coudert by Statek, Johnston, Spillane or any affiliates of Statek, Johnston and/or Spillane and the value of all assets deposited in the 1990 No. 1 Trust or other asset protection vehicles on which Coudert advised Johnston.

## COUNT III (Legal Malpractice)

1-160.   Statek incorporates Paragraphs 1 through 160 into Count III as though fully set forth herein.

161.   From 1990 through 1996, Coudert represented Statek.

162.   By virtue of the attorney-client relationship between Coudert and Statek, Coudert owed Statek a duty of care, including the duty to avoid representations that would create a conflict of interest with respect to Coudert's representation of Statek.  New York Lawyer's Code of Professional Responsibility, DR 5-105.

163.   Coudert also owed Statek a duty not to "[p]rejudice or damage the client during the course of the professional relationship."  New York Lawyer's Code of Professional Responsibility, DR 7-101.

41609886.6 089544-00000
October 28, 2005 10:57 AM

-32-

S-817

164.    While representing Statek, Coudert also advised Johnston, personally, on numerous legal matters, including the diversion and secretion of assets from Statek. The work performed by Coudert for Johnston, individually, created a conflict of interest with respect to Coudert's representation of Statek.

165.    Coudert issued dummy bills to Statek and collected payment from Statek to cover all work performed by Coudert for Johnston, in his personal capacity.

166.    In connection with its work for Johnston, personally, Coudert knowingly participated in and facilitated Johnston's defalcation scheme, including the theft of assets from Statek.

167.    As the Delaware Court found in the Fraud and Waste Action, Johnston and Spillane wrongfully diverted funds from TCI II and Statek in the total amount of $30,314,271.00. See Fraud and Waste Decision, attached hereto and made a part hereof as Exhibit C.

168.    As an active participant in Johnston's scheme to loot TCI II and Statek, Coudert created the legal framework and strategy that allowed Johnston and Spillane to divert the assets from TCI II and Statek, provided direct assistance to Johnston and Spillane in connection with the diversion of assets from TCI II and Statek and played a key role in the cover up and concealment of their actions from Statek, TCI II, Vendel and the Trustee.

169.    Coudert participated in Johnston's and Spillane's fraud and theft of Statek funds at the same time that it represented Statek in various corporate matters.

S-818

170.    Coudert had a duty to withdraw from the representation of both Statek and Johnston or to disclose the conflict of interest to both Statek and Johnston.  New York Lawyer's Code of Professional Responsibility, DR 5-105.

171.    Coudert neither withdrew from the representation of Statek and Johnston nor disclosed to Statek and Johnston the conflict of interest.

172.    By providing legal services to Johnston, in his personal capacity, adverse to the interests of Statek, by billing Statek for those services and by failing to disclose to Statek the conflict of interest, Coudert failed to exercise the care, skill and diligence commonly exercised by members of the legal profession.

173.    By providing legal services to Johnston, in his personal capacity, adverse to the interests of Statek, by billing Statek for those services and by failing to disclose to Statek the conflict of interest, Coudert prevented Statek and TCI II from discovering Johnston's defalcation scheme and caused Statek and TCI II to suffer losses as a result of that scheme.

174.    Coudert is liable to Statek for damages arising from Coudert's breach of the duty of care to Statek including, but not limited to, joint and several liability for the full amount of the Second Delaware Judgment, disgorgement of all fees paid to Coudert by Statek, the value of Johnston's collection of art, stamps and collectibles, all funds deposited with Coudert by Statek, Johnston, Spillane or any affiliates of Statek, Johnston and/or Spillane and the value of all assets deposited in the 1990 No. 1 Trust or other asset protection vehicles on which Coudert advised Johnston.

41609886 6 089544-00000
October 27, 2005 11 37 AM

-34-

S-819

## COUNT IV (Fraudulent Concealment)

1-160. Statek and TCI II incorporate Paragraphs 1 through 160 into Count IV as though fully set forth herein.

161.   From 1990 through 1996, Coudert represented Statek.

162.   While representing Statek, Coudert also advised Johnston, personally, on numerous legal matters including the diversion and secretion of assets from Statek and TCI II.

163.   In connection with its work for Johnston, personally, Coudert knowingly participated in and facilitated Johnston's defalcation scheme, including the theft of assets from Statek and TCI II.

164.   As the Delaware Court found in the Fraud and Waste Action, Johnston and Spillane wrongfully diverted funds from TCI II and Statek in the total amount of $30,314,271.00. See Fraud and Waste Decision, attached hereto and made a part hereof as Exhibit C.

165.   As an active participant in Johnston's scheme to loot TCI II and Statek, Coudert created the legal framework and strategy that allowed Johnston and Spillane to divert the assets from TCI II and Statek, provided direct assistance to Johnston and Spillane in connection with the diversion of assets from TCI II and Statek and played a key role in the cover up and concealment of their actions from Statek, TCI II, Vendel and the Trustee.

166.   At all times, Coudert was aware of the work it had done for Johnston, in his personal capacity, and of its facilitation of, participation in and concealment of Johnston's defalcation scheme.

S-820

167.    Despite requests by Statek as early as 1996, Coudert routinely denied having represented Johnston in his individual capacity.  In addition, despite specific requests by Statek for files regarding Coudert's representation of Statek and its affiliates, Coudert failed to turn over any documents related to any work performed for Johnston, personally.

168.    As an explanation for the lack of documents, Poster indicated in an August 14, 1996 letter to Statek that "very little written work was ever done [by Coudert for Statek and any subsidiaries and/or affiliates]...."

169.    As late as 2004, when asked by the Trustee for documents related to Johnston, Coudert denied representing Johnston in his personal capacity and failed to turn over documents concerning the representation.

170.    Coudert intentionally delayed production of files and disclosure of information to Statek and the Trustee regarding Coudert's representation of Johnston, personally, in order to further aid Johnston in the cover up of the fraud and theft and to assist Johnston in his efforts to avoid payment of the Second Delaware Judgment.

171.    In late 2004, Coudert finally admitted representing Johnston, individually.  At that time, Coudert finally turned over documents to the Trustee with regard to that representation.

172.    As a result of Coudert's almost nine-year delay in revealing its representation of Johnston, personally, the Second Delaware Judgment remains unsatisfied and, with statutory interest, exceeds $75 million.

S-821

## COUNT V (Negligence)

1-160.   Statek incorporates Paragraphs 1 through 160 into Count V as though fully set forth herein.

161.   From 1990 through 1996, Coudert represented Statek.

162.   In connection with its representation of Statek, Coudert received funds from Statek and held those funds in a trust account for the benefit of Statek.

163.   By check dated May 12, 1995, Coudert transferred $43,557.47 in funds held in trust for Statek.

164.   Statek never received the $43,557.47 transfer.

165.   Despite countless demands by Statek, Coudert has been unable to account for the $43,557.47 transfer and has been unable to identify the recipient of that transfer.

166.   Coudert had a duty to maintain complete records of all Statek funds in its possession and to render accounts to Statek regarding those funds.  New York Lawyer's Code of Professional Responsibility, DR 9-102.

167.   By failing to account to Statek for the $43,557.47 transfer, Coudert breached its duty to Statek.

168.   By breaching its duty to account to Statek for the $43,554.47 transfer, Coudert caused Statek to suffer damages in the amount of $43,557.47.

S-822

WHEREFORE, Statek and TCI II requests the following relief:

1.   An accounting of all fees billed to and/or paid for by Statek;

2.   An accounting of all money paid to Coudert on account of Statek, held by Coudert on account for Statek and/or paid out by Coudert on account of Statek;

3.   An accounting of all money paid to Coudert on account of Johnston, held by Coudert on account for Johnston and/or paid out by Coudert on account of Johnston;

4.   An accounting of all money paid to Coudert on account of Spillane, held by Coudert on account for Spillane and/or paid out by Coudert on account of Spillane.

5.   Compensatory damages;

6.   Disgorgement of all legal fees paid to Coudert by Statek;

7.   Legal fees, costs and expenses;

8.   Punitive damages; and

*- Remainder of Page Intentionally Left Blank -*

-38-

S-823

9.    Other legal and equitable relief, as the Court deems appropriate.

STATEK CORPORATION and
TECHNICORP INTERNATIONAL II, INC.

By _____
Joshua W. Cohen
Day, Berry & Howard LLP
One Audubon Street
New Haven, CT  06511

James J. Tancredi
John B. Nolan
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499
(860) 275-0100
(860) 275-0343 (fax)
Juris No. 14229
Their Attorneys

S-824

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATEK CORPORATION, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | 3:07-CV-00456 (SRU) |
| | : | |
| vs. | : | |
| | : | JURY TRIAL DEMANDED |
| COUDERT BROTHERS LLP, | : | |
| | : | |
| Defendant. | : | AUGUST 29, 2008 |

## AMENDED COMPLAINT

Statek Corporation, for its Amended Complaint, herein alleges as follows:

## THE PARTIES

1.      The plaintiff, Statek Corporation ("Statek"), is a California corporation engaged in the manufacture of leading edge micro-electronic components, such as ultra-miniature quartz crystals, oscillators and sensors.

2.      Statek is a wholly-owned subsidiary of Technicorp International II, Inc. ("TCI II"), a Delaware corporation that owns 100% of the shares of Statek.

3.      The defendant, Coudert Brothers, LLP ("Coudert"), was an international law firm headquartered in New York with offices in London and other cities throughout the world that filed a Chapter 11 bankruptcy petition on September 22, 2006.  At all times, Coudert operated as one worldwide integrated firm and partnership .  The liabilities of the various offices were liabilities of Coudert.

## JURISDICTION AND VENUE

4.      Jurisdiction is conferred on this Court by virtue of 28 U.S.C. §1334, as it is related to a case under title 11, *In re Coudert Brothers LLP*, Case No. 06-12226 (Bankr. S.D.N.Y.) (RDD) (the "Bankruptcy Case").

5.      In connection with the Bankruptcy Case, Statek and TCI II filed a proof of claim (Claim No. 00239) on January 30, 2007, in the approximate amount of $85,000,000.00 (the "Bankruptcy Claim").

6.      Coudert, as debtor-in-possession in the Bankruptcy Case, has disputed the Bankruptcy Claim.

7.      The Bankruptcy Claim remains unliquidated.

8.      On August 20, 2008, the United States Bankruptcy Court for the Southern District of New York confirmed Coudert's First Amended Plan of Liquidation (the "Plan") in the Bankruptcy Case.  Under the Plan, claims and interests are divided into seven classes, including Class 3 Insured Malpractice Claims and Class 4 General Unsecured Claims.

9.      When the Bankruptcy Claim is liquidated, Statek will have a claim entitled to distribution in some combination of Class 3 and Class 4 under the Plan.

10.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a)(3).

## FACTUAL BACKGROUND

11.     On January 5, 1996, the Delaware Court of Chancery (the "Delaware Court") rendered a decision, pursuant to Section 225 of the Delaware General Corporation Law, determining that Hans Frederick Johnston ("Johnston") and his associate Sandra Spillane ("Spillane") were not the lawful directors of Statek's parent, TCI II.  Arbitrium (Cayman Islands) Handels AG v. Johnston, No. 13056, 1996 Del. Ch. LEXIS 1 (Del. Ch. Jan. 5, 1996) (the

S-826

"Section 225 Decision").  A copy of the Section 225 Decision is attached hereto as Exhibit A and incorporated herein by reference.

12.     In the Section 225 Decision, the Delaware Court found that Johnston and Spillane had engaged in a pattern of deception, which included "misleading [the Delaware Court] and other courts," and concealing from the lawful director of TCI II payments by TCI II and Statek to themselves "of almost $ 6 million in undocumented, interest free 'loans,' between 1984 and 1992." Id. at *43, 47.

13.     Thereafter, the lawful director of TCI II caused Johnston and Spillane to be removed from their positions as directors and officers of Statek.

14.     On or about June 26, 1996, Statek and TCI II commenced an action in the Delaware Court against Johnston, Spillane and a series of entities owned or controlled by them (the "Johnston Entities") based on claims of fraud, breach of fiduciary duty and corporate waste (the "Fraud and Waste Action").

15.     In the Fraud and Waste Action, Statek proved that, from 1984 until they were removed as corporate officers and directors, Johnston and Spillane had exclusively managed and controlled TCI II and Statek, including all access to the companies' cash and corporate records.

16.     In the Fraud and Waste Action, Statek proved that, during that time, Johnston and Spillane had systematically looted TCI II and Statek, treating the corporate assets as their private preserve.

17.     In the Fraud and Waste Action, Statek proved that Johnston and Spillane had lived like jet-setting potentates.  They had traveled extensively and lavishly in the United States, in the Bahamas, and throughout Western Europe, all at the expense of Statek and TCI II, while

S-827

keeping the corporate books and records in such way as to minimize, if not altogether avoid, the risk of being held accountable.

18.     On May 31, 2000, after almost four years of bitter and protracted litigation and a trial on the merits, the Delaware Court issued an opinion finding that Johnston and Spillane had wrongfully diverted $10,501,329.00 from TCI II and $19,812,942.00 from Statek. Technicorp Int'l II, Inc. v. Johnston, No. 15084, 2000 Del. Ch. LEXIS 81, at *186 (Del. Ch. May 31, 2000) (the "Fraud and Waste Decision").  A copy of the Fraud and Waste Decision is attached hereto as Exhibit B and is incorporated herein by reference.

19.     As the Delaware Court noted, "[t]he task of proving those diversions was daunting, because many of the expenditures were either inadequately documented or not documented at all."  Id. at *4.

20.     While the evidentiary burden was daunting, the proof clearly demonstrated that Johnston and Spillane, corporate fiduciaries, had caused Statek to pay millions of dollars to themselves, to the Johnston Entities and to third parties, including David Alford ("Alford"), a British citizen and long-time friend of Johnston.

21.     What was far less clear was where the money had gone.  As the Delaware Court noted, "Mrs. Spillane moved money in huge amounts to Johnston [Entities] and back to Statek and back out of Statek, with an elan and skill of a drug cartel consigliere.  This money moves at the speed of light and in huge amounts."  Id. at *76.

22.     Statek prevailed, however, because Johnston and Spillane could not establish a legitimate business purpose for the vast majority of the challenged expenditures.

23.     On September 7, 2000, the Delaware Court entered judgment, jointly and severally, against Johnston, Spillane and the Johnston Entities for wrongful diversion of funds

-4-

S-828

from TCI II and Statek in a total amount of $30,314,271.00.  Technicorp Int'l II, Inc. v. Johnston, No. 15084 (Del. Ch. Sept. 7, 2000) (implementing order).

24.    In the Fraud and Waste Decision, the Delaware Court remarked that, "if past is prologue, it is predictable that [Johnston and Spillane] will attempt to delay and obstruct the plaintiffs' efforts to collect the judgment, including not voluntarily disclosing the whereabouts of domestic and offshore bank accounts into which Statek and TCI II assets were on deposit, as well as the whereabouts of other corporate assets." Technicorp Int'l II, Inc. v. Johnston, No. 15084, 2000 Del. Ch. LEXIS 81, at *207.

25.    Starting in 1996 and continuing to the present day, Statek has devoted significant time and expense to seeking to discover the whereabouts of domestic and offshore bank accounts into which Statek assets were on deposit, as well as the whereabouts of other corporate assets, and to recover the loss suffered by Statek.

26.    In 1996, Statek identified Coudert as a law firm that Johnston and Spillane had retained in London to provide services that were billed to Statek and paid for with Statek funds (the "Statek services").

27.    On January 15, 1996, Statek's counsel sent Coudert a copy of the Section 225 Decision, requested certain information from Coudert and instructed Coudert not to transfer any funds it was holding for Statek without proper authorization.

28.    On July 12, 1996, Statek notified Coudert that Statek had commenced an action against Johnston and Spillane seeking $22 million for fraud and theft.  Statek asked Coudert to provide information and a complete copy of the files arising out of and relating to the services Coudert had rendered (the "Statek files").

S-829

29.     Coudert provided information to Statek, and, after months of delay, sent Statek six files related to the services it had rendered in setting up a subsidiary known as Statek Europe Limited and in assisting with the lease and operation of an apartment in London that was used by Johnston.

30.     Coudert confirmed that it had no other Statek files or information about other Statek services it had rendered.

31.     Contrary to the confirmation it provided to Statek, Coudert had additional Statek files and information about other Statek services it had rendered, including:

(a)     the formation of one or more asset protection trusts in Jersey, Channel Islands, and elsewhere, which were used by Johnston and Spillane to divert and conceal funds misappropriated from Statek;

(b)     assistance in setting up a bank account and arranging for safe deposit boxes in the name of one of the asset protection trusts, the 1990 No. 1 Trust;

(c)     advice related to a house in Nassau, Bahamas, that Johnston and Spillane had purchased and renovated using funds misappropriated from Statek; and

(d)     advice and assistance related to purchasing, shipping and storing art and stamps that Johnston and Spillane acquired using funds misappropriated from Statek.

32.     The additional Statek files also contained information showing that Alford, who was the recipient of substantial funds misappropriated from Statek, was a trustee of the 1990 No. 1 Trust, a signatory on the related bank account and a holder of the keys to the related safe deposit boxes.

S-830

33.      The additional Statek files also showed that Alford held 995 of the 1000 shares, in trust for the benefit of Johnston, in a corporation known as Beverley Lane Limited, which held title to the Bahamas house.

34.      The additional Statek files also showed that Alford had been a director of Statek.

35.      More than any other individual, Alford assisted Johnston and Spillane in carrying out and concealing their fraudulent schemes.

36.      For reasons unknown to the plaintiff, Coudert did not provide Statek with complete and accurate information about the Statek services or the contents of all of its Statek files either when first requested in July 1996 or at any time since.

37.      Moreover, Coudert has never accounted for all of the Statek funds that it disbursed out of its General US Dollar Account in London.

38.      On or about July 11, 2002, Statek and two other judgment creditors of Johnston filed a petition (the "Bankruptcy Petition") with the Supreme Court of the Judicature of England and Wales in the United Kingdom of Great Britain (the "Foreign Court"), pursuant to the United Kingdom's Insolvency Act of 1986 (the "Insolvency Act"), requesting the Foreign Court to enter a Bankruptcy Order against Johnston.

39.      On or about September 27, 2002, the Foreign Court issued a Bankruptcy Order against Johnston (the "Bankruptcy Order"), adjudging Johnston bankrupt.

40.      On or about October 2, 2002, the Foreign Court appointed Nicholas Stewart Wood (the "Trustee") as the trustee of Johnston's bankruptcy estate pursuant to the Insolvency Act.

41.      The Trustee's responsibility is to investigate the assets, liabilities and financial affairs of Johnston.

S-831

42.     By letter to Coudert dated October 22, 2002, the Trustee sought files and documents from Coudert related to Johnston and to any assets that should be included in Johnston's bankruptcy estate.

43.     In a letter dated November 4, 2002, Coudert denied having done any work for Johnston, individually, and referred the Trustee to the six files that Coudert had previously produced to Statek. In that letter, however, Coudert revealed that it had information concerning an art collection: "The only papers relevant to Mr. Johnston which I have found in our residual file appear to be a folder of papers relating to an art collection he wanted to bring to Europe. I am enclosing copies of all the papers related to that matter."

44.     On December 12, 2002, the Trustee wrote to Coudert and stated, "It is my understanding that you assisted the bankrupt [Johnston] with numerous affairs and I shall therefore be grateful if you would provide me with copies of your fee notes in relation to the Bankrupt and Statek in order that I can establish the exact nature of the advice provided."

45.     On January 22, 2003, Coudert responded to the Trustee's December 12, 2002, letter as follows: "We did not assist the bankrupt personally, but only in his capacity as an officer of Statek. We never issued any fee notes to him. As to the Statek fee notes, I do not think you are entitled those without Statek's approval. In any event, Statek is, I believe, your major creditor and they have all the files and fee notes themselves."

46.     On June 11, 2003, the Trustee commenced an ancillary bankruptcy proceeding against Johnston in the United States Bankruptcy Court for the District of Connecticut (the "Ancillary Proceeding") pursuant to Section 304 of the United States Bankruptcy Code.

47.     In connection with the Ancillary Proceeding and his efforts to discover and identify Johnston's assets, the Trustee sought information and documentation from a broad group

-8-

S-832

of individuals and entities located in the United States pursuant to Federal Rule of Bankruptcy
Procedure 2004.

48.     In the spring of 2004, as part of his discovery efforts in the Ancillary Proceeding,
the Trustee served subpoenas upon Coudert and Steven R. Beharrell ("Beharrell"), a partner in
the firm.  From 1990 to 1996, Beharrell was resident in Coudert's London office and the partner
in charge of the work done for Statek.  In 2001, Beharrell moved to Coudert's New York office,
where he served for a time as the chairman of the firm.

49.     In response to the subpoenas, Coudert produced documents to the Trustee related
to Statek Europe Limited and the London apartment, some, but not all, of which had been
provided to Statek in 1996.

50.     Beharrell did not produce any documents and failed to appear for a deposition
requested in the subpoena served on him.  At some point in 2004, Beharrell returned to Coudert's
London office.

51.     On July 26, 2004, the Trustee wrote to Coudert, questioning whether it had
"provided full disclosure of your files to Statek as we think that may not be the case.  With
regard to the bankrupt's personal affairs, we have evidence showing that you were involved in
his personal affairs and we wish to discuss those with you as well."

52.     On August 9, 2004, Coudert disclosed, for the first time, that it had worked with
Alford to set up the 1990 No. 1 Trust.  Coudert indicated that it had searched its records and
found a file concerning the 1990 No. 1 Trust, which it then sent to the Trustee.  Coudert also
disclosed that there were "references" in the file to a safe deposit box and a Bahamian property.

53.     On August 12, 2004, the Trustee conducted an interview of Beharrell.

S-833

54.     Beharrell told the Trustee that it was "surprising" that the documents provided on August 9, 2004, had not been found and produced earlier.  Beharrell told the Trustee that the file regarding the 1990 No. 1 Trust "should have appeared long, long ago and it's very odd to me why it didn't."  Beharrell agreed that the information about the 1990 No. 1 Trust, which was never provided to Statek, "certainly would have been useful in 1996" when it was first requested.

55.     The Trustee provided Statek with copies of the Statek files it received from Coudert and a copy of the transcript of his interview with Beharrell.

56.     Based on the documents and information it received from the Trustee, as well as additional information it received from other sources, Statek commenced this action.

57.     Statek also commenced an action against Alford in the High Court of England and Wales (Chancery Division) (the "High Court").

58.     On January 17, 2008, the High Court rendered a Judgment against Alford for dishonestly assisting in the misappropriation of the assets of Statek.  A copy of that Judgment, Statek Corp. v. Alford, [2008] EWHC 32 (Ch) (17 January 2008), is attached hereto as Exhibit C and is incorporated herein by reference.

59.     The High Court cited as critical evidence supporting the Judgment: "the setting up of the secret No. 1 Trust, the passing of substantial sums of Statek's money to accounts controlled by Mr Alford to *'take them out of the normal banking system'* for reasons which don't bear examination by any remotely intelligent businessman, and the opening of safe deposit boxes for the use of Johnston but in the name of Alford, to name but the most obvious."  Id. at 19-20, Findings, ¶ 95.

-10-

S-834

## BREACH OF PROFESSIONAL AND FIDUCIARY DUTIES

60.     Coudert owed professional and fiduciary duties to its client Statek to act in Statek's best interests, to provide Statek with all of the Statek files, to disclose to Statek all of the information of which it was aware about Statek's matters and the Statek services and to account for Statek's funds that it disbursed from its accounts.

61.     Coudert breached and continues to breach its professional and fiduciary duties to its client Statek by failing to act in Statek's best interests, failing to provide Statek with all of the Statek files, failing to disclose to Statek all of the information of which it was aware about Statek's matters and the Statek services and failing to account for Statek's funds that it disbursed from its accounts.

62.     Statek has been damaged by Coudert's breach of its professional and fiduciary duties in that:

(a)     Statek has been hindered, delayed and frustrated in its ability to discover and recover assets that Johnston and Spillane had misappropriated from Statek and had hidden throughout the world;

(b)     Statek has incurred greater costs and expenses in its efforts to discover and recover assets that Johnston and Spillane had misappropriated from Statek and had hidden throughout the world; and

(c)     Statek has been hindered, delayed and frustrated in its ability to adduce the evidence necessary to bring an action and to obtain and enforce a judgment against Alford.

63.     Had Coudert discharged its professional and fiduciary duties to Statek, Statek would have recovered more money and saved significant costs and expenses, thereby providing

S-835

Statek with additional capital with which it could have and would have expanded its operations, increased its profits and enhanced the value of the company.

WHEREFORE, Statek requests the following relief:

a.      Damages;

b.      Interest;

c.      Costs;

d.      An accounting for all fees billed to and/or paid for by Statek;

e.      An accounting for all money paid to Coudert on account of Statek, held by Coudert for Statek and/or paid out by Coudert on account of Statek;

f.      Such other and further legal and equitable relief, including punitive damages and attorneys' fees and expenses, as the Court deems appropriate based on the findings of fact and conclusions of law.

<div style="text-align:center">STATEK CORPORATION</div>

By   /s/ Kenneth W. Ritt
     Kenneth W. Ritt (ct05982)
     Day Pitney LLP
     One Canterbury Green
     Stamford, Connecticut 06901-2047
     (203) 977-7300
     (203) 977-7301 (fax)
     kwritt@daypitney.com

     James J. Tancredi (ct06819)
     Erick M. Sandler (ct25029)
     Day Pitney LLP
     242 Trumbull Street
     Hartford, Connecticut 06103-1212
     (860) 275-0100
     jtancredi@daypitney.com
     emsandler@daypitney.com

S-836

Joshua W. Cohen (ct14731)
Day Pitney LLP
One Audubon Street
New Haven, Connecticut 06511
(203) 752-0500
jwcohen@daypitney.com

Its Attorneys

### CERTIFICATION

I hereby certify that on August 29, 2008, a copy of the foregoing Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<div align="right">

   /s/ Kenneth W. Ritt
Kenneth W. Ritt

</div>

S-838